IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION
ASSOCIATION; AMERICAN ASSOCIATION FOR
STATE AND LOCAL HISTORY; ASSOCIATION
OF NATIONAL PARK RANGERS; COALITION
TO PROTECT AMERICA'S NATIONAL PARKS;
SOCIETY FOR EXPERIENTIAL GRAPHIC
DESIGN; UNION OF CONCERNED SCIENTISTS,

Case No. 26-cv-10877

**AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

*Plaintiffs,*

v.

U.S. DEPARTMENT OF THE INTERIOR; DOUG
BURGUM, in his official capacity as Secretary of the
Interior; NATIONAL PARK SERVICE; JESSICA
BOWRON, in her official capacity as the Official
Exercising the Delegated Authority of the Director,

*Defendants.*

## INTRODUCTION

1.      For over 150 years, Congress has entrusted the federal government to operate the

national parks—including natural wonders, battlefields, sacred Indigenous grounds, sites

memorializing and commemorating this country's history of slavery and the Civil Rights

movement, and other places of historical significance—"for the benefit and enjoyment of the

people."[1] But the federal government has now betrayed that trust by mounting a sustained

campaign to erase history and undermine science, so the parks no longer "reflect different cultural

---

[1] 16 U.S.C. § 21; *see also* 54 U.S.C. § 100101(b)(1)(C) (mandating that the parks be managed
"for the benefit and inspiration of all the people of the United States").

backgrounds, ages, education, gender, abilities, ethnicity, and needs" or "reflect current scientific and academic research."[2]

2.      That campaign escalated in recent weeks, as the National Park Service, implementing an order of the Secretary of the Interior, tore down the exhibit in Philadelphia's Independence National Historical Park memorializing the legacy of people enslaved by the country's first President; ripped away signage detailing climate threats at Fort Sumter, one of the country's most environmentally endangered parks; and wiped away descriptions of history and science at countless national parks throughout the United States.

3.      The legacy of the national parks as a shared, invaluable, natural and cultural resource for all people goes back to their earliest days. Dedicating an arch to mark the entrance to the country's first national park in 1903, President Theodore Roosevelt recognized the parks' crucial role in democracy in the United States: "I cannot too often repeat that the essential feature in the present management of the Yellowstone Park, as in all similar places, is its essential democracy—it is the preservation of the scenery, of the forests, of the wilderness life and the wilderness game for the people as a whole, instead of leaving the enjoyment thereof to be confined to the very rich who can control private reserves."

4.      Just over 30 years after the dedication at Yellowstone, President Franklin D. Roosevelt reiterated the same sentiment, noting: "There is nothing so American as our national parks.… The fundamental idea behind the parks … is that the country belongs to the people, that it is in the process of making for the enrichment of the lives of all of us."

5.      Congress has reiterated these principles time and again, mandating that the parks be "managed for the benefit and inspiration of all the people of the United States"[3] and exist for

---

[2] 54 U.S.C. §§ 100803, 100802.
[3] *Id.* § 100101(b)(1)(C).

"the common benefit of all the people of the United States."[4] Just ten years ago, Congress affirmed that the parks play a critical role in the "shared heritage" of democracy in the United States; must "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs"; must "use … a broad program of the highest quality interpretation and education"; and must "reflect current scientific and academic research."[5] And Congress has been clear that no action may be taken "in derogation of" this purpose "except as directly and specifically provided by Congress."[6]

6.      Yet the federal government is now ignoring these well-established principles and legal requirements as it seeks to erase from the national parks discussion of historic or scientific facts that this administration disfavors. President Trump explicitly acknowledged this goal—to remove "monuments, memorials, statues, markers, or similar properties" that do not adopt the administration's preferred perspective—in a March 2025 executive order.[7] Two months later, the Secretary of the Interior ordered that National Park Service employees should "immediately undertake" action to remove any such disfavored information by identifying and reporting it to the agency (the "Secretary's Order").[8]

7.      In the months since the Secretary's Order was issued, the Park Service has ramped up efforts to implement and enforce it. Maine's Acadia National Park, the only National Park[9] in

---

[4] *Id.* § 100101(b)(2).

[5] *Id.* §§ 100803, 100802.

[6] *Id.* § 100101(b)(2).

[7] Exec. Order 14253, *Restoring Truth and Sanity to American History* § 4(iii) (Mar. 27, 2025), https://perma.cc/RZJ5-BA9M ("Exec. Order"); *Dep't of Interior, SO 3431 - Restoring Truth and Sanity to American History* (May 20, 2025), https://perma.cc/72F3-6BHY ("Sec. Order") (quoting Exec. Order).

[8] Sec. Order § 5(a)(3). "Flag," or "flaggings" are used throughout this complaint to refer to the identification and reporting to agency leadership of any material that is allegedly inconsistent with the Secretary's Order.

[9] The National Park System includes 433 units or sites, which can be parks, battlefields, sites, memorials, monuments, trails, or recreation areas. Only 63 of the 433 are National Parks. Acadia

3

New England, saw some of the earliest flaggings and removals of interpretive materials to comply with the Secretary's Order. The removed signs discussed the impact of climate change on the park and the importance of Cadillac Mountain—known as a centerpiece of Acadia—to the Wabanaki people.[10] At the end of January and the beginning of February 2026, a rash of removals stripped historic and scientific information from parks across the United States.

8.      The orders and resulting implementation actions ignore Congress's mandate for how the parks must be managed; erase the history of countless people and communities from public spaces; limit the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impair the mission of the National Park Service to preserve the parks "for the enjoyment, education, and inspiration of this and future generations."[11]

9.      In violation of the Administrative Procedure Act ("APA"), the Department of the Interior and National Park Service decided to adopt and implement the Secretary's Order relying on improper factors, and without considering Congress's clear instructions; the effect on constituencies that help operate, maintain and visit the parks; the consequences on communities;

---

is the only National Park in New England of the 63. Throughout the remainder of the complaint, the terms "parks" or "sites" are used interchangeably to refer to any type of unit of the national park system, regardless of their particular designation, unless otherwise noted. The National Park Service maintains a listing of units, divided by type. *See* Nat'l Park Serv., *National Park System*, https://perma.cc/3TZV-9AQG (last visited Feb. 16, 2026).

[10] Four federally recognized tribes—Mi'kmaq Nation, Houlton Band of Maliseet Indians, Passamaquoddy Tribe, and Penobscot Nation—are collectively referred to as the Wabanaki Nations, or the "People of the Dawnland." Acadia lies in the heart of the Wabanaki homeland, where the Wabanaki people have lived for millennia. *See generally* Wabanaki Alliance, https://perma.cc/X5Q2-VYU7 (last visited Feb. 15, 2026); Nat'l Park Serv., Wabanaki Nations, https://perma.cc/GCD4-PUVM (last visited Feb. 16, 2026).

[11] Nat'l Park Serv., *About Us*, https://perma.cc/U85B-3EWE (last visited Jan. 7, 2026); *see also* 54 U.S.C. § 100101(a) (providing that the purpose of the National Park System units is "to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations").

or the long-term impact on the ability to preserve the parks for the unimpaired "enjoyment of future generations."

10.    Plaintiffs are organizations committed to protecting the national parks, preserving history, promoting access to high quality scientific information, and providing high quality interpretive materials—including exhibits, signs, brochures, and other educational materials—that bridge the gap between physical objects and human understanding for park visitors. They and their members—including avid users of America's national parks and historians whose research is being erased—have been injured by these actions and seek to ensure that the administration does not wash away history and science from what the National Park Service has recognized is "America's largest classroom." To prevent that result, Plaintiffs respectfully ask that this Court declare unlawful and vacate the Secretary's Order, require Defendants to cease all unlawful efforts to remove up-to-date and accurate historical or scientific information from the national parks, and order that interpretive materials that have been removed pursuant to the unlawful Order be restored.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, namely the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

12.    This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201–2202, the All Writs Act, and the Court's inherent equitable powers.

13.    Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1) because this action seeks relief against an agency of the United States and an officer of that agency

sued in their official capacity, and Plaintiff Union of Concerned Scientists is headquartered in this judicial district.

## PARTIES

14.    Plaintiff the National Parks Conservation Association ("NPCA") is a national nonprofit membership organization headquartered in Washington, D.C. Since NPCA was established in 1919, it has been a leading voice of the American people in protecting and enhancing our National Park System. With more than 1.9 million members and supporters nationwide and a network of more than two dozen programmatic locations in 11 regions, NPCA and its members and supporters work to protect and preserve the country's most iconic and inspirational places for present and future generations. As part of its work, NPCA advocates to ensure the National Park Service tells stories of all Americans—that includes stories of triumph and of tragedies; stories to celebrate and ones that Americans have a duty to never forget. NPCA brings this challenge on behalf of itself and its members.

15.    Plaintiff the American Association for State and Local History ("AASLH") is a 501(c)(3) organization whose mission is to provide leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs. For the better part of a century, AASLH has provided leadership and resources to its members who preserve and interpret American history, particularly state and local history, to make the past more meaningful to all people. Today, AASLH provides crucial resources, guidance, professional development, advocacy, new publications, field-wide research, and a sense of connectedness to more than 5,000 institutional and individual members, as well as leadership for history practitioners and history organizations nationally. It is the only comprehensive national organization dedicated to state and local history. AASLH is headquartered in Nashville, Tennessee. AASLH brings this challenge on

behalf of itself and its members.

16.     Plaintiff Association of National Park Rangers ("ANPR") is a 501(c)(3) nonprofit membership organization made up of nearly 800 members who are park professionals, park volunteers, retirees, and allies. ANPR was created to advocate for the National Park Service employees of all disciplines; to promote and enhance the professions, competence, and spirit of the National Park Service employees and to provide a forum for professional enrichment for them; and to support the lawful mission and management and the perpetuation of the National Park Service and the National Park System. Since 1977, ANPR has worked to foster a communication network across National Park Service employees to address common issues and maintain an esprit de corps across the parks. ANPR is incorporated in Washington, D.C., and is currently headquartered in Marana, Arizona.

17.     Plaintiff the Coalition to Protect America's National Parks ("Coalition") is a 501(c)(3) nonprofit organization made up of nearly 5,000 members, all of whom are current, former, and retired employees and volunteers of the National Park Service. Together, the Coalition's members have accumulated over 50,000 years of experience among them caring for America's most valuable natural and cultural resources. The Coalition's goal is to support the preservation and protection of the National Park System and the mission-related programs of the National Park Service to ensure the survival of the park system for generations to come. The Coalition's members are regular and avid users of the National Park System and Park Service programs, as well as the national forests and other public lands, for recreation and conservation activities. The Coalition is incorporated in Arizona and headquartered in Washington, D.C.

18.     Plaintiff Society for Experiential Graphic Design ("SEGD") is a 501(c)(3) nonprofit organization, founded in 1973, composed of approximately 2,000 graphic and exhibition

designers, fabricators, architects, media developers, creative technologists, students, and educators, who all share the common motivation of connecting people to place. SEGD's members interpret complex concepts into understandable language to create the wayfinding exhibits, interpretive panels, and other displays seen at national parks, museums, visitor centers, and countless other sites across the United States. Through its platform, core to its mission and values, SEGD strives to make spaces and environments more inclusive and intuitive, emotive and engaging, sustainable and shared. SEGD is headquartered in Washington, D.C.

19.    Plaintiff Union of Concerned Scientists ("UCS") is a 501(c)(3) not-for-profit membership organization composed of 610,000 supporters, including 23,000 scientists, economists, engineers, public health specialists, and other technical experts in the UCS Science Network. UCS puts rigorous, independent science into action, developing solutions and advocating for a healthy, safe, and just future. UCS represents the interests of the scientific community in advancing science in public policy, and advocates for the role of science and scientists in federal policymaking and in civil society, including by combating misinformation about science through public education. Through the UCS Center for Science and Democracy, UCS works to highlight the role of impartial, best available science in solving the nation's most critical problems, and to strengthen the overall partnership between science and democracy, with a focus on federal government agencies. The UCS Climate and Energy Program works to safeguard people, communities, and landscapes from the consequences of climate change, including through policy-relevant science and resources and development of science-backed, equitable solutions. UCS is headquartered in Cambridge, Massachusetts.

20.    Defendant Department of the Interior is an executive department of the United States and an agency within the meaning of the APA, headquartered in Washington, D.C.

8

21.     Defendant National Park Service ("Park Service" or "NPS") is a component of the Department of the Interior and an agency within the meaning of the APA, headquartered in Washington, D.C.

22.     Defendant Doug Burgum is the Secretary of the Interior. He is sued in his official capacity.

23.     Defendant Jessica Bowron is the Comptroller of the National Park Service, who is exercising the Delegated Authority of the Director of the National Park Service. She is sued in her official capacity.

## LEGAL AND ADMINISTRATIVE FRAMEWORK

24.     In 1872, when Congress created the first national park—Yellowstone—it declared in unequivocal terms that it was "for the benefit and enjoyment of the people." 16 U.S.C. § 21.

25.     The national parks system is organized into "units" ("parks" or "sites") either created by Congress through an implementing statute or via presidential proclamation pursuant to the Antiquities Act of 1906.

26.     Parks each have their own "foundation documents" that answer five key questions about the individual park: (1) "What is the purpose of this park?" (2) "Why was it included in the national park system?" (3) "What makes it significant?" (4) "What are its fundamental resources and values?"; and (5) "What legal and policy requirements, special mandates, and administrative commitments apply to this park?"[12]

27.     Through the Organic Act of 1916, Congress created the National Park Service and entrusted it to maintain these sites, "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such

---

[12] *Foundation Documents*, Park Planning, Nat'l Park Serv., https://perma.cc/LS7B-SV25 (last visited Mar. 10, 2026).

means as will leave them unimpaired for the enjoyment of future generations." An Act to establish a National Park Service, and for other purposes, Pub. L. No. 64-235, § 1, 39 Stat. 535, 535 (1916) (amended and recodified at 54 U.S.C. § 100101(a)).[13]

28.    Congress codified the Park Service's role in education with the 1935 Historic Sites Act, which directed the Secretary of the Interior, acting through the Director of the Park Service, to develop "an educational program and service for the purpose of making available to the public facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." An Act to provide for the preservation of historic American sites, buildings, objects, and antiquities of national significance, and for other purposes, Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (1935) (amended and recodified at 54 U.S.C. § 320102(k)).

29.    By 1970, Congress, in adopting the National Park Service General Authorities Act of 1970, emphasized that the park system is a "cumulative expression[] of a single national heritage" and that each individual site "derive[s] increased national dignity" by being included in a system that is "managed for the benefit and inspiration of all the people of the United States." An act to improve the administration of the national park system by the Secretary of the Interior, and to clarify the authorities applicable to the system, and for other purposes, Pub. L. No. 91-383, § 1, 84 Stat. 825, 825 (1970) (amended and recodified at 54 U.S.C. § 100101(b)(1)).

30.    In 1978, Congress reaffirmed the broad mission of the Park Service and the national parks as detailed in the 1916 Organic Act, providing that "[t]he authorization of activities shall be

---

[13] "The Organic Act, originally codified at 16 U.S.C. § 1, was amended and recodified in 2014, although the core mandate remained the same." *Wesberry v. United States*, 304 F. Supp. 3d 30, 35 n.1 (D.D.C. 2018); *see also* National Park Service and Related Programs, Pub. L. No. 113-287, § 7, 128 Stat. 3094, 3272 (2014). The 2014 recodification mandates that the "Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a).

construed and the protection, management, and administration of these area(s) shall be conducted in light of the high public value and integrity of the National Park System and shall not be exercised in derogation of the values and purposes for which these various areas have been established, except as . . . directly and specifically provided by Congress." An Act to Amend the Act of October 2, 1968, an Act to establish a Redwood National Park in the State of California, and for other purposes, Pub. L. No. 95-250, § 101(6)(b), 92 Stat. 163, 166 (1978) (amended and recodified at 54 U.S.C. § 100101(b)(2) (internal quotation marks omitted)).

31.    Twenty years later, Congress expressly acknowledged the importance of education in the parks in the National Parks Omnibus Management Act of 1998, imposing requirements that the Secretary "shall continually improve the ability of the National Park Service to provide state-of-the-art … interpretation of and research on the resources of the National Park System" and "assure that management of units of the National Park System is enhanced by the availability and utilization of a broad program of the highest quality science and information." Pub. L. No. 105-391, §§ 101, 202, 112 Stat. 3497, 3498–99, (amended and recodified at 54 U.S.C. §§ 100701, 100702).

32.    In 2016, Congress once again reiterated the importance of the parks' role in an inclusive democracy in the National Park Service Centennial Act, providing that the Secretary of the Interior "shall ensure that management of System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." Pub. L. No. 114-289, § 301, 130 Stat. 1482, 1487 (2016) (codified at 54 U.S.C. § 100802). "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." *Id.* at 1486 (codified at 54 U.S.C. § 100801(1)(A)). "Education" means "enhancing

11

public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." *Id.* (codified at 54 U.S.C. § 100801(2)).

33.    In the Centennial Act, Congress also authorized the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." *Id.* at 1487 (codified at 54 U.S.C. § 100803).

34.    In addition to the statutory framework, the Park Service is also guided by Management Policies that "set a firm foundation for stewardship that will continue to earn the trust and confidence of the American people."[14] The Management Policies confirm that the parks "will be managed as places to demonstrate the principles of science, to illustrate the national experience as history, to engage learners throughout their lifetimes, and to do these things while challenging visitors in exciting and motivating settings." Management Policies § 7.3.1.1. The Policies also provide that the Park Service "will continually adjust to changing patterns of visitation and an increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations." *Id.* § 7.3.4. And the "unique qualities" of the national parks "will be used to advantage in educating Americans and visitors to America about topics such as the civic experience of our country; the complex [diverse]

---

[14] *Management Policies*, Nat'l Park Serv., https://perma.cc/LD22-RP25 (last visited Feb. 16, 2026).

ecology of our nation and the world; and the influence of global climate change." *Id.* § 7.5.1. To achieve those goals, the policies require the Park Service to "respectfully consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive programs and media relating to their cultures and histories." *Id.* § 7.5.6.

35.    National Parks Director's Order #6 ("DO #6") requires that "[t]he content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases." DO #6 at 8.4.1. DO #6 further requires:

> Superintendents, historians, scientists, and interpretive staff are responsible for ensuring that park interpretive and educational programs and media are accurate and reflect current scholarship. To accomplish this, an on-going dialogue must be established. Questions often arise round the presentation of geological, biological, and evolutionary processes. The interpretive and educational treatment used to explain the natural processes and history of the Earth must be based on the best scientific evidence available, as found in scholarly sources that have stood the test of scientific peer review and criticism. The facts, theories, and interpretations to be used will reflect the thinking of the scientific community in such fields as biology, geology, physics, astronomy, chemistry, and paleontology. Interpretive and educational programs must refrain from appearing to endorse religious beliefs explaining natural processes. Programs, however, may acknowledge or explain other explanations of natural processes and events.

*Id.* § 8.4.2.[15]

36.    In order to achieve this accurate telling of history and science, DO #6 further mandates a meticulous consultation process:

> The NPS will present factual and balanced presentations of the many American cultures, heritages, and histories. Through civic engagement, consultation, and collaboration with various constituencies, the NPS fosters the development of effective and

---

[15] Dep't of Interior, *Director's Order #6: Interpretation and Education* (Jan. 19, 2005), https://perma.cc/YU55-PJ7B.

> meaningful interpretive and educational programs. Broad civic engagement ensures appropriate content and accuracy, and identifies multiple points of view and potentially sensitive issues. The [Park] Service will actively consult traditionally associated peoples and other cultural and community groups in the planning, development, presentation, and operation of park interpretive and educational programs.

*Id.* § 8.5.

37.     These procedures are critical for the ecosystem of non–Park Service stewards—including volunteers, guides, and concessioners—who are part of the learning experience in parks and who rely on high quality information. The Management Policies provide that the Park Service will pursue partnerships with compatible organizations such as historical societies and conservation groups, and that Park Service interpreters and educators "will provide the leadership, example, and standards for all partners to deliver effective interpretation and education services." Management Policies § 7.6. Similarly, the Policies state that Park Service "interpretation and education employees will be held to the most comprehensive standards and act as models and coaches for other NPS staff, especially law enforcement, volunteers, and other partners." *Id.* § 7.4.

38.     Today, the Park Service enlists approximately 13,000 permanent employees, and thousands of temporary and seasonal employees, who work at 433 park sites and help manage and provide assistance at more than 150 related areas, and numerous additional programs, to serve 332 million visitors each year and to preserve "unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations."[16]

---

[16] Nat'l Park Serv., *Our Mission*, https://perma.cc/U85B-3EWE (last visited Jan. 7, 2026).

**FACTUAL BACKGROUND**

I.    **The National Parks Are America's Largest Classroom**.

39.    The national parks established their reputation as "America's largest classroom" in their earliest days, when, in 1886, U.S. Army infantrymen deployed to protect Yellowstone Park began answering questions to visitors in what became known as "ranger talks" at Old Faithful and the Upper Geyser Basin.

40.    In 1917, just one year after Congress created the national parks system, the first director of the Park Service, Stephen Mather, embraced his role as an educator for the nation, acknowledging that "one of the chief functions of the national parks and monuments is to serve educational purposes," and creating the National Parks Education Committee to "further the view of the national parks as classrooms and museums of nature."

41.    The Park Service's understanding of its mission to educate expanded to include interpretation—that is, bridging the gap between physical objects and human understanding for park visitors—such that by 1929, the Park Service considered its role to include creating "simple, understandable interpretation of the major features of each park to the public by means of field trips, lectures, exhibits, and literature."[17]

42.    Today, the Park Service furnishes this interpretation through exhibits, signs, brochures,[18] books, and other educational materials that provide details and context at each park

---

[17] Dwight T. Pitcaithley, *National Parks and Education: The First 20 Years*, National Park Service History Electronic Library and Archive (2002), https://perma.cc/65BK-HTV8.

[18] One of the most common types of brochures is the "Unigrid," a Park Service "agency institution" since the late 1970s. The Unigrid is a "comprehensive graphic design system" that allows "designers, writers, and cartographers to focus on content and creativity while conveying a strong visual identity for the National Park Service." Nat'l Park Serv., *A Brief History of the Unigrid*, https://perma.cc/LF36-HW6R (last visited Feb. 14, 2026). Unigrid brochures are customized by park site and are "on the front lines of storytelling in the National Park Service."

15

site and help visitors connect to their surroundings. According to the Park Service, "National parks are America's largest classrooms."[19]

43.    These materials are created by teams, often led by experiential designers and specialized fabricators—many of whom are members of Plaintiff SEGD—who steward the perspective of park visitors and other end users through their design and fabrication expertise. Most experiential designers and specialized fabricators work as contracted professionals with the Park Service and other public institutions, while some are employed by those agencies. Their work to create an interpretive wayside sign or exhibition panels typically involves months—and often years—of collaboration with historians, scientists, subject-matter experts, community advocates, educators, interpretive specialists, and accessibility experts. This process is led by the Park Service or the relevant public entity and is governed by established review and approval procedures designed to uphold accuracy, accessibility, and public trust.

44.    The Harpers Ferry Center manages contracts for exhibit planning and design, exhibit fabrication, and exhibit design-build contracts, and sometimes provides exhibit planning and design services directly for all parks across the country. It has also been creating the Park Service's iconic educational visitor brochures, known as Unigrid brochures, for over 50 years.

45.    Pursuant to its mandate to "use a broad program of the highest quality interpretation and education," the Park Service prides itself on ensuring interpretive materials "reflect up-to-date information and research"[20] that can be used to add and explain details and context as knowledge about particular sites, history, or science expands.

---

[19] As of February 16, 2026, a page on the National Park Service website focused on educators included that headline. *See, e.g.*, Nat'l Park Serv., *Educators*, https://perma.cc/VAB5-A2QD (last visited Feb. 16, 2026).

[20] Nat'l Park Serv., *History Under Construction*, https://perma.cc/AQ5V-37E4 (last visited Feb. 16, 2026).

46.     The Park Service has recognized that while it may need to supplement or update information to "tell a more holistic story" in order to advance its mission to preserve the parks "for the enjoyment, education, and inspiration of this and future generations," its role is not "to judge what history is worth telling." In its approach to interpretation and education, the Park Service has affirmed that, "[t]he facts are not 'under construction.'"[21]

47.     The Park Service has acknowledged the need to "share an accurate and comprehensive history," even when that history extends to "the good, the bad, the ugly, and everything in between."[22] Telling history in this way, according to the Park Service, is the appropriate way to share "the stories of all Americans."[23]

## II.     Defendants Have Embarked on a Campaign to Erase History and Science at the Country's Most Valuable Sites.

48.     On March 27, 2025, President Trump issued an executive order titled "Restoring Truth and Sanity to American History," which claimed that "[o]ver the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Exec. Order § 1.

---

[21] *Id.* For example, a Muir Woods exhibit recounted a timeline of conservation events that was supplemented with previously untold stories of the role women played in local conservation efforts. *Id.* Likewise, a now-removed sign titled "Changing with the Times" at Glacier National Park acknowledged the developing nature of interpretive materials, providing information about the effect of $CO_2$ emissions and climate change on the glaciers that give the park its name.

[22] *Id.* In recognizing that "it's not our job to judge what history is worth telling," the Park Service has previously documented and preserved, for example, the incarceration of Japanese-Americans at the Manzanar National Historical Park, the enslavement of Black Americans at the plantations in Cane River Creole National Park, the killing of Native Americans at the Sand Creek Massacre National Historic Site, and countless other instances of discrimination and marginalization throughout American history.

[23] Nat'l Park Serv., *Telling All Americans' Stories: Publications on Diverse and Inclusive History*, https://perma.cc/82JZ-VK7M (last visited Feb. 16, 2026). It has done so, in part, through the publication of several National Historic Landmarks Theme Studies touching on "[d]iverse and [i]nclusive [h]istory," including the history of Asian American and Pacific Islanders, Hispanics/Latinos, African Americans, American Indians, and Lesbian, Gay, and Bisexual populations.

17

49.     The Executive Order described efforts to tell a more complete and accurate history as a "revisionist movement" and declared that the policy of the Trump administration would be "to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing." *Id.*

50.     Through the Executive Order, President Trump directed the Secretary of the Interior to:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;
> (ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. 1451 et seq., 54 U.S.C. 100101 et seq., and other applicable law; and
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

*Id.* § 4.

51.     On May 20, 2025, Secretary Burgum issued Secretary's Order 3431, "Restoring Truth and Sanity to American History," implementing the identically-named Executive Order. The Secretary's Order directed the Park Service to, within 30 days, review "any public monuments,

memorials, statues, markers, or similar properties (collectively: properties)" at park sites that had been "removed or changed" since January 1, 2020. Sec. Order § 5(a)(1).[24]

52.    By its terms, the only purpose of the Secretary's Order is to implement the Executive Order:

> **Purpose.** This Order implements provisions of President Trump's March 27, 2025, Executive Order (EO) 14253, titled "Restoring Truth and Sanity to American History." EO 14253 directs the Secretary of the Interior (Secretary) to provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park and to complete such improvements by July 4, 2026, the 250th anniversary of the signing of the Declaration of Independence. It also directs the Secretary to review public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's (Department) jurisdiction and to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.

*Id.* § 1.

53.    The Secretary's Order mentions the National Park Service Organic Act and the Federal Land Policy and Management Act only as "Authority" and does not explain its relationship to the mandates of those statutes.

54.    The Secretary's Order does not mention the National Park Centennial Act or the National Park Omnibus Management Act and does not provide any explanation for departing from the requirements of those statutes.

55.    In the Order, the Secretary instructed the Park Service to, within 60 days, submit a report identifying any reviewed monuments, markers, or other similar properties and "concluding

---

[24] The Secretary's Order also applies to other subagencies, specifically the U.S. Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (referred to collectively in the Secretary's Order as "the land management Bureaus"). Sec. Order § 5.

whether the alteration or removal of each property was made to perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology." *Id.* § 5(a)(2).

56.     According to the Order, the Park Service was required to "immediately undertake such actions as are necessary to reinstate" any properties it identified that had been altered for allegedly improper reasons. *Id.* § 5(a)(3).

57.     The Secretary's Order also required the Park Service to, within 90 days, review "all public monuments, memorials, statues, markers, or similar properties" at park sites

> to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.

*Id.* § 5(b)(1).

58.     The Secretary's Order demanded that, within 120 days, the Park Service "remove any content" that "inappropriately disparages Americans … [or] emphasizes matters unrelated to the beauty, abundance, or grandeur" of a "natural feature" or is otherwise "inconsistent with the purposes of" the Restoring Truth and Sanity Executive Order. *Id.* § 5(b)(2).

59.     In its place, the Secretary's Order requires the Park Service to install "content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with" the Executive Order. *Id.* § 5(b)(2).

60.     To "[e]ncourag[e] public participation," the Secretary's Order directed the Park Service to "post signage" at park sites that "allow for public input" through a QR code linked to a Park Service–managed website. *Id.* § 6.

61.    The Secretary's Order required that the QR-code signs include the following language:

> (Name of property) belongs to the American people, and (name of land management Bureau) wants your feedback. Please let us know if you have identified (1) any areas of the (park/area, etc. as appropriate) that need repair; (2) any services that need improvement; or (3) any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features.

*Id.*

62.    Park Service staff were provided with a template sign, including a QR code, and instructed that it should be posted "by the order of the Secretary of the Interior," in support of the Restoring Truth and Sanity Executive Order at all national parks, monuments, and historic sites by June 13, 2025.



[25]

63.    Signs containing the mandated language and QR code were posted in national parks throughout the country:

64.    Defendants did not publish notice in the Federal Register or solicit input before collecting this information from the public, and the posted signs did not display an Office of Management and Budget control number.

---

[25] Chloe Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, NPR (June 26, 2025), https://perma.cc/N5Y8-G697.

65.    Agency leaders informed park superintendents they would be required to review public concerns about anything that "inappropriately disparages Americans past or living (including persons living in colonial times)" and remove or cover "all inappropriate content."

66.    In June 2025, the Park Service began compiling a database identifying the date, topic, and park that were the subject of each comment, along with the specifics of the comment itself.

67.    The public comments submitted via the QR code overwhelmingly denounced efforts to wash away discussion of history and science. National Public Radio reviewed dozens of comments submitted about the signs in parks around the country, none of which "suggest the parks need to change their descriptions of people or history."[26]

68.    A Freedom of Information Act request submitted by the Sierra Club uncovered responses submitted to other Interior Department component agencies also bound by the Secretary's Order that "show that Americans overwhelmingly reject the Trump administration's attempt to sanitize history on public lands."[27]

69.    In the summer of 2025, the Park Service instructed park officials to respond to queries by saying that the Trump administration is focused on "historical accuracy."

70.    In order to implement the Secretary's Order, the Park Service deployed a system to flag, and ultimately remove, interpretive materials that contain the administration's disfavored views.

71.    Interior and Park Service leadership instructed Park Service staff to review all interpretive materials for compliance with the Executive Order and Secretary's Order.

---

[26] Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, https://perma.cc/N5Y8-G697.

[27] Sierra Club, *Latest Documents Uncovered by Sierra Club Reveal Americans Oppose Efforts to Whitewash History and Public Lands* (Dec. 11, 2025), https://perma.cc/P6B2-2ZNF.

72.     Based on their reviews, in July 2025, Park Service staff at each park were required to submit reports describing each sign, exhibit, film, booklet, wayside, or material that they identified, including to describe changes they thought would be needed and to upload photos and links of the interpretive materials to be changed. On information and belief, Park Service staff were told that the Secretary's Order applies to "retail items" available in the parks, and that their reviews must include those items.[28]

73.     On March 2, 2026, unnamed "civil servants on the front lines" posted, on two publicly available websites, a copy of the database of interpretive materials that have been flagged by park staff implementing the Secretary's Order.[29] In total, the database contains approximately 500 materials flagged based on the Secretary's Order.[30]

74.     The entries in the database show that even when flagging materials based on the Secretary's Order, Park Service staff often emphasized the extensive research, consultation, and labor that went into creating the materials at their respective parks. In some instances, Park Service staff explicitly stated that while the materials may not comply with the Secretary's Order, they should not be removed.

75.     The interpretive materials listed in these assessment reports were different from the database already containing those materials flagged in the QR code submissions.

---

[28] A separate order, signed by Defendant Bowron, issued in November 2025, purports to require Park Service staff to review all "retail items" for compliance with a different Secretary's Order, SO 3416, which implements Executive Orders 14151 and 14168. Despite the separate order, Park Staff were told that Secretary's Order 3431 applies to retail items.
[29] Karin Brulliard and Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://perma.cc/7TA8-NPXV (citing Internet Archive, *DOI Targets for Removal From National Parks under EO14253/SO3431*, (last visited Mar. 7, 2026) https://perma.cc/99YZ-PYGW; Sciop, *DOI Targets for Removal from National Parks under EO14253/SO3431*, (last visited Mar. 7, 2026), https://perma.cc/KYC9-7E8Z.
[30] *Id.*

76.    On information and belief, in August and September 2025, Defendant Bowron sent letters to individual parks that notified them of alleged "non-compliance" with the Secretary's Order—but did not provide any information on next steps or how to come into compliance—and identified allegedly noncompliant materials only by a number without explaining how to connect those numbers to specific interpretive materials.

77.    Park Service leadership provided staff with a "Park Action List" detailing content that leadership had determined was out of compliance with the Secretary's Order, and told staff to submit revisions or propose actions. On information and belief, Park Service staff were told to complete this work by early 2026.

78.    On information and belief, Park Service staff understand that the Harpers Ferry Center will provide protocols for removing and replacing interpretive material that did not comply with the Secretary's Order.

79.    Park Service staff were also informed that there would be another review by the Department of the Interior.

80.    On information and belief, parks that did not submit a report detailing interpretive materials out of compliance with the Secretary's Order have been told that Park Service leadership is going to conduct the assessment themselves.

81.    In January 2026, Park Service staff received an email instructing that "[i]f asked [by park visitors] about an altered/removed exhibit in your park related to [the Secretary's Order]," park staff should answer either that they were not aware of the reason for the change, or that the change was made to comply with the Secretary's Order.

82.    In February 2026, Park Service staff were informed that all new public-facing content, such as new signs, exhibits, and brochures, must be submitted to the Department of Interior for review for compliance with the Secretary's Order.

### III.    The Park Service Has Removed and Will Remove Interpretive Materials to Comply with the Secretary's Order.

83.    On information and belief, as of March 13, 2026, the Park Service has identified for removal, and begun removing, hundreds of interpretive signs and other materials from national parks.

84.    In order to comply with the Secretary's Order, Park Service staff reportedly began removing material in the summer of 2025.

85.    At Acadia National Park in Maine, Park Service officials reportedly removed signs addressing both history and science. At least one now-removed sign discussed the Wabanaki people and the significance of the Cadillac Mountain—or what the Wabanaki call *Wapuwoc*—to their culture and heritage. Another removed sign described the effects of climate change on the surrounding environment and the resulting costly damage to the park.[31]

---

[31] The now-removed signs were part of a Park Service effort "intended to make those displays more accessible for people who have mobility, visual, and cognitive impairments." Nat'l Park Serv., *Changing Acadia: Summits*, https://perma.cc/T6TX-R5GQ (last visited Feb. 12, 2026). The website for the exhibit provides images of the signs, text explanations of some of the images for people who are visually impaired, and the complete text of the signs. Jake Spring, *National parks remove signs about climate, slavery, and Japanese detention*, Wash. Post (Sep. 20, 2025), https://perma.cc/2C5C-9FMH.



86.    Park Service staff also reportedly altered a "History Under Construction" exhibit at Muir Woods in Golden Gate National Park in California. The now-removed 2021 installation annotated an existing sign with "sticky notes" that provided previously-omitted content on Indigenous history, the role of women in the Muir Woods conservation movement, and the historical role of Park Service staff in eugenics movements.

---

[32] *Erasure in Action*, Save Our Signs, University of Minnesota, https://perma.cc/6DHU-7A92 (last visited Feb. 14, 2026).

 

87.    An exhibit at the Jamaica Bay Wildlife Refuge at the Gateway National Recreation Area in New York concerning climate change, women's rights and liberty, and components of the country's history "we hope never to repeat—like slavery, massacres of Indians, or holding Japanese Americans in wartime camps"—was also reportedly removed in the early rash of changes.



88.    At Rock Creek Park in Washington, D.C., the Park Service reportedly removed a sign describing the legacy of Francis G. Newlands—a congressman and senator from 1893 to 1917—including details about his White supremacist views.

---

[33] *Erasure in Action,* https://perma.cc/6DHU-7A92.

[34] Devry Becker Jones/Historical Marker Database, photograph *in* Dan Friedman, *Trump's War on National Park Signs is Even Dumber Than you Think*, MotherJones (Feb. 26, 2026), https://perma.cc/3XYA-6Z9W.

89.    The Park Service escalated its implementation of the Secretary's Order in January 2026, with dozens of interpretive signs—detailing the contributions of historically marginalized populations, describing atrocities perpetuated against particular communities, and explaining the long-term impact of scientific developments—removed during the last ten days of the month into early February 2026.



90.    For instance, at the President's House Site in Independence National Historical Park in Philadelphia, Park Service officials removed an exhibit that, according to the Park Service, "examin[ed] the paradox between slavery and freedom in the founding of the nation" and described the critical role that enslaved people played in the operation of the home during George Washington's presidency. One of the removed signs discussed Ona Judge, a woman the Park Service described as "a talented seamstress" who "became Martha Washington's personal maid as a teenager" and who escaped enslavement and evaded recapture.[37]

---

[35] Emma Lee, WHYY, photograph *in* Carmen Russell-Sluchansky, *Philadelphia slavery exhibit: Judge blasts federal lawyers over removal, calls their argument 'horrifying*,' WHYY (Jan. 31, 2026), https://perma.cc/8PMC-JE8X.

[36] Mijuel K. Johnson, photograph *in* Jake Spring, *Park Service removes slavery exhibit at Independence Park in Philadelphia*, Wash. Post (Jan. 22, 2025), https://perma.cc/2X8P-6BD6.

[37] Nat'l Park Serv., *President's House Site; Enslaved People in the Washington Household*, https://perma.cc/WU4K-LXA3 (last visited Jan. 23, 2026); Nat'l Park Serv., *Visiting the President's House Site*, https://perma.cc/F9GM-EWXH (last visited Feb. 15, 2026); Nat'l Park Serv., *Ona Judge Escapes to Freedom*, https://perma.cc/M6A6-HFCB (last visited Jan. 23, 2026). On February 16, 2026, the U.S. District Court for the Eastern District of Pennsylvania issued a preliminary injunction requiring the Interior Department and the Park Service to restore the President's House Site to its physical status as of January 21, 2026, and enjoined the



91.    At Fort Sumter in South Carolina, the Park Service removed an interpretive display that previously described how the historic island fortress that sparked the beginning of the Civil War may be underwater by the end of the century due to climate change. The display was the product of extensive research by the Park Service and West Carolina University showing the effects of sea level rise, coastal erosion, flooding and storm surge on the park.

92.    At Lowell National Historical Park in Massachusetts, Park Service officials stopped showing two films on labor history, reportedly "to ensure compliance with the Interior Secretary's order implementing Trump's executive order."

93.    At Glacier National Park in Montana, Park Service officials reportedly removed or ordered the removal of several interpretive materials. Signs describing the concept of climate change, the effect it has had on the park, and its role in driving the disappearance of glaciers have been ordered removed. A season of the official podcast of the park, Headwaters, has already been

---

defendants from making any further changes to the site without mutual agreement of the City of Philadelphia or further action by the court. *See City of Philadelphia v. Burgum*, No. 26-cv-434 (E.D. Pa. Feb. 16, 2026), ECF No. 54. After restoration began but before it was completed, Judge Hardiman of the Third Circuit issued an administrative stay, ordering that the exhibit remain in the status quo as of the entry of that order on February 20, 2026. *City of Philadelphia v. Secretary U.S. Department of Interior*, No. 26-1348 (3d Cir. Feb. 20, 2026), ECF No. 11.

[38] Maxine Joselow, *Park Service Erases Climate Facts at Fort Sumter, Where the Civil War Began*, N.Y. Times (Jan. 22, 2026), https://perma.cc/HA4K-NFLG.

[39] *Erasure in Action*, https://perma.cc/6DHU-7A92 (capturing the spot where the sign previously existed).

taken down. A film about the park shown to visitors has been ordered removed or altered. Another sign that attributes the sharp increase in wildlife in the American west to "hotter and drier conditions" has been ordered removed, as well as a sign that describes the "controversy" over the hunting of wolves. Finally, a placard titled "Blame It on the Grain," which "describes the construction of a dam that created a reservoir in the eastern part of the park to support farming," has also been ordered replaced. In reporting these signs for review with the Secretary's Order, Park Service staff described the materials as "all well-researched, thoroughly reviewed by resource experts for accuracy, and are directly tied to Glacier National Park's resources and primary interpretive themes."

94.    At Arizona's Grand Canyon National Park, Park Service staff removed portions of displays characterizing settlers, cattle ranchers, and tourists as negatively impacting the land for their own benefit and describing how federal officials claimed tribal land to establish the park.

95.    At Sunset Crater Volcano National Monument in Arizona, a sign describing basalt bubbles was recently ordered removed, reportedly because the sign included an image of a visitor holding a Pride flag.

96.    At Grand Teton National Park, the Park Service removed a sign explaining the complicated history of Gustavus Cheyney Doane, a key member of an early Yellowstone expedition who had participated in a massacre of Native Americans.

97.    In addition to those interpretive materials that have already been removed, the Park Service has flagged hundreds more for potential removal because they allegedly do not comply with the Secretary's Order according to public reporting and the copy of the database made available on public websites.



[40]

98. For example, at Fort Pulaski National Park, flagged content included a reproduction of "The Scourged Back," an 1863 image of Peter Gordon, a man who was enslaved in Louisiana, with scars covering his back.

99. Other signs and exhibits detailing the history of people who were enslaved have also been flagged for removal. For instance, at Harpers Ferry National Historic Park in West Virginia, where abolitionist John Brown led a raid seeking to arm enslaved people for a revolt in 1859, Park Service officials flagged more than 30 signs. A sign describing a family's "ownership" of enslaved people was flagged at Bent's Old Fort National Historic Site. An exhibit entitled "Freedom Seekers of Timucuan Preserve" at the Kingsley Plantation in the Timucuan Ecological & Historic Preserve was flagged for removal. It describes stories of enslaved people who "illustrated the perseverance of the human spirit" as they navigated "sites of bondage and of escape." Park officials have also targeted interpretive materials at Virgin Islands National Park, where, as recently as 2022, Congress provided that a plaque be installed at Ram Head commemorating the "slave rebellion that began on St. John on November 23, 1733." Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, § 621, 136 Stat. 4459, 5608 (2022) (codified at 16 U.S.C. § 398 note).[41] In flagging these signs, Park Service staff emphasized that

---

[40] McPherson & Oliver, *The Scourged Back* (c. 1863) (albumen print), National Gallery of Art, Washington, D.C., https://perma.cc/AS5Q-R2FL (last visited Feb. 14, 2026).

[41] *See also* Nat'l Park Serv., *1733 Akwamu Insurrection*, https://perma.cc/87JT-PK7J (last visited Feb. 16, 2026); Stacy Plaskett, *Congresswoman Plaskett Condemns Removal of Historical*

"Virgin Islands National Park already me[a]nt to refresh the waysides at Annaberg with a more []holistic explanation of the history." More information about slavery was flagged at Cane River Creole National Historic Park, including an exhibit about enslaved people who tried to escape but were captured and publicly whipped. Park officials explained that these materials were "designed to provide visitors with a deeper understanding of complex histories connected to the site."  And park officials at Manassas National Battlefield in Virginia flagged a sign that criticized post–Civil War "Lost Cause" ideology, which denied the central role slavery played in the war.[42]

100.    Likewise, the Park Service has flagged for removal interpretive materials describing key moments in the civil rights movement.  At Emmett Till and Mamie Till-Mobley National Monument, Park officials flagged an exhibit that "tells the story of Emmett Till and his mother" and was created "in collaboration between the Emmett Till and Mamie Till-Mobley Institute, the Emmett Till Interpretive Center (ETIC), the Till family, and The Children's Museum of Indianapolis." In flagging this exhibit, Park officials explained that "[w]ithout this exhibit to share the difficult Till story, the new NPS site would be almost completely devoid of interpretation." At the Selma to Montgomery National Historic Trail in Alabama, the Park Service has flagged approximately 80 items for removal.[43] And the permanent exhibit at Brown v. Board of Education National Historical Park in Kansas has been flagged because it mentions "equity."

101.    Similarly, interpretive materials explaining mistreatment of Indigenous groups have been flagged for removal at parks across the country. These include a display at Sitka National Historical Park referencing the mistreatment of Alaskan Natives by missionaries, a

---

*Markers in the Virgin Islands National Park*, Office U.S. House Representative Stacey E. Plaskett (Feb. 13, 2026), https://perma.cc/45AA-2M2D.

[42] Maxine Joselow, *Park Service is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sep. 16, 2025), https://perma.cc/9DKR-EPJR.

[43] Jason Laljee, *Trump's DEI Crackdown is Changing MLK Day*, Axios (Jan. 19, 2026), https://perma.cc/9HWC-D97W.

brochure and sign describing the mass slaughter of the Piegan Blackfeet people at Glacier National Park, a sign at Bent's Old Fort National Historic Site that described the forced removal of a Native tribe, and an exhibit at Little Bighorn Battlefield National Monument that described the United States being "hungry for gold and land" and breaking promises to Native Americans. At Castillo de San Marcos National Monument in Florida, the Park Service flagged language about the imprisonment of Native Americans inside the Spanish stone fortress. In reporting these signs, Park Service staff emphasized that these signs were "developed in collaboration with the Cheyenne and Arapaho Tribes." A panel at Hubbell Trading Post National Historic Site discussing Ganado Mucho, a Navajo leader known for settling disputes with ranchers, has also been flagged for removal. At Fort Laramie National Historic Site, a sign that references the persecution of Native Americans has also been flagged for removal. And at Death Valley National Park, the Timbisha Soshone tribe requested that a new exhibit be placed with the phrases "these are our homelands" and "we are still here" to commemorate the 25th anniversary of the Homeland Act—which transferred nearly 7,800 acres of land to the tribe. Timbisha Shoshone Homeland Act, Pub. L. No. 106-423, 114 Stat. 1875 (2000). However, this too has reportedly been placed under review pursuant to the Executive Order and Secretary's Order.

102.    Likewise, signage and exhibits providing scientific information at parks across the country have also been targeted. So has a plaque at Great Smoky Mountains National Park explaining how fossil fuels cause air pollution, and a sign at Cape Hatteras National Seashore titled "The Air We Breathe" discussing the importance of clean air. At Everglades National Park, the Park Service flagged descriptions of industrialization's impact on the wetland ecosystem. The importance of fresh water is a "theme [that] can be found throughout the purpose, foundation, and enabling legislation of what established Everglades National Park," according to the Park Service

33

staff that submitted the interpretations for review. And at Organ Pipe Cactus National Monument, descriptions of destructive grazing practices and the accelerating rate of global warming since 1850, as well as a booklet that talks about endangered turtles and Sonoran pronghorn, have been flagged for removal.

103.    Hundreds of other signs, exhibits, and unigrids have been flagged, altered, or rejected, but not yet removed, to comply with the Secretary's Order.[44] According to the Park Service database that was made public in March, at least 500 interpretive materials have been flagged based on the Secretary's Order.



[45]

104.    Yet the administration has also acted arbitrarily in applying its own policy about not providing signage in national parks that "disparages Americans past or living." For example, the administration reportedly installed plaques in the White House—which is a national park site—that disparage former presidents, characterizing one as "the worst President in American History" and as allegedly responsible for bringing the country "to the

_____

[44] For instance, a Junior Ranger pamphlet at Cape Hatteras in North Carolina has reportedly been flagged because it explains that "Women pirates like Anne Bonnie often dressed like men to hide amongst the crew." *Booklet,* Junior Seashore Ranger Program, Cape Hatteras Nat'l Seashore, Nat'l Park Serv., https://perma.cc/4R5K-MZ74 (last visited Feb. 14, 2026).

[45] Mark Schiefelbein, Photograph of Plaque beneath the space for President Joe Biden's portrait, Assoc. Press, *reprinted by* Sarah Dean, Garrett Haake, Alexandra Bacallao, and Rebecca Shabad, *White House installs plaques mocking former Presidents Barack Obama and Joe Biden*, NBC News (Dec. 17, 2025), https://perma.cc/J5NY-5KAX.

brink of destruction," and another of spying on a political adversary and presiding over "the worst political scandal in American History."

**IV.    The Secretary's Order and Its Implementation Have and Will Continue to Irreparably Harm Plaintiff Organizations.**

105.    The Secretary's Order and its implementation have caused and will continue to impose irreparable harm on Plaintiffs and their members. The Order and its implementation directly undermine the missions and functions of the plaintiff organizations—all leaders in their respective fields—and have forced each organization to redirect significant time and resources away from other elements of their work. *See, e.g.*, *Victim Rts. L. Ctr. v. U.S. Dep't of Educ.*, 788 F. Supp. 3d 70, 95 (D. Mass. 2025) (explaining that "[a]ctions by a defendant that 'make it more difficult for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes [] of . . . irreparable harm.'" (alterations and omissions in original) (citation omitted)).

106.    Each organization's mission involves ensuring access to high quality information, including on recent developments in science, history, or both. And each of the Plaintiffs' missions, either directly or indirectly, involves ensuring that the national parks are preserved and inclusive for visitors now and in the future. Defendants' actions have frustrated those missions: Because of the Secretary's Order and its implementation, Plaintiffs face inordinate burdens to supplement the resources lost or removed, or mitigate the ensuing harm, as a result of the sustained campaign to erase history and censor science through the Secretary's Order and its implementation. Because they have been forced to divert resources from other organizational efforts as a result of the Secretary's Order and its implementation, each Plaintiff has suffered harm that will only increase with each day that the Order remains in effect, and with each new removal Defendants undertake to implement the Order. Meanwhile, Plaintiffs' members who visit individual parks—often a literal once-in-a-lifetime experience—suffer informational, recreational, and aesthetic harms by

35

being deprived of valuable context about the parks. And those plaintiffs whose members have historically contracted with the parks have already suffered lost income, chilled expression, and reputational injuries. These harms to Plaintiffs and their members will only continue to grow absent relief.

**National Parks Conservation Association**

107.    The mission of the National Parks Conservation Association is "protecting and enhancing America's National Park System" for present and future generations, a mission that is closely aligned with the mission of the Park Service itself but that the Secretary's Order ignores. Notably, the first Park Service Director himself founded NPCA just three years after the birth of the Park Service because he understood the need for an outside guardian of the parks to hold the agency accountable for fulfilling its mission. As part of NPCA's mission, the organization conducts independent research, develops and provides resources and other tools to support the Park Service, and "engag[es] advocates as diverse as the parks themselves" to defend the parks against environmental threats and ensure that the shared heritage of the parks is both protected and tells a more inclusive, complete story of the United States. As part of its effort to ensure future generations are equally committed to preserving the parks, NPCA aims to "bring people and parks together" by encouraging and facilitating visits to parks through partnerships with local communities, organized campaigns, one-time events, regular publications (including the National Parks Magazine[46]), and overviews and other materials on all individual parks. In recent years,

---

[46] The Winter 2026 issue of National Parks Magazine included a piece by NPCA's Senior Director of Cultural Resources in Government Affairs titled "To Tell the Truth," explaining some of the historical questions that are currently unanswered and describing some of the effects, thus far, of the implementation of the Secretary's Order. Alan Spears, *To Tell the Truth*, Nat'l Parks Magazine (Winter 2026), https://perma.cc/H6JY-R2H3.

NPCA has worked in particular to establish and highlight park sites that help enshrine a more complete American story, including by organizing educational trips to some of those sites.[47]

108.    NPCA's most recent strategic plan, adopted in 2021, sets out the goal of ensuring that national parks tell the stories of all Americans. By enhancing park storytelling, NPCA seeks to ensure that national parks represent, welcome, and share a fuller American story with all visitors. This in turn helps create a new generation of park advocates who will continue to work towards protecting and enhancing the national park system. Park Service staff have made tremendous strides towards that reality in recent decades, sharing the facts about difficult topics like slavery, segregation, and climate change. The Secretary's Order impedes NPCA's years' long work in this area and instead moves the park system in the opposite direction. Moreover, the Order and its implementation will deprive visitors of the full picture of history and nature at the parks that they deserve.

109.    In the past, NPCA has known that its members who visit park sites would be exposed to historical and scientific interpretation that reflects the diversity of the United States and its people, and the organization has strived to attract new audiences to national parks by showing them that they and their experiences are represented. As Defendants further implement the Secretary's Order and remove accurate information about our history and diverse populations, that becomes harder and harder.

110.    As the country's largest organization with a mission squarely focused on preserving national parks, NPCA has frequently collaborated with the Park Service through formal programming and resource protection and as a thought partner considering how to ensure the parks

---

[47] One such trip, "On the Road to Freedom," covers Civil Rights history from Alabama to Mississippi and involves visiting multiple park sites, including some where interpretive materials have reportedly been flagged. *See, e.g.*, *supra*, ¶ 100.

tell a more complete history. But those collaborations are all in danger based on the Secretary's Order. For instance, in service of its mission to "enhance" the national parks, NPCA played an instrumental role in Congress's adopting, in the Centennial Act, the requirement that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." And since 2012 alone, NPCA has worked to help create and expand more than 25 national park sites focused on telling diverse stories, including the Stonewall National Monument honoring LGBTQ+ history, the Birmingham Civil Rights National Monument and Medgar and Myrlie Evers Home National Monument honoring the history of the civil rights movement and its leaders, and the Belmont-Paul Women's Equality National Monument honoring the history of women's suffrage. Implementation of the Secretary's Order now threatens the interpretive materials that explain the very reason NPCA fought to and succeeded at establishing these sites. Already, NPCA has diverted resources from other programs and efforts to address the effects of the Secretary's Order by tracking sign removals, educating members of Congress and other policymakers and partners about the fact and effect of censorship in the parks, and working to build awareness and transparency around the Secretary's Order and its implementation. Instead of being able to push to make the park system more inclusive and historically accurate, NPCA has had to pivot to prevent erasure of history and science that was reflected in the parks because of hard fought victories by NPCA and its partners.

111.    NPCA's members regularly visit, study, work, photograph, or recreate at NPS sites. These members, many of whom visit national parks every year, seek honest, authentic experiences, information, and education—not censorship. They come to learn about accurate and more complete American history and science. They expect the parks to serve as a classroom for

38

themselves and their families. Removing educational materials and signage deeply harms their informational, recreational, scientific, and educational interests and ultimately degrades their park experiences.

**American Association for State and Local History**

112.    The Secretary's Order and its implementation also hinder the ability of the American Association for State and Local History to perform its core functions and fulfill its mission. In order to serve its mission to "provide[] leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs," AASLH supports and provides resources for history practitioners and the country's 21,000 history organizations, which include National Park sites. These resources and programs help practitioners educate the public in a fashion that allows people to engage with a more complete and accurate understanding of history and to value history for its relevance to the present. As "America's classroom" in which the public engages with and learns about our nation's history, national parks are critical to fulfilling this core mission. Because of Defendants' actions, AASLH has had to divert resources from organizational needs that are centered around expanding its reach, including by improving membership development efforts, and engaging on other issues and program areas in which it would typically be active. Instead, AASLH has had to use the redirected resources to address an urgent need to develop strategies to respond to attacks on historical best practices and historical topics disfavored by Defendants, including attacks related to the national parks, and to assist history practitioners in carrying on their work in the challenging environment Defendants' actions have created.

113.    AASLH has long been a leader in an effort to ensure that the public discourse around the history of the United States is expanded from prioritizing the perspectives and

experiences of primarily dominant groups to telling a more comprehensive and accurate history. The organization has done so through research, trainings, workshops, webinars, and written educational materials, including work that specifically highlights or focuses on national parks. In 2019, research done in conjunction with an AASLH study of visitation trends at history organizations, including National Park sites, suggested that Americans' interest in history had shifted such that the most recently-opened national parks, which largely focused on telling a more complete and accurate history, including that of African Americans, women, Indigenous people, Latinx people, LGBTQ+ people, and immigrants, might have attracted more visitors. Due to the significant role of the Park Service sites to the entire history sector, the Secretary's Order has impaired AASLH's efforts to continue to tell a more complete and honest history by literally seeking to erase evidence of history from the parks. As a result, AASLH must now shift its efforts from seeking to tell a more complete history to instead ensuring that people have access to at least what was available before the issuance and implementation of the Secretary's Order.

114. AASLH and its members have long partnered with the Park Service to aim to tell a whole history of the United States. The Secretary's Order endangers that relationship because it calls for cherry picking history in a fashion that directly contradicts the professional standards that AASLH advances. In the past, AASLH has had a mutually beneficial relationship with the Park Service. AASLH provided training and programs that included Park Service staff, worked with Park staff on committees and similar groups and connected the organization's members to Park Service sites, personnel, and offerings that provided models for the field aligned with best practices in history (including and especially for members who specialize in the history of those communities most affected by the Secretary's Order, particularly African American, Indigenous,

LGBTQ+, and women's history). The Secretary's Order has undermined that relationship and opportunities for collaboration.

115. The orders have created an environment in which AASLH has been forced to reconsider program and resource offerings, a crucial source of organizational revenue, to ensure that history practitioners—including any who may be employed by or contract with the federal government, generally, or the Park Service, specifically—can participate without fear of political backlash. AASLH understands from practitioners that declining to adjust such offerings could result in lowered participation, and therefore lower revenues in the long run.

116. AASLH is also a membership organization whose members include historians and other practitioners who work with the Park Service. This includes history practitioners who specialize in the history of communities that have been historically marginalized or entirely excluded, and who in the past have contracted with and provided research to the Park Service to ensure park visitors are exposed to a more complete and accurate understanding of the history of those sites. AASLH's membership includes history practitioners who have been harmed by the Secretary's Order and its implementation in a number of ways. First, some members have lost income because the Secretary's Order has effectively censored their specialties, which focus on communities that have been historically marginalized or entirely excluded, and whose stories the Park Service is now refusing to tell. Second, their own expression as practitioners of history has been chilled because the only way to continue to work with the Park Service and stay out of Defendants' crosshairs is to adopt the censored narrative and disregard a whole history by neglecting to discuss anything that Defendants, pursuant to the Secretary's Order, might consider "disparaging." Practicing history in this way is in direct contradiction to AASLH's mission and would require violating AASLH's Statement of Standards and Ethics. The Standards acknowledge

41

that "everyone makes history" and that history practitioners and organizations "must be attuned to issues and ideas reflective of the breadth of experience in their local communities and in the United States, and must include these varied perspectives in documentation, collections, preservation, and interpretation." They also note that interpretation should "recognize multiple perspectives, including community-based and descendant knowledge." Faced with a diametrically opposed approach to historical interpretation from the Park Service, AASLH members must choose between violating AASLH's professional ethics—and generally the ethics of the profession—or risk losing their livelihoods. Finally, the reputations of AASLH's members have been harmed because the Secretary's Order baselessly declares their work, which aims to tell a more complete history, to be no more than "improper partisan ideology" that is not appropriately considered part of the country's "extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing."

**Association of National Park Rangers**

117. The Association of National Park Rangers represents park professionals of all disciplines who help fulfill the lawful mission of the national parks and the Park Service, including that the national parks should be a vehicle for conveying accurate history and science to visitors. Its functions include providing mentorship, support, and professional enrichment to current and former Park Service staff as they work to protect the natural, cultural, and recreational resources of the national parks. In addition to ongoing programming and ad hoc opportunities, ANPR hosts an annual conference, entitled the Ranger Rendezvous, which features educational presentations, field trips, and opportunities for Park Service employees and alumni to discuss experiences and gather information and ideas in an effort to better allow them to contribute to fulfilling the mission

of the Park Service. Funds generated from the Ranger Rendezvous are critical to ensuring ANPR's continued viability.

118. A significant number of ANPR's members are Park Service employees whose job it is to interpret the resources and stories related to the parks where they work. Many of ANPR's members are retired from the Park Service but continue working in parks as volunteers. The Secretary's Order and its implementation has put ANPR in the impossible position of choosing which part of its mission to fully fulfill: whether to provide the type of guidance and support it traditionally has for current Park Service employees, or to continue to work to support the mission of the parks and the Park Service, including ensuring that the parks remain places where visitors can learn about uncensored history of the United States and the relationships between scientific evidence and the park sites. Defendants' actions now stand as an obstacle to simultaneously pursuing both parts of ANPR's mission. In an effort to support the mission to preserve the national parks for all people, ANPR has publicly denounced censorship of history and science at the parks, endangering its relationship with current Park Service employees. Indeed, at its Ranger Rendezvous in 2025, ANPR saw a drop off in attendance by current Park Service employees, depriving ANPR of the benefit of the perspectives of a significant segment of its membership and undermining its ability to later represent their interests. The organization understands this drop to be due to fear among current Park Service staff that attending this ANPR event would be seen as opposing the Park Service and, by extension, the Secretary's Order.

**Coalition to Protect America's National Parks**

119. The Coalition to Protect America's National Parks channels the experience of thousands of current and former Park Service employees and volunteers towards advancing the long-term mission of the Park Service and the National Park System. The Coalition's mission

includes building public awareness for issues affecting the national parks, particularly around applying "sound science." The organization uses its platform to educate policymakers and the public about issues affecting the national parks, including around park protection, biodiversity, climate change, and the need to ensure the parks reflect the breadth, diversity, and richness of communities and cultures within the United States, and has historically done so in partnership with the Park Service itself. The Coalition supports and promotes the use of peer-reviewed science to ensure these irreplaceable natural resources are properly stewarded, as required by law. As an organization of Park Service professionals of all levels, skill sets, and expertise, the Coalition is recognized by the public, park partners, Congress, and historically the Park Service itself as the "Voice of Experience."

120.    The Secretary's Order and its implementation create a direct conflict for the Coalition: Either it refrains from supporting the Park Service in order to continue pursuing its mission to protect the parks for the enjoyment of all people in the United States, or it accepts censorship—thus abandoning its own mission—in order to continue supporting the Park Service in its current iteration. This conflict has a direct impact on the Coalition's relationship with its members. If the Coalition remains silent on the violation of the mission of the Park Service and the national park system by erasing history and science, it violates the trust of its members who have spent their careers pursuing that mission. By contrast, describing accurate history and science as crucial to protecting the parks means effectively denouncing the Park Service and effectively asking Coalition members to choose sides between the organization and their current or former employer. Even where Coalition members may prefer to remain loyal to the Park Service mission, and in turn the Coalition, there is widespread fear of retribution for being perceived as opposing the current campaign.

44

121.    Further, because of the Secretary's Order, the Coalition has to reallocate its resources to develop resources and investigate claims about the removal of historical and scientific information. In order to continue to advance its mission and combat Defendants' attempts to erase history, the Coalition has also been forced to devote valuable staff time and resources to fielding questions about removals from members and partners, developing briefing papers, and collaborating with policymakers—including members of Congress—on how best to continue protecting the national parks despite Defendants' actions.

122.    The Coalition has produced—and expects to continue to produce—materials that used to be more widely accessible through the Park Service. For example, the Coalition provides research, education, and resources to study and assess the effects of climate change on the parks, including a 2025 Report titled "America's Best Idea in Peril: Climate Change and the Future of Our National Parks,"[48] which proposes solutions to safeguard the parks from long-term harm. The report—produced entirely independently of the Park Service—includes the type of information that has historically either been produced, publicized, or relied upon by Park Service personnel.

123.    Due to its continued engagement in fighting the removal of history and science in parks, the Coalition must take time and resources away from activities it would otherwise engage in. For example, the Coalition has been forced to divert resources away from core organizational activities and goals such as developing a new strategic plan in 2025, developing an annual work plan for 2026, hosting educational webinars, and building an internal process for donor outreach and development.

---

[48] SEEC Inst. & Coal. to Protect America's Nat'l Parks, *America's Best Idea in Peril: Climate Change & the Future of Our National Parks* (July 2025), https://perma.cc/FVT6-DXQM.

**Society for Experiential Graphic Design**

124.    The Society for Experiential Graphic Design "connects people to place" by supporting experiential graphic designers as they work to ensure that design—including interpretive exhibits and wayfinding at national parks—helps people understand history, culture, science, and the environment in ways that are clear, inclusive, and truthful. Developing any one wayfinding sign or exhibit panel often takes months or even years of research, peer review, and coordination among historians, scientists, educators, interpretive planners, and accessibility experts. As a professional association for experiential and interpretive exhibition design, SEGD provides education, training, and professional standards that guide how complex stories are responsibly translated into accessible public experiences.

125.    The Park Service has long established professional standards for research-based interpretive planning and public communication; its practices are closely aligned with SEGD's mission to enrich the human experience by making physical environments—including parks—more inclusive, accessible, and meaningful. SEGD has therefore relied on the Park Service's commitment to rigorous, scholarship-driven interpretation as consistent with its own professional values. To that end, SEGD's programming and resources benefit many of its members who provide the Park Service with interpretive wayfinding and exhibition design that fulfills the Congressional mandate that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "current scientific and academic research, content, and methods." But because of the Secretary's Order, the Park Service is censoring the very type of interpretive design that SEGD's mission demands. As a result, SEGD is caught between abandoning its mission and its vision and abandoning its members who rely on contracts with the Park Service for their livelihood. The Secretary's Order and its implementation dramatically undermine SEGD's work

46

to make the built environment more inclusive and intuitive, emotive and engaging, sustainable and shared.

126.    SEGD spends substantial time and effort to develop best practices related to historic and scientific interpretation and to develop educational content and programming for its members that is geared toward the goal of ensuring interpretive wayfinding, signage, and exhibitions are welcoming to all people. SEGD gives its members tools to help them achieve that goal and advance their practice, including for members who work with the national parks. Those tools have included helping members become adept at the process of telling complete and accurate history when working on a project, consistent with the Park Service's statutory mandates. SEGD's efforts to provide members with that kind of professional development and programming, and to advance the progress of its profession through best practices around interpretation, have been frustrated by the Secretary's Order and its implementation.

**Union of Concerned Scientists**

127.    The Union of Concerned Scientists endeavors to put rigorous, independent scientific principles into practice and to increase scientific literacy and access to support evidence-based decisionmaking. Through research, advocacy, engagement, and policy analysis, UCS works to ensure that federal agencies are held to the highest standards of scientific integrity in their production, use, and communication of scientific information, including the Park Service. UCS fights to combat inaccurate studies and claims that sow doubt about science by providing accurate, current scientific information through blog posts, campaigns, reports, and peer-reviewed scientific studies. Since 2016, UCS has published at least 267 reports, on average a little over 26 reports per year organizationwide. Producing any one scientific or analytical product takes hundreds of hours

47

of dedicated time for each scientist, analyst, or communication specialist, including research and production.

128.    UCS's mission is frustrated by Defendants' efforts to censor peer-reviewed, scientific information and interpretations of the American landscape and its science in the national parks, especially around climate science and climate impacts, and by the fact that these moves run counter to the Department of the Interior Scientific Integrity Policy, which UCS sees as consistent with and critical for its mission and has long worked to advance. Because of the Secretary's Order and its implementation, UCS has delayed or put on hold several long term projects, and has had to redirect approximately 5% of staff resources and capacity away from other activities that are integral to its mission. UCS leaders have already spent considerable time responding to inquiries and strategizing about how best to ensure rigorous, independent scientific principles continue to be reflected in the national parks despite Defendants' actions. In 2025, UCS had to reduce the number of reports it published, dropping from 27 in 2024 to 18 in 2025. Producing additional scientific reports or other analytical materials to replace the science that Defendants have censored would require UCS to further cut back on other key elements of its work.

129.    UCS will now need to expend additional resources to ensure scientific integrity is preserved at the National Park Service. For two decades, UCS has worked to advance scientific integrity and fight censorship at federal agencies, through conducting surveys of federal scientists, developing policy solutions, and advocating with federal agencies and Congress to instill a culture and practice of scientific integrity government wide. As just one example, in 2018, UCS surveyed more than 63,000 federal scientists across 16 agencies, including the Park Service, on scientific integrity, censorship, and public access to scientific information, in a report titled "Science Under Trump: Voices of Scientists across 16 Federal Agencies," and subsequently engaged the Park

48

Service to share its findings and implement solutions. Likewise, UCS' 2018 report, "Science Under Siege at the Department of the Interior: America's Health, Parks, and Wildlife at Risk" contains additional research and policy analysis relevant to the parks.[49] At the time, UCS recommended that "agency leaders could best improve scientific integrity at the NPS by reaffirming scientists' freedom to pursue and communicate openly about their scientific work without asking for permission, regardless of whether it is politically contentious"—a goal that has only been further hindered as a result of the Secretary's Order. Because of the Secretary's Order, UCS will have less access to Park Service officials to advance its goal of strengthening scientific integrity at federal agencies and will need to expend additional resources to ensure that science and scientists are not censored by the Park Service.

130. UCS has also lost a key partner in fulfilling its mission to provide accurate scientific information and increase scientific literacy and access. Prior to the Secretary's Order, UCS regularly collaborated with the Park Service. In previous UCS reports, Park Service employees served as external reviewers given the relevance of scientific information for national parks. Park Service scientists and experts have historically contributed to studies, and some are also members of UCS. Those studies, and the research behind them, help inform interpretive materials at national parks. Further, the Park Service has also provided its expertise when UCS publishes reports on how scientific phenomena affect American ecosystems and cultural sites, including those that are managed by the Park Service. In May 2014, for example, UCS published the "National Landmarks at Risk" study, which detailed how rising seas, floods, and wildfires are threatening several of the United States' most cherished historic sites, many of which are managed by the Park Service.[50] In

---

[49] Jacob Carter et al., *Science under Siege at the Department of Interior*, Union of Concerned Scientists (Dec. 2018), https://perma.cc/L4LH-J2JD.

[50] Debra Holtz et al., *National Landmarks at Risk*, Union of Concerned Scientists (May 2014), https://perma.cc/B65Y-RGUW.

conducting this study, a dozen Park Service staff collaborated with UCS to create the report, including Marcy Rockman, the then-Climate Change Adaptation Coordinator for Cultural Resources at the National Park Service. But the report discusses, for example, the rising sea levels around Fort Sumter—the very science-based interpretation that the Park Service just removed from Fort Sumter in January. Not only is UCS harmed because the very scientific research it helped develop has been pulled from the national parks, but the organization has also lost a trusted partner in its effort to advance scientific literacy and access and combat climate change through effective science communication. Because of the Secretary's Order, Park Service staff are no longer able to contribute to these reports either formally or informally if they discuss information that Defendants find "disparaging" or focus on natural features other than the "beauty, abundance, and grandeur of the American landscape." Without these contributions from the Park Service, UCS will not be able to produce the same quality and quantity of reports and studies relevant to national parks, and will have to expend its own resources to find relevant expertise that the Park Service previously filled.

## CLAIMS FOR RELIEF

### Count 1
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

131.    The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

132.    All Plaintiffs state this claim against all Defendants.

133.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

134.    The Department of the Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

135.    The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted).

136.    Agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (citation omitted). An agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"; it must instead "display awareness that it *is* changing position" and provide "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). Agency action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem" it seeks to address. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citation omitted). "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 30 (internal quotation marks and citation omitted).

137.    The Secretary's Order is arbitrary and capricious in several ways.

138.    The Secretary's Order fails to provide a reasoned explanation for mandating the removal of interpretive signs and exhibits that do not align with the administration's preferred historical and scientific narratives. The only alleged justification, contained in the stated "purpose"

of the Order—to "implement[] provisions of" EO 14253, *see* Sec. Order § 1—is not the type of reasoned explanation required by the APA.

139.    In executing and implementing the Secretary's Order, Defendants failed to consider "important aspects of the problem" the Order purported to address, including: the unique role of the national parks in telling a full and accurate history of the United States; the importance of educating visitors on the impact of environmental developments on park land; the impact of erasing the history of certain people, communities, and ideas; the fundamental principle that the parks are for the benefit and enjoyment of all the people of the United States; the wastefulness of removing historical and scientific information and ignoring what the agency has learned; the impact on future generations of not having access to comprehensive historical and scientific information at national parks; and the harmful effects of erasing history and science on entities and municipalities that regularly partner with the national parks for educational and other purposes.

140.    Additionally, the Secretary's Order failed to account for the reliance interests of organizations, like Plaintiffs, who focus on the preservation, protection, and long-term enjoyment of the parks or whose missions concern ensuring historical and scientific accuracy and completeness, and who have historically relied on the Park Service to help fulfill their goals. It also failed to account for the reliance interests of constituencies, including Indigenous communities, who have worked tirelessly to ensure their own history and ties to park sites and land are accurately and comprehensively reflected at those national parks. Nor did the Secretary's Order account for the reliance interests of educators, visitors, and other communities who depend on the parks to learn about the history of the United States in its entirety, and for accurate and complete scientific information. Defendants' complete failure to account for these reliance interests renders the Secretary's Order arbitrary and capricious.

141. The Secretary's Order also lacks support and contradicts facts before Defendants. The Order provided no factual basis whatsoever for its insinuations that existing signs and exhibits promoted a "false reconstruction of American history" or included "partisan ideology." Instead, the facts available to Defendants include reams of high-quality academic and scientific research developed over years if not decades that demonstrate the accuracy of the posted information, and hundreds of comments submitted by the public that overwhelmingly denounce the projected impact of the Secretary's Order.

142. The Secretary's Order also failed to offer any explanation, let alone a reasoned one, for its departure from the Park Service's longstanding practice of complying with its statutory and policy obligations. The Order provides no justification for disregarding the Park Service's statutory mandate that the parks be managed in such a fashion that they benefit and inspire "all people of the United States." And without any explanation, Defendants have chosen to depart from the Park Service's practice of explaining the "shared heritage" of the United States, and they have decided instead that some history is not worth telling. Nor did the Order explain the reason for ceasing to ensure that the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "use . . . a broad program of the highest quality interpretation and education." This lack of awareness and failure to provide "good reasons" for the new policy renders the Order arbitrary and capricious.

143. Moreover, the Secretary's Order does not explain its failure to conform to the requirements set out in the implementing statutes and Foundation Documents of the parks, many of which require the specific park site to focus on particular history or science, or mandate that the particular park provide interpretation on specific topics that are now seen as non-compliant with the Secretary's Order.

144.    Finally, the Secretary's Order is arbitrary and capricious because it fails to account for language in implementing statutes for certain parks and historic sites defining their specific purposes and goals.

145.    For these and other failings, the Secretary's Order is arbitrary and capricious and must be set aside under 5 U.S.C. § 706(2)(A).

**Count 2**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Park Service Centennial Act, 54 U.S.C. §§ 100801–803**

146.    The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

147.    All Plaintiffs state this claim against all Defendants.

148.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

149.    An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (internal quotation marks and citation omitted).

150.    The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

151.    The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

54

152.    The Secretary's Order is contrary to the National Park Service Centennial Act, 54 U.S.C. §§ 100801–803.

153.    The Centennial Act provides that the Secretary "shall ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802.

154.    The statute defines "interpretation" as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." 54 U.S.C. § 100801(1)(A).

155.    The statute defines "education" as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." 54 U.S.C. § 100801(2).

156.    The Centennial Act also authorizes the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803.

157.    The Secretary's Order violates these provisions of the Centennial Act because it does not enhance public awareness, understanding, or appreciation. Requiring the highest quality interpretation and education means telling full stories and providing full information, not only sharing content that puts the United States in a positive light.

158.    Nor does the Order comport with the statute's directives that the parks must reflect different backgrounds and current scientific research, and use a broad program of the "highest quality" interpretation and education. Rather, the content being removed pursuant to the Secretary's Order overwhelmingly concerns environmental impacts on the parks and describing the history and experiences of Indigenous communities, African Americans, and other marginalized groups.

159.    Because the Secretary's Order violates the Centennial Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 3**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Park Service Organic Act, 54 U.S.C. § 100101**

160.    The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

161.    All Plaintiffs state this claim against all Defendants.

162.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

163.    An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

164.    The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

165.    The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's]

56

decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

166.    The Secretary's Order is contrary to the National Park Service Organic Act, 54 U.S.C. § 100101.

167.    The Organic Act provides that the "Secretary [of the Interior], acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a).

168.    The Secretary's Order directs the Park Service to remove "all public monuments, memorials, statues, markers, or similar properties" containing content that allegedly "inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature." Sec. Order § 5(b)(1).

169.    The Secretary's Order also directs the Park Service to "remove any content . . . otherwise found to be inconsistent with the purposes of EO 14253." *Id.* § 5(b)(2).

170.    Both of these directives contravene the Organic Act's requirement that the Secretary's management of the National Park System "shall conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a).

171.    Similarly, the Secretary's Order violates the Organic Act's mandate that the Secretary manage the parks so as to "leave them unimpaired for the enjoyment of future generations." *Id.*

172.    Because the Secretary's Order violates the Organic Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 4**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**National Parks Omnibus Management Act, 54 U.S.C. §§ 100701–702**

173.    The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

174.    All Plaintiffs state this claim against all Defendants.

175.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

176.    An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

177.    The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

178.    The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

179.    The Secretary's Order is contrary to the National Parks Omnibus Management Act.

180.    The Omnibus Management Act provides that the Secretary "shall continually improve the ability of the [Park] Service to provide state-of-the-art . . . interpretation of, and research on, the resources of the [Park] System." 54 U.S.C. § 100701.

181.    The Omnibus Management Act also provides that the Secretary "shall ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." 54 U.S.C. § 100702.

182.    The Secretary's Order does not improve the ability of the Park Service to provide state-of-the-art interpretation and resources. Instead, it does just the opposite by providing narrower interpretation that conforms only to the administration's preferred viewpoint.

183.    The Secretary's Order also does not utilize the highest quality science and information. Instead, it directs the Park Service to remove or censor exhibits that reflect history or science, regardless of their accuracy.

184.    Because the Secretary's Order violates the National Parks Omnibus Management Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 5**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Contrary to Law and Exceeds Statutory Authority**
**Federal Land Policy Management Act of 1976, 43 U.S.C. § 1701,** *et seq.*

185.    The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

186.    All Plaintiffs state this claim against all Defendants.

187.    Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

188.    An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

189.    The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

190.    The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted).

191.    The Secretary's Order is contrary to the Federal Land Policy Management Act of 1976, 43 U.S.C. § 1701, *et seq.*

192.    There, Congress declared that it is the policy of the United States that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8).

193.    The Secretary's Order directs the Park Service to remove "all public monuments, memorials, statues, markers, or similar properties" containing content that allegedly "inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature." Sec. Order § 5(b)(1).

194.    The Secretary's Order also directs the Park Service to "remove any content . . . otherwise found to be inconsistent with the purposes of EO 14253." *Id.* § 5(b)(2).

60

195.   These directives contravene the requirement that public lands be managed in a manner that will protect the quality of scientific and historical values. 43 U.S.C. § 1701(a)(8).

196.   Because the Secretary's Order violates the Federal Land Policy Management Act, it must be held unlawful and set aside as contrary to law and in excess of statutory authority.

**Count 6**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)**
**Contrary to Law, Exceeds Statutory Authority, and Without Observance of Procedure Required by Law**
**Paperwork Reduction Act, 44 U.S.C. § 3501, *et seq.***

197.   The allegations in paragraphs 1-130 are incorporated and reasserted as if fully set forth here.

198.   All Plaintiffs state this claim against all Defendants.

199.   Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

200.   An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *Cruz*, 596 U.S. at 301 (internal quotation marks and citation omitted).

201.   The Department of Interior and the National Park Service are each an "agency" under the APA. *See* 5 U.S.C. § 701(b)(1).

202.   The Secretary's Order is a final agency action subject to judicial review under the APA, *see* 5 U.S.C. § 704, because it "mark[s] the consummation of the [Department's] decisionmaking process" and is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. 178 (internal quotation marks and citations omitted).

203.    The Secretary's Order is contrary to the Paperwork Reduction Act ("PRA"), 44 U.S.C. § 3501, *et seq.*, and Defendants did not observe the procedures required by the statute in implementing the Order.

204.    The PRA sets out certain requirements for each "collection of information," which means "the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format." 44 U.S.C. § 3502(3)(A); *see also* 5 C.F.R. § 1320.3(c) ("'Collection of information' includes any requirement or request for persons to obtain, maintain, retain, report, or publicly disclose information.").

205.    Those requirements include that the agency must ensure each information collection "is inventoried" and "displays a control number." 44 U.S.C. § 3506(c)(1)(B)(i).

206.    The agency must "provide 60-day notice in the Federal Register, and otherwise consult with members of the public and affected agencies concerning each proposed collection of information." 44 U.S.C. § 3506(c)(2)(A).

207.    The agency must solicit comments to, among other things, "evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility," and "enhance the quality, utility, and clarity of the information to be collected." 44 U.S.C. § 3506(c)(2)(A)(i), (iii).

208.    The agency must "ensure that the public has timely and equitable access to the agency's public information" and must "provide adequate notice when initiating, substantially modifying, or terminating significant information dissemination products." 44 U.S.C. § 3506(d)(1), (3).

209.    The Park Service conducted an information collection when, in accordance with section 6 of the Secretary's Order, it asked the public to comment on different aspects of parks. In doing so, the Park Service did not comply with the requirements of the PRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare unlawful, vacate, and set aside the Secretary's Order as arbitrary and capricious, contrary to law, and in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C);

B.  Grant preliminary and permanent injunctive relief, a stay under 5 U.S.C. § 705, and vacatur under 5 U.S.C. § 706, barring Defendants and all of their officers, employees, or agents from implementing, enforcing, or otherwise giving effect to the Secretary's Order, or any substantively similar order, mandate, guidance, or instruction, including by requiring Park Service staff to assess, flag, modify, remove, or submit for compliance reviews interpretive materials based on alleged compliance with or violation of the "Restoring Truth and Sanity to American History" Executive Order;

C.  Grant preliminary and permanent injunctive relief to restore the status quo ante that existed prior to the unlawful Secretary's Order by ordering Defendants to preserve and not destroy or alter any and all interpretive materials removed pursuant to the Secretary's Order and restore all materials to their state as of May 19, 2025;

D.  Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

E.  Grant other relief as the Court deems necessary, just, and proper.

Date: March 18, 2026                    Respectfully submitted,

                                        /s/ *Brooke Menschel*
                                        Brooke Menschel* (NY Bar No. 5004692)
                                        Michael J. Torcello* (DC Bar No. 90014480)
                                        Pablo A. Moraga* (DC Bar No. 90037895)
                                        Mark B. Samburg (Mass. BBO No. 680099)
                                        Steven Y. Bressler* (DC Bar No. 482492)
                                        Robin F. Thurston* (DC Bar No. 1531399)
                                        DEMOCRACY FORWARD
                                        FOUNDATION
                                        P.O. Box 34553
                                        Washington, D.C. 20043
                                        T: (202) 448-9090
                                        F: (202) 796-4426

                                        *Counsel for the Plaintiffs*
                                        *Admitted *pro hac vice*