**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Case No. 26-cv-10877** |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al*., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR 5 U.S.C. § 705 STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION .............................................................................................................. 1

BACKGROUND ............................................................................................................... 1

    I.      Congress enshrined the national parks as America's largest classroom. ..................... 1

    II.     Defendants campaign to erase history and science from national parks. .................... 4

          A.      The Secretary's Order provides a template for censorship. ................................... 4

          B.      The Park Service flags and begins removing hundreds of interpretive materials pursuant to the Secretary's Order. .......................................................... 6

    III.    The Secretary's Order irreparably harms Plaintiffs and their members. ...................... 8

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 11

    I.      Plaintiffs are likely to show that the Secretary's Order violates the APA. .................. 12

          A.      The Secretary's Order is final agency action. ......................................................... 12

          B.      The Secretary's Order is arbitrary and capricious in numerous ways. ................. 14

          C.      The Secretary's Order is contrary to law and exceeds Defendants' statutory authority. ....................................................................................................... 19

              1.     The Secretary's Order violates the Centennial Act. ...................................... 20

              2.     The Secretary's Order violates the Organic Act. .......................................... 22

              3.     The Secretary's Order violates the Omnibus Management Act. ................... 24

    II.     Plaintiffs are likely to establish standing to challenge the Secretary's Order. ............................................................................................................................. 25

          A.      All Plaintiffs have organizational standing. ............................................................. 25

          B.      Plaintiffs NPCA and AASLH also have associational standing. .......................... 28

    III.    Plaintiffs will suffer irreparable harm absent preliminary injunctive relief. .............. 30

    IV.    The balance of the equities and the public interest favor Plaintiffs. ........................... 34

CONCLUSION.................................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9 (D. Mass. 2024)................................27

*Am. Acad. of Pediatrics v. Kennedy*, No. 25-cv-11916, 2026 WL 33719 (D. Mass.
    Jan. 6, 2026) ........................................................................................................25, 27

*Ass'n of Am. Univs. v. U.S. Dep't of Energy*, 789 F. Supp. 3d 118 (D. Mass. 2025) ...................13

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................12

*Bluewater Network v. Salazar*, 721 F. Supp. 2d 7 (D.D.C. 2010) .............................................22, 23

*Brox v. Woods Hole*, 164 F.4th 37 (1st Cir. 2026).............................................................11

*City of Philadelphia v. Burgum*, No. 26-cv-434, 2026 WL 431943
    (E.D. Pa. Feb. 16, 2026)..............................................................................7, 14, 33

*City of Philadelphia v. Sec'y of the Interior*, No. 26-1348 (3d Cir. 2026) ....................................7

*Comfort v. Lynn Sch. Comm.*, 418 F.3d 1 (1st Cir. 2005)....................................................25

*Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325
    (D.N.H. 2024) ....................................................................................................33

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ................................................11

*Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103 (1st Cir. 2006) ....................28

*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020)........................................................17

*Doe v. Trump*, 157 F.4th 36 (1st Cir. 2025).................................................................25

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).............................................14, 19

*FEC v. Cruz*, 596 U.S. 289 (2022)............................................................................20

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024).....................................27

*Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183 (D.D.C. 2008)........20, 22, 23, 24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...................................................27

*Housatonic River Initiative v. EPA*, 75 F.4th 248 (1st Cir. 2023) ..............................................30

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ............................................................20

*Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) .........................................25, 27

*Maine v. Dep't of Agric.*, No. 25-cv-00131, 2025 WL 1088946
    (D. Me. Apr. 11, 2025) ........................................................................................................35

*Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600 (D. Mass. 2020) ...................................11, 34

*Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) ...........................................30, 34, 35

*McBreairty v. Miller*, 93 F.4th 513 (1st Cir. 2024)....................................................................27

*Melone v. Coit*, 100 F.4th 21 (1st Cir. 2024) ...............................................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............16, 18

*Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149 (D.N.H. 2025) .............................27, 34

*Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024) .................................................................................15

*New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025) ................................................30, 31

*New York v. Trump*, No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) .............15, 29

*Nken v. Holder*, 556 U.S. 418 (2009) ..........................................................................................34

*Ohio v. EPA*, 603 U.S. 279 (2024)............................................................................................14, 15

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)........................25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996)  ...........30, 31, 33

*Sackett v. EPA*, 566 U.S. 120 (2012) .............................................................................................13

*Sierra Club v. Andrus*, 487 F. Supp. 443 (D.D.C. 1980)...............................................................23

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016).........................................................12, 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................................12

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*,
    985 F.3d 472 (5th Cir. 2021) ..............................................................................................15

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ................................30, 33

*Victim Rts. L. Ctr. v. Dep't of Educ.*, 788 F. Supp. 3d 70 (D. Mass. 2025)........................30, 31, 34

*Wesberry v. United States*, 304 F. Supp. 3d 30 (D.D.C. 2018) ........................................................2

*Woonasquatucket River Watershed Council v. Dep't of Agric.*, 778 F. Supp. 3d 440
    (D.R.I. 2025) ...............................................................................................................................35

**Statutes, Rules, and Regulations**

16 U.S.C. § 410aaaa................................................................................................................................18

5 U.S.C. § 704........................................................................................................................................12

5 U.S.C. § 706..................................................................................................................................14, 20

54 U.S.C. § 100101..............................................................................................2, 14, 18, 22, 24, 33

54 U.S.C. § 100701..................................................................................................................13, 24, 33

54 U.S.C. § 100702........................................................................................................................13, 24

54 U.S.C. § 100801........................................................................................................................20

54 U.S.C. § 100802.................................................................................................................3, 13, 20

54 U.S.C. § 100803.........................................................................................................3, 13, 18, 21, 33

54 U.S.C. § 320102................................................................................................................................2

Dep't of Interior, Sec. Order 3431: Restoring Truth and Sanity to American History,
    2025 WL 1517953 (May 20, 2025) ........................................................4, 5, 12, 14, 17, 21

Exec. Order No. 14253, 90 Fed. Reg. 14563, 2025 WL 986448 (Mar. 27, 2025) ..........................4

Pub. L. No. 105-391, 112 Stat. 3497 (1998)....................................................................................2

Pub. L. No. 114-289, 130 Stat. 1482 (2016)................................................................................2, 3

Pub. L. No. 64-235, 39 Stat. 535 (1916)..........................................................................................2

Pub. L. No. 74-292, 49 Stat. 666 (1935)..........................................................................................2

iv

**Other Authorities**

*America's Largest Classroom* (Jessica L. Thompson & Ana K. Houseal eds., 2020) ....................1

Carla Mendez, *'Censoring history divides us': Florida national parks flagged under executive order*, WLRN (Aug. 20, 2025), https://perma.cc/94NN-G5AM .....................6, 8

Chloe Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, NPR (June 26, 2025), https://perma.cc/N5Y8-G697....................5, 18

Dan Friedman, *Trump's War on National Park Signs is Even Dumber Than You Think*, MotherJones (Feb. 26, 2026), https://perma.cc/3XYA-6Z9W ................................7

Dep't of Interior, Director's Order #6 (Jan. 19, 2005), https://perma.cc/YU55-PJ7B ....................3

Dorany Pineda, *From slavery to pollution, National Park employees flagged material deemed 'disparaging' to US*, AP (Sep. 10, 2025), https://perma.cc/JSQ3-DACY ......................................................................................................6

Foundation Document Overview, Lowell National Historical Park, Nat'l Park Serv., https://perma.cc/5MFP-J2H6 (last visited Mar. 16, 2026). ...............................19

Foundation Document, Acadia National Park, Nat'l Park Serv., https://perma.cc/8HC2-7ENK (last visited Mar. 15, 2026) ...............................19

*Foundation Documents*, Nat'l Park Serv., https://perma.cc/LS7B-SV25 (last visited Mar. 10, 2026)...............................................................................................3

*History Under Construction*, Nat'l Park Serv., https://perma.cc/AQ5V-37E4 (last visited Feb. 16, 2026)..........................................................................4, 19

Internet Archive, *DOI Targets for Removal From National Parks under EO14253/SO3431*, https://perma.cc/99YZ-PYGW (last visited Mar. 7, 2026) .................8

Jake Spring & Hannah Natanson, *National Park to remove photo of enslaved man's scars*, Wash. Post (Sep. 15, 2025), https://perma.cc/D4XS-H4US ................................6, 8

Jake Spring, *National park signs related to Native Americans, climate change to be removed*, Wash. Post (Jan. 27, 2026), https://perma.cc/4E76-V3QT ..............................6, 7

Jake Spring, *Park Service removes slavery exhibit at Independence Park in Philadelphia*, Wash. Post (Jan. 22, 2025), https://perma.cc/2X8P-6BD6 .................6, 7, 19

Karin Brulliard & Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://perma.cc/7TA8-NPXV .....................................................................................8

v

Kylie Mohr, *List of national park signs under federal review moves into the absurd*, SFGate (Mar. 10, 2026), https://perma.cc/3ETN-RG3N ...................................................15

Management Policies, Nat'l Park Serv., https://perma.cc/R6VB-XM2G (captured Nov. 20, 2025) .......................................................................3, 19, 21, 22, 23, 24

Maxine Joselow & Lisa Friedman, *Trump Told Park Workers to Report Displays That 'Disparage' Americans. Here's What They Flagged*, N.Y. Times (July 22, 2025), https://perma.cc/4BJ8-WUW9 ...........................................................6, 8

Maxine Joselow, *Park Service Erases Climate Facts at Fort Sumter, Where the Civil War Began*, N.Y. Times (Jan. 22, 2026), https://perma.cc/HA4K-NFLG ......................6, 7

Maxine Joselow, *Park Service is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sep. 16, 2025), https://perma.cc/9DKR-EPJR ........................6, 8

Molly Enking, *Acadia National Park removes educational signs about climate change, Indigenous history*, Maine Public (Sep. 25, 2025), https://perma.cc/CD3L-REFV ................................................................6, 7, 19

Olivia Hebert, *Muir Woods exhibit becomes first casualty of White House directive to erase history*, SFGate (July 22, 2025) https://perma.cc/K4VB-HHFZ ..........................6, 7

*President's House Site; Enslaved People in the Washington Household*, Nat'l Park Serv., https://perma.cc/WU4K-LXA3 (last visited Jan. 23, 2026) ......................................7

*Report of the Director of the National Park Service* (1917), https://perma.cc/528Q-XMHZ.....................................................................................................2

Sarah Dean et al., *White House installs plaques mocking former Presidents Barack Obama and Joe Biden*, NBC News (Dec. 17, 2025), https://perma.cc/J5NY-5KAX....................................................................................................15

Sierra Club, *Latest Documents Uncovered by Sierra Club Reveal Americans Oppose Efforts to Whitewash History and Public Lands* (Dec. 11, 2025), https://perma.cc/P6B2-2ZNF .......................................................................18

Stacy Plaskett, *Congresswoman Plaskett Condemns Removal of Historical Markers in the Virgin Islands National Park*, Office U.S. House Representative Stacey E. Plaskett (Feb. 13, 2026), https://perma.cc/45AA-2M2D.................................................6, 8

*Visiting the President's House Site*, Nat'l Park Serv., https://perma.cc/F9GM-EWXH (last visited Feb. 15, 2026)................................................................................7

**INTRODUCTION**

For generations, national parks have been an awe-inspiring classroom to teach visitors cutting-edge science along with the country's greatest triumphs and tragedies. Congress has repeatedly affirmed that role, and millions of park visitors, storytellers, and communities with ties to the land rely on the National Park Service fulfilling its mandate. But without justification, Defendants cast aside that reliance, clear evidence, and the plain terms of multiple statutes, as well as the implementing statutes and Foundation Documents of countless national parks. In their place, the Interior Secretary's "Restoring Truth and Sanity to American History" Order imposes a broad campaign of censoring disfavored history and science. The Order is arbitrary and capricious and contrary to law—and thus violates the Administrative Procedure Act ("APA")—and causes significant harm. As detailed in Plaintiffs' declarations representing the voices of hundreds of thousands of park visitors and supporters, current and former park employees, history practitioners, scientists, and interpretive designers, that harm is widespread, ongoing, and irreparable. Plaintiffs respectfully request a stay, or in the alternative, a preliminary injunction, of the Order to stop those harms.

**BACKGROUND**

**I.    Congress enshrined the national parks as America's largest classroom.**

Since their earliest days, national parks have been America's largest classroom. In 1886, U.S. Army infantrymen began answering visitor questions in what are now known as "ranger talks" at Yellowstone—the country's first national park.[1] Thirty years later, Congress established

---

[1] *America's Largest Classroom* 1 (Jessica L. Thompson & Ana K. Houseal eds., 2020). The National Park System today includes 433 units or sites, which can be parks, battlefields, sites, memorials, monuments, trails, or recreation areas. This brief uses the terms "parks" or "sites" interchangeably to refer to any type of unit of the national park system, regardless of their particular designation, unless otherwise noted.

the National Park Service through the Organic Act of 1916 and set out its purpose: "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." Pub. L. No. 64-235, § 1, 39 Stat. 535, 535 (1916) (amended and recodified at 54 U.S.C. § 100101(a)).[2] As a 1917 Park Service report observed, "[o]ne of the chief functions of the national parks and monuments is to serve educational purposes."[3]

Congress soon codified the Park Service's educational role in the 1935 Historic Sites Act, which established an education program aimed at publicizing "facts and information pertaining to American historic and archeologic sites, buildings, and properties of national significance." Pub. L. No. 74-292, § 2(j), 49 Stat. 666, 667 (amended and recodified at 54 U.S.C. § 320102(k)). Congress later reiterated the parks' educational function in the National Parks Omnibus Management Act of 1998, providing that the Secretary "shall continually improve the ability of the National Park Service to provide state-of-the-art . . . interpretation of and research on the resources of the National Park System" and "assure that management of units of the National Park System is enhanced by the availability and utilization of a broad program of the highest quality science and information." Pub. L. No. 105-391, §§ 101, 202, 112 Stat. 3497, 3498–99 (amended and recodified at 54 U.S.C. §§ 100701, 100702).

Congress reemphasized these well-established purposes in the National Park Service Centennial Act of 2016, providing that the Secretary "shall ensure that management of System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." Pub. L. No. 114-289, § 301, 130 Stat. 1482, 1487 (codified

---

[2] The Organic Act "was amended and recodified in 2014, although the core mandate remained the same." *Wesberry v. United States*, 304 F. Supp. 3d 30, 35 n.1 (D.D.C. 2018).
[3] *Report of the Director of the National Park Service*, at 7 (1917), https://perma.cc/528Q-XMHZ.

2

at 54 U.S.C. § 100802). The statute further authorizes the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that," among other things, they reflect "different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "current scientific and academic research, content, methods, and audience analysis." *Id.* at 1487 (codified at 54 U.S.C. § 100803). Each park is also guided by its own implementing statute or presidential proclamation, as well as a foundation document describing the purpose of the park and its fundamental resources and values. *Foundation Documents*, Nat'l Park Serv., https://perma.cc/LS7B-SV25 (last visited Mar. 10, 2026).

Beyond these statutory commands, the Park Service's Management Policies confirm that the parks "will be managed as places to demonstrate the principles of science [and] to illustrate the national experience as history." Management Policies § 7.3.1.1. The Policies provide that the Park Service "will continually adjust to changing patterns of visitation and an increasingly multiracial, multiethnic, and multicultural society to ensure that the national park system remains high among societal concerns and relevant to future generations." *Id.* § 7.3.4. And under National Parks Director's Order #6, "[t]he content of interpretive and educational services must be accurate, respect multiple points of view and be free of cultural, ethnic, and personal biases." Dep't of Interior, Director's Order #6 § 8.4.1.

Today, the Park Service provides interpretive materials—including exhibits, signs, brochures, and books—that lend context to each park site and allow visitors to connect to their surroundings. Declaration of Alan Spears ("Spears Decl.") ¶ 23. Creating these materials usually requires months or even years of collaboration among historians, scientists, subject-matter experts, community advocates, and educators, among others. Declaration of Cybelle Jones ("Jones Decl.") ¶¶ 21–23; Declaration of Donna Graves ("Graves Decl.") ¶ 8. The Park Service has prided itself

3

on ensuring that these materials reflect the most current information and research. *History Under Construction*, Nat'l Park Serv., https://perma.cc/AQ5V-37E4 (last visited Feb. 16, 2026). The Park Service has also expressly recognized that it may need to update information to "tell a more holistic story" and that its role is not "to judge what history is worth telling." *Id.* As the Park Service has explained, it is essential to "share an accurate and comprehensive history," including "the good, the bad, the ugly, and everything in between." *Id.*

**II.    Defendants campaign to erase history and science from national parks.**

### A.  The Secretary's Order provides a template for censorship.

Openly defying these statutory requirements and longstanding practices, Defendants have embarked on a campaign to rewrite history and science in the national parks. On March 27, 2025, President Trump issued the "Restoring Truth and Sanity to American History" executive order, which claimed that "[o]ver the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth." Exec. Order No. 14253, § 1, 90 Fed. Reg. 14563, 2025 WL 986448 ("Exec. Order"). Two months later, Interior Secretary Burgum issued Secretary's Order 3431, also titled "Restoring Truth and Sanity to American History," 2025 WL 1517953 ("Sec. Order"), with the stated purpose of "implement[ing] provisions" of the Executive Order. Sec. Order § 1. The Order directed the Park Service to, within 90 days, review "all public monuments, memorials, statues, markers, or similar properties" at park sites

> to identify whether any such properties contain images, descriptions, depictions, messages, narratives or other information (content) that inappropriately disparages Americans past or living (including persons living in colonial times), or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature.

4

*Id.* § 5(b)(1); *see also id.* § 5(a)(1)–(2) (directing the Park Service to review materials "removed or changed" since January 1, 2020 and report whether those alterations "perpetuate a false reconstruction of American history; inappropriately minimize the value of certain historical events or figures; or include any other improper partisan ideology"). Within 120 days, the Order required the Park Service to "remove any content" that "inappropriately disparages Americans . . . [or] emphasizes matters unrelated to the beauty, abundance, or grandeur" of a "natural feature" or is otherwise "inconsistent with the purposes of" the Executive Order. *Id.* § 5(b)(2); *see also id.* § 5(a)(2) (requiring the Park Service to "immediately undertake such actions as are necessary to reinstate" any properties altered since January 1, 2020 for allegedly improper reasons). In place of the noncompliant materials, the Secretary's Order directs the Park Service to install "content that focuses on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape, and is otherwise consistent with" the Executive Order. *Id.* § 5(b)(2).

To "[e]ncourag[e] public participation," the Secretary's Order directed the Park Service to "post signage" at park sites that "allow for public input" through a QR code linked to a Park Service–managed website. *Id.* § 6. The Order required that the signs solicit feedback from visitors on "any signs or other information that are negative about either past or living Americans or that fail to emphasize the beauty, grandeur, and abundance of landscapes and other natural features." *Id.* Signs with the required language and QR code were posted in national parks across the country. Declaration of Jennifer Goepfert ("Goepfert Decl.") ¶ 28.[4] The public comments submitted in response overwhelmingly denounced Defendants' censorship campaign. Spears Decl. ¶ 40.[5]

---

[4] *See* Chloe Veltman, *Asked to flag 'negative' National Park content, visitors gave their own 2 cents instead*, NPR (June 26, 2025), https://perma.cc/N5Y8-G697.
[5] *See also* Veltman, *supra* note 4.

Meanwhile, Park Service leaders instructed staff to review all interpretive materials for compliance with the Executive Order and Secretary's Order and report, in July 2025, on those that needed to be changed to come into compliance. Spears Decl. ¶ 31. In the following months, Park Service leaders notified certain parks of their "non-compliance" with the Secretary's Order— without explaining how to come into compliance. *Id.* Park Service staff were also instructed to submit all new public-facing content for Interior Department review. *Id.*

### B.  The Park Service flags and begins removing hundreds of interpretive materials pursuant to the Secretary's Order.

In the summer of 2025, Park Service staff began removing materials from the parks to comply with the Secretary's Order. *Id.* ¶ 32.[6] In the months since, the Park Service has identified for removal and begun removing hundreds interpretive materials at parks across the country. *Id.*[7] The removed materials include: signs at Acadia National Park that discussed the cultural significance of one of Acadia's landmarks to the Wabanaki people and the effects of climate

---

[6] *See also, e.g.*, Olivia Hebert, *Muir Woods exhibit becomes first casualty of White House directive to erase history*, SFGate (July 22, 2025) https://perma.cc/K4VB-HHFZ; Maxine Joselow & Lisa Friedman, *Trump Told Park Workers to Report Displays That 'Disparage' Americans. Here's What They Flagged*, N.Y. Times (July 22, 2025), https://perma.cc/4BJ8-WUW9; Carla Mendez, *'Censoring history divides us': Florida national parks flagged under executive order*, WLRN (Aug. 20, 2025), https://perma.cc/94NN-G5AM; Dorany Pineda, *From slavery to pollution, National Park employees flagged material deemed 'disparaging' to US*, AP (Sep. 10, 2025), https://perma.cc/JSQ3-DACY; Jake Spring & Hannah Natanson, *National Park to remove photo of enslaved man's scars*, Wash. Post (Sep. 15, 2025), https://perma.cc/D4XS-H4US; Maxine Joselow, *Park Service is Ordered to Take Down Some Materials on Slavery and Tribes*, N.Y. Times (Sep. 16, 2025), https://perma.cc/9DKR-EPJR; Molly Enking, *Acadia National Park removes educational signs about climate change, Indigenous history*, Maine Public (Sep. 25, 2025), https://perma.cc/CD3L-REFV.

[7] *See also, e.g.*, Jake Spring, *Park Service removes slavery exhibit at Independence Park in Philadelphia*, Wash. Post (Jan. 22, 2025), https://perma.cc/2X8P-6BD6; Maxine Joselow, *Park Service Erases Climate Facts at Fort Sumter, Where the Civil War Began*, N.Y. Times (Jan. 22, 2026), https://perma.cc/HA4K-NFLG; Jake Spring, *National park signs related to Native Americans, climate change to be removed*, Wash. Post (Jan. 27, 2026), https://perma.cc/4E76-V3QT; Stacy Plaskett, *Congresswoman Plaskett Condemns Removal of Historical Markers in the Virgin Islands National Park*, Office U.S. House Representative Stacey E. Plaskett (Feb. 13, 2026), https://perma.cc/45AA-2M2D.

change on the surrounding environment and the resulting damage to the park;[8] two films on labor history at Lowell National Historical Park;[9] an exhibit at the President's House Site in Independence National Historical Park examining "the paradox between slavery and freedom in the founding of the nation" and describing the critical role that enslaved people played in the operation of the home during George Washington's presidency;[10] signs describing environmental developments, a film about the park, and the official podcast at Glacier National Park;[11] "sticky notes" at Muir Woods in Golden Gate National Park detailing Indigenous history, the role of women in the conservation movement, and the historical role of Park Service staff in eugenics movements;[12] an interpretive display at Fort Sumter that described how the historic island fortress may be underwater by the end of the century due to climate change;[13] and many others. The vast majority of the removals pursuant to the Order have targeted materials that detail the contributions of historically marginalized groups, describe atrocities perpetrated against certain communities, or explain the long-term impact of scientific developments. *Id*. ¶ 32.

Meanwhile, based on the Secretary's Order, Park Service staff have flagged hundreds of other signs and interpretive materials, including materials detailing the history of people who were

---

[8] Enking, *supra* note 6.

[9] Spring, *Park Service removes slavery exhibit*, *supra* note 7.

[10] *President's House Site; Enslaved People in the Washington Household*, Nat'l Park Serv., https://perma.cc/WU4K-LXA3 (last visited Jan. 23, 2026); *Visiting the President's House Site*, Nat'l Park Serv., https://perma.cc/F9GM-EWXH (last visited Feb. 15, 2026). A Pennsylvania district court issued a preliminary injunction concluding that the removal was likely unlawful and ordered the defendants to restore the site. *See City of Philadelphia v. Burgum*, No. 26-cv-434, 2026 WL 431943, at *10 (E.D. Pa. Feb. 16, 2026). After restoration began but before it was completed, Judge Hardiman of the Third Circuit issued an administrative stay, ordering that the exhibit remain in the status quo as of the entry of that order on February 20, 2026. *City of Philadelphia v. Sec'y of the Interior*, No. 26-1348 (3d Cir. Feb. 20, 2026), Doc. No. 11.

[11] Spring, *National park signs related to Native Americans*, *supra* note 7; Dan Friedman, *Trump's War on National Park Signs is Even Dumber Than You Think*, MotherJones (Feb. 26, 2026), https://perma.cc/3XYA-6Z9W.

[12] Hebert, *supra* note 6.

[13] Joselow, *Park Service Erases Climate Facts*, supra note 7.

enslaved; describing key moments in the civil rights movement; discussing the mistreatment of Indigenous groups; or providing scientific information such as the importance of clean air and the acceleration of global warming. *Id.*[14] On March 2, 2026, unnamed "civil servants on the front lines" posted a copy of the database of interpretive materials that have been flagged by park staff.[15] The database, available on two public websites, lists at least 500 interpretive materials that have been flagged based on the Secretary's Order. *See* supra n.15.

**III.    The Secretary's Order irreparably harms Plaintiffs and their members.**

The harms from the Secretary's Order and its implementation have been far-reaching, irreparable, and devastating to park visitors, historians, scientists, conservationists, designers, and those who devote their lives and careers to the national parks. For Plaintiffs and their members, it has impeded their missions; upended their work; chilled expression; undermined entire professions; led to loss of income; caused informational, recreational, and aesthetic harms; and detracted from public enjoyment of and engagement with the parks.

Plaintiffs are organizations committed to protecting the national parks, preserving and sharing history, promoting access to high-quality scientific information, and providing high-quality interpretive materials for park visitors. Their missions involve ensuring that the national parks are preserved and welcoming for all visitors, now and in the future. Declaration of John Dichtl ("Dichtl Decl.") ¶¶ 8–9; Declaration of Bill Wade ("Wade Decl.") ¶¶ 13, 19, 22; Declaration of Emily Thompson ("Thompson Decl.") ¶ 9; Jones Decl. ¶¶ 11, 18; Declaration of Julian Jon

---

[14] *See also, e.g.*, Spring & Natanson, *supra* note 6; Mendez, *supra* note 6; Plaskett, *supra* note 7; Joselow & Friedman, *supra* note 6; Joselow, *Park Service is Ordered*, *supra* note 7.

[15] Karin Brulliard and Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://perma.cc/7TA8-NPXV (citing Internet Archive, *DOI Targets for Removal From National Parks under EO14253/SO3431*, https://perma.cc/99YZ-PYGW (last visited Mar. 7, 2026)); Sciop, *DOI Targets for Removal from National Parks under EO14253/SO3431* (last visited Mar. 7, 2026), https://perma.cc/KYC9-7E8Z).

Reyes ("Reyes Decl.") ¶ 7. For example, in fulfilling its mission of "protecting and enhancing America's National Park System for present and future generations," the National Parks Conservation Association ("NPCA") aims to "ensur[e] the national parks tell the stories of all Americans" and "are managed according to science-based standards for long-term ecological and climate resilience." Spears Decl. ¶¶ 19, 25–26. The Secretary's Order impairs Plaintiffs' ability to fulfill their missions. *See* Spears Decl. ¶¶ 31, 34; Dichtl Decl. ¶ 21; Wade Decl. ¶ 13; Thompson Decl. ¶ 12; Reyes Decl. ¶¶ 15, 17. For the Society for Experiential Graphic Design ("SEGD"), the Secretary's Order and its implementation have "dramatically undermined and interfered with [its] work to make the built environment more inclusive and intuitive, emotive and engaging, sustainable and shared." Jones Decl. ¶ 28. Plaintiffs have also diverted resources from other core functions because of the Order. *See* Spears Decl. ¶ 41; Dichtl Decl. ¶¶ 21, 25; Wade Decl. ¶ 25; Thompson Decl. ¶¶ 14–16; Jones Decl. ¶ 30. For instance, the Union of Concerned Scientists ("UCS") has postponed several long-term projects and redirected "approximately 5% of staff resources and capacity away from other activities that are integral to its mission" since issuance of the Secretary's Order. Reyes Decl. ¶ 16.

Defendants' actions have also chilled expression. For American Association for State and Local History ("AASLH") members, "the only way to continue to work with the Park Service and stay out of the agency's crosshairs is to adopt the censored narrative and disregard a whole history by neglecting to discuss anything that the Park Service, pursuant to the Secretary's Order, might consider disparaging." Dichtl Decl. ¶ 29; Graves Decl. ¶ 35; *see also* Jones Decl. ¶ 31. And Defendants' actions have harmed entire professions. AASLH, for instance, has spent time supporting history practitioners who are "feeling pressure to defy fieldwide best practices" because of the Secretary's Order. Dichtl Decl. ¶ 25; *see also* Wade Decl. ¶¶ 20, 24, 26; Jones Decl. ¶ 29.

9

Multiple Plaintiffs have lost income, either for their organizations or for their members. Employment opportunities with the Park Service have "completely evaporated" for AASLH member Ms. Graves, who has historically relied on the Park Service for 40% to 80% of her annual income. Graves Decl. ¶ 33. Other AASLH members have suffered similar harm to their employment prospects. Dichtl Decl. ¶¶ 28, 32. And Association of National Park Rangers ("ANPR") saw attendance at a paid event drop "due to fear among current Park Service staff" of being seen opposing the Secretary's Order, but funds from that event are "critical" to ANPR's "continued viability." Wade Decl. ¶¶ 23, 16.

Finally, regular park visitors like NPCA member Jennifer Goepfert have suffered informational, recreational, and aesthetic harms because the Secretary's Order deprives them of valuable context about the parks. For parents, and educators, like Ms. Goepfert, the interpretive materials at the parks "are fundamental" to teaching, and the Order "jeopardize[s]" the ability "to continue using the parks to educate" children. Goepfert Decl. ¶¶ 34, 32. Because of Defendants' actions, Ms. Goepfert can "no longer dependably rely on the Park Service for accurate information about science and history to teach" her children. *Id.* ¶ 34. For NPCA's other 1.9 million members and supporters who "regularly visit, study, work, photograph, or recreate" at national parks, the Order and its implementation mean that when they visit parks, they no longer have access to "the full history of our country," "the effects of environmental developments on park land," or "interpretive materials that previously provided complete and accurate historical and scientific information." Spears Decl. ¶¶ 18, 38–39, 42–43. Because of the Secretary's Order, "'America's largest classroom' has essentially shut its doors." Goepfert Decl. ¶ 34.

10

**LEGAL STANDARD**

"In deciding whether to issue a preliminary injunction, a court weighs four factors: '(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.'" *Brox v. Woods Hole*, 164 F.4th 37, 42 (1st Cir. 2026) (citation omitted).[16] Whether to stay agency action under § 705 of the APA turns on these same factors. *Mass. Fair Hous. Ctr. v. HUD*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020).

**ARGUMENT**

The Secretary's Order is an extraordinary attempt to rewrite history and science in America's largest classroom. On the merits, Plaintiffs are likely to show that the Secretary's Order violates the APA in multiple ways. First, the Order is arbitrary and capricious for several reasons, including because Defendants offered no explanation for their abrupt decision that some history and science is not worth telling, or their disregard for the Order's impact on numerous constituencies. The Order is also contrary to at least three statutes that delineate the mission of the national parks and the Park Service's duties and educational responsibilities. Plaintiffs have standing to challenge the Order because they—and their members—have been harmed by the Order's censorship of historical and scientific information at national parks. And the equitable factors favor Plaintiffs because they are irreparably harmed by the frustration of their missions and loss of income and goodwill stemming from the Order, while Defendants face no countervailing

---

[16] At the preliminary injunction stage, the court need only "make an estimation of likelihood of success and need not predict the eventual outcome on the merits with absolute assurance." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quotation marks and citation omitted).

harm from an injunction that simply halts their unlawful actions. Accordingly, this Court should preliminarily enjoin or stay the Secretary's Order.

## I.    Plaintiffs are likely to show that the Secretary's Order violates the APA.

The Secretary's Order marks a stark shift in policy for the Park Service: rather than working to ensure that full and accurate historical and scientific information is shared at park sites, the Order requires park staff to censor interpretive materials that do not conform to the administration's preferred viewpoint. That unreasoned and unreasonable departure from past practice is arbitrary and capricious under the APA. And it violates multiple statutes requiring the Park Service to educate the public and provide accurate, and inclusive, interpretation. Accordingly, Plaintiffs are likely to succeed on the first four counts of the amended complaint.[17]

### A.    The Secretary's Order is final agency action.

At the outset, the Secretary's Order is reviewable "final agency action." 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 156, 178 (1997) (quotation marks omitted). Courts take a "pragmatic approach . . . to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation marks omitted). "In determining whether a particular agency action is final, 'the core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016).

The Secretary's Order directs Park Service staff to identify and remove any disfavored content and to reinstate any properties altered for disfavored reasons. Sec. Order §§ 5(a)(3), (b)(2).

---

[17] Plaintiffs do not seek preliminary relief on the fifth and sixth counts of the amended complaint.

The Order confirms that the agency's decisionmaking process has ended: properties that contain the administration's disfavored viewpoints must be identified and taken down. The plain language of the Order demonstrates that Defendants have "made a decision and [are] moving forward with it." *Ass'n of Am. Univs. v. U.S. Dep't of Energy*, 789 F. Supp. 3d 118, 138 (D. Mass. 2025). And the Order itself is final, even though the removal process remains ongoing. *Cf. Sackett v. EPA*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal.").

The second prong of the finality inquiry is satisfied because the Secretary's Order "directly affect[s]" Plaintiffs. *Sig Sauer*, 826 F.3d at 600 n.1. Hundreds of signs and exhibits have already been flagged or removed in compliance with the Order, and Plaintiffs have every reason to expect more of the same will follow. Spears Decl. ¶¶ 31–33; Graves Decl. ¶¶ 30–32. As detailed above, the Order has real-world consequences (the disappearance of interpretive materials) that impact Plaintiffs' day-to-day work: it has frustrated their missions and forced them to divert resources from other efforts to combat Defendants' censorship.[18] It also has legal consequences: in visits to national parks, Plaintiffs and their members are no longer assured that interpretation will "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" or "reflect current scientific and academic research." 54 U.S.C. § 100803(2), (4). Nor can they enjoy parks that are "enhanced by the availability and use of a broad program of the highest quality interpretation and education," *id.* § 100802, or include "state-of-the-art" interpretation and research using the "highest quality science and information," *id.* §§ 100701–100702. Defendants' actions hardly ensure that the parks will be "unimpaired for the enjoyment of future generations."

---

[18] Spears Decl. ¶¶ 36, 41; Dichtl Decl. ¶¶ 23–25; Reyes Decl. ¶ 16; Wade Decl. ¶¶ 22, 25; Thompson Decl. ¶ 14; Jones Decl. ¶ 30 (all describing diversion of resources)).

*Id.* § 100101(a). And Plaintiffs and their members lose the benefit they would have from Defendants following those laws.

Because the Secretary's Order is the end result of the agency's decisionmaking process, and because the Order directly affects Plaintiffs, it is final agency action subject to judicial review under the APA. *See City of Philadelphia v. Burgum*, No. 26-cv-434, 2026 WL 431943, at *10 (E.D. Pa. Feb. 16, 2026) (holding that Park Service's removal of slavery-related displays at President's House site in Philadelphia constituted final agency action).

### B. The Secretary's Order is arbitrary and capricious in numerous ways.

Under the APA, courts must set aside agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted). Agency action is also arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Melone v. Coit*, 100 F.4th 21, 29 (1st Cir. 2024) (citation omitted). And while agencies are free to change existing policies, they must "display awareness that" they are doing so, provide "good reasons for the new policy," and demonstrate that they have taken account of "reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

The Secretary's Order is arbitrary and capricious for several reasons, any one of which is a sufficient basis to set it aside. First, Defendants failed to provide any explanation—much less a reasoned one—for the Order's mandate that signs and exhibits that do not align with the administration's preferred historical and scientific narratives be removed. The Order summarily

14

stated that its purpose was to "implement[] provisions" of the Executive Order. Sec. Order § 1. But "final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024); *see also, e.g.*, *New York v. Trump*, No. 25-cv-11221, 2025 WL 3514301, at *9 & n.9 (D. Mass. Dec. 8, 2025) (collecting cases). Here, Defendants offered no explanation as to why the removal of any materials that "inappropriately disparage Americans" is warranted, and provided no coherent definition of what would qualify as inappropriately disparaging.[19] Likewise, Defendants provided no justification for ordering the removal of materials that "emphasize[] matters unrelated to the beauty, abundance, or grandeur" of natural features, and offered no explanation of what it means to "relate to" those facets of the landscape. Defendants' complete failure to explain the basis for (or meaning of) the terms of the Order renders it arbitrary and capricious. *See Ohio*, 603 U.S. at 292.

Second, Defendants failed to consider important aspects of the problem the Order purports to address. In announcing sweeping changes to how history and science would be shared in "America's largest classroom," Defendants completely disregarded, among other things: the unique role national parks play in telling a full and accurate history of the United States; the impact of erasing the history of certain people, communities, and ideas; the importance of educating visitors about environmental impacts on park land; the fundamental principle that the parks are for

---

[19] Indeed, despite the Order's prohibition on "disparaging" content, the White House—also a national park site—later displayed plaques denigrating one former president as "the worst President in American History" and another as having presided over "the worst political scandal in American History." Sarah Dean et al., *White House installs plaques mocking former Presidents Barack Obama and Joe Biden*, NBC News (Dec. 17, 2025), https://perma.cc/J5NY-5KAX. Meanwhile, a sign at the White House Visitor Center mentioning that President Harding served cocktails to guests during Prohibition was flagged based on the Order. Kylie Mohr, *List of national park signs under federal review moves into the absurd*, SFGate (Mar. 10, 2026), https://perma.cc/3ETN-RG3N. This arbitrary application of the Order further shows that it violates the APA. *Cf. Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 479 (5th Cir. 2021) (noting that a "bedrock principle of administrative law [is] that an agency must treat like cases alike") (citation modified).

15

the enjoyment of all the people of the United States; the wastefulness of removing historical and scientific information and ignoring the agency's knowledge; the impact on future generations of not having access to comprehensive historical and scientific information at the parks; and the harmful effects of erasing history on entities and jurisdictions that regularly partner with national parks. *See, e.g.*, Spears Decl. ¶ 22 (explaining that the Park Service is "one of our nation's largest repositories of American history" and that the parks "are also one of the largest practical science classrooms in the world"). Nowhere in the Order did Defendants even attempt to reckon with these significant concerns. That alone demonstrates that Defendants "entirely failed to consider" several "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Third, Defendants failed to account for reliance interests of Plaintiffs and countless others when issuing the Order. Millions of parents, educators, park visitors, and community groups rely on the parks as a critical resource to learn, and teach, the most complete and accurate history and science possible. *See, e.g.*, Goepfert Decl. ¶¶ 8–14; Spears Decl. ¶¶ 23, 42–44. Historically marginalized communities whose own histories are often undertold or disregarded in mainstream sources rely on the parks to continue chronicling their stories. *See, e.g.*, Graves Decl. ¶¶ 8, 36 (describing consultation with impacted communities as a key element of interpretation for the Park Service); Jones Decl. ¶¶ 21–22 (describing one interpretive project on the history of slavery as a product of "public surveys, forums, and more than a dozen workshops with National Park Service rangers and interpreters, local educators, national historians, and specialists"). Scientists, environmentalists, and conservationists rely on the parks to be responsible stewards of the environment, not only educating the public but taking affirmative steps to mitigate the human impact on natural resources. *See, e.g.*, Reyes Decl. ¶ 18 (describing the Park Service as "a key

16

partner in . . . provid[ing] accurate scientific information and increas[ing] scientific literacy and access); Thompson Decl. ¶¶ 12, 16 (describing reliance on the Park Service to provide sound science, and needing to issue reports about climate impacts at parks to fill the gap left by the Park Service). And Plaintiffs and others have long relied on the Park Service to help achieve their missions, which include focusing on the preservation and protection of the parks or ensuring historical and scientific accuracy and completeness. Spears Decl. ¶¶ 19–30; Thompson Decl.¶ ¶ 9–11; Wade Decl. ¶¶ 19; Dichtl Decl. ¶¶ 8–12, 17–20; Reyes Decl. ¶¶13–14; Jones Decl. ¶¶ 21– 23. Defendants failed to account for any of these reliance interests before upending the Park Service's approach to historical and scientific interpretation. That failure, too, renders the Order arbitrary and capricious. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 33 (2020) (explaining that because the agency "was not writing on a blank slate, it was required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns" (quotation marks, citation, and emphasis omitted)).

Fourth, the Order lacks support and runs counter to the evidence. The Order requires the Park Service to install interpretations focused on "the greatness of the achievements and progress of the American people" in place of material that "disparages Americans past or living." Sec. Order § 5(b)(1)–(2). But Defendants provided no factual basis for this insinuation that interpretation not focused on "greatness" is necessarily disparaging, or that accurate factual information constitutes disparagement. Similarly, Defendants provided no factual basis for the Order's suggestion that alterations or removals of interpretive materials since January 1, 2020 were done to promote a "false reconstruction of American history" or include "partisan ideology." *Id.* § 5(a)(2)(iv). Instead, the facts available to Defendants include high-quality academic and scientific research, carefully developed over years, demonstrating the accuracy of the information Defendants have

17

now erased. Dichtl Decl. ¶ 18 (describing previous Park Service practices as "standard bearers for the field"); Reyes Decl. ¶¶ 13–14 (describing the "independent, expert scrutiny" that the Park Service once provided); Spears Decl. ¶ 23; Graves Decl. ¶ 8; Jones Decl. ¶ 20. Defendants also received hundreds of comments from the public that overwhelmingly denounced the projected impact of the Order and its censorship. Spears Decl. ¶ 40; Goepfert Decl. ¶ 28; Veltman, *supra*.[20] Because Defendants' decision "runs counter to the evidence before the agency," the Order is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Finally, Defendants did not provide any explanation, let alone a reasoned one, for departing from the Park Service's practice of seeking to share full and accurate historical and scientific information, in compliance with statutory and policy obligations. Defendants provided no justification for abandoning the Park Service's statutory mandate that the parks be "managed for the benefit and inspiration of all the people of the United States." 54 U.S.C. § 100101(b)(1)(C). Nor did they address how the Order squares with statutory requirements that interpretation in the parks "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs," and "reflect current scientific and academic research." *Id.* § 100803. And Defendants failed to explain how the Order's terms should be reconciled with individual parks' implementing statutes that require a focus on content other than "the greatness of the achievements and progress of the American people" or "the beauty, abundance, and grandeur of the American landscape."[21] Defendants also did not provide a rationale for ignoring the Management Policies' guidance that

---

[20] *See also* Sierra Club, *Latest Documents Uncovered by Sierra Club Reveal Americans Oppose Efforts to Whitewash History and Public Lands* (Dec. 11, 2025), https://perma.cc/P6B2-2ZNF (describing comments to other agencies bound by the Secretary's Order that "show that Americans overwhelmingly reject the Trump administration's attempt to sanitize history on public lands").

[21] For example, the implementing statute for Fort Sumter mandates that "[t]he Secretary shall provide for the interpretation of historical events and activities that occurred in the vicinity of Fort Sumter and Fort Moultrie, including . . . the lives of (i) the free and enslaved workers who built and maintained Fort Sumter and Fort Moultrie." 16 U.S.C. § 410aaaa(e)(2).

the parks should educate visitors about "topics such as the civic experience of our country; the complex [diverse] ecology of our nation and the world; and the influence of global climate change." Management Policies § 7.5.1. And Defendants did not explain how to reconcile the Order's instructions with the Foundation Documents of dozens, if not hundreds, of parks, that describe primary interpretive themes, *see id.* § 2.2, that prioritize history or science other than "the greatness of the achievements and progress of the American people" or "the beauty, abundance, and grandeur of the American landscape."[22] The Park Service has acknowledged that it is critical to "share an accurate and comprehensive history" that includes "the good, the bad, the ugly, and everything in between." *History Under Construction*, *supra* Sec. I. Yet without any explanation, Defendants chose to depart from these practices and decided instead that some history and science is not worth telling. Defendants' failure to acknowledge this change in position, and to provide "good reasons for the new policy," was arbitrary and capricious. *See Fox*, 556 U.S. at 515.

**C. The Secretary's Order is contrary to law and exceeds Defendants' statutory authority.**

---

[22] For example, the Lowell National Park Foundation Document lists "labor relations in the United States and transforming gender, racial, and ethnic identities ultimately leading to socioeconomic opportunity and inequity" as one interpretive theme. Foundation Document Overview, Lowell National Historical Park, Nat'l Park Serv., https://perma.cc/5MFP-J2H6 (last visited Mar. 16, 2026). Yet the Park Service there stopped showing two films on labor history "to ensure compliance with the Interior Secretary's order implementing Trump's executive order." Spring, *Park Service removes slavery exhibit*, *supra* note 7. Similarly, the Foundation Document for Acadia National Park notes that "Acadia's human history begins with centuries of use by native people known as the Wabanaki," and explains the park's ability to "inspire people to learn about the critical issues threatening the park and take action to protect the integrity of Acadia in a changing world and an era of changing climates." Foundation Document, Acadia National Park, Nat'l Park Serv., https://perma.cc/8HC2-7ENK (last visited Mar. 15, 2026). Nonetheless, pursuant to the Order, the Park Service removed signs that described the cultural significance of park landmarks to the Wabanaki people, explained "how rising seas and intense storms due to climate change impact the park, and encouraged visitors to help avoid emissions." An Interior spokesperson characterized the removed signs as "brainless fear-mongering rhetoric used to steal taxpayer dollars." Enking, *supra* note 6.

19

The Secretary's Order also violates the APA because it is contrary to law and exceeds Defendants' statutory authority. An agency "literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quotation marks and citation omitted). The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). In making this determination, "courts must exercise their independent judgment" and "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).

The Park Service is "bound by specific statutory mandates that define the Service's mission and impose independent requirements upon the agency." *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 189–90 (D.D.C. 2008). The Secretary's Order violates multiple statutes that define the role and duties of the Park Service, including the National Park Service Centennial Act, the Organic Act, and the National Parks Omnibus Management Act.

### 1.  The Secretary's Order violates the Centennial Act.

The Secretary's Order is contrary to the Centennial Act, which provides that the Secretary "shall ensure that management of [National Park] System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education." 54 U.S.C. § 100802. The statute defines "interpretation" as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." *Id.* § 100801(1)(A). "Education" means "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." *Id.* § 100801(2).

The Secretary's Order does not ensure that the parks provide "the highest quality interpretation and education." Instead of "enhancing" public awareness and understanding of park sites and resources, it does precisely the opposite by censoring any historical and scientific information that the administration disfavors. And the Order restricts, rather than promotes, opportunities for people to form intellectual and emotional connections in the parks. Spears Decl. ¶ 37. By insisting that some history is not worth telling, the Order sharply narrows the universe of people whose own experiences and history are represented in the parks. *Id.* This contravenes the statutory mandate to provide high-quality interpretation and education.

The Centennial Act also authorizes the Secretary to "undertake a program of regular evaluation of interpretation and education programs to ensure that they (1) adjust to how people learn and engage with the natural world and shared heritage as embodied in the System; (2) reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs; (3) demonstrate innovative approaches to management and appropriately incorporate emerging learning and communications technology; and (4) reflect current scientific and academic research, content, methods, and audience analysis." 54 U.S.C. § 100803.[23] It does not authorize a program to ensure the inverse result.

The Secretary's Order violates these provisions, too. The Order brands history that is more complete, and science that is more comprehensive, as "a false reconstruction of American history" and "improper partisan ideology." Sec. Order § 5(a)(2)(iv). The content being removed or flagged under the Order largely concerns the history and experiences of groups whose stories have previously gone untold—particularly Black history and Indigenous history—as well as

---

[23] The Management Policies speak to these goals as well. *See, e.g.*, § 7.3.1.1 (providing that the parks "will be managed as places to demonstrate the principles of science, to illustrate the national experience as history, to engage learners throughout their lifetimes, and to do these things while challenging visitors in exciting and motivating settings")

information about environmental impacts on the parks, including climate change. Spears Decl. ¶¶ 31–33; Dichtl Decl. ¶¶ 27–28; Reyes Decl. ¶ 15. In other words, the targeted content is precisely the type the Centennial Act envisions: content that reflects "different cultural backgrounds" and "current scientific and academic research." That places the Order in direct tension with the Centennial Act and corresponding provisions of the Management Policies.

### 2. The Secretary's Order violates the Organic Act.

The Secretary's Order is also contrary to the Organic Act, which is "the most important statutory directive for the National Park Service." *Greater Yellowstone*, 577 F. Supp. 2d at 190 (quoting Management Policies § 1.4.1). The "overriding aim of the Organic Act, as well as the purpose of NPS' oversight and management of the park system, is to conserve the natural wonders of our nation's parks for future generations." *Bluewater Network v. Salazar*, 721 F. Supp. 2d 7, 21 (D.D.C. 2010). The Organic Act provides that the Secretary, "acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units." 54 U.S.C. § 100101(a). That purpose is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." *Id.*

The Management Policies flesh out the Organic Act's requirements. *See* Management Policies § 1.4.1 ("This section . . . represents the agency's interpretation of these key statutory provisions."); *cf. Greater Yellowstone*, 577 F. Supp. 2d at 190 n.1 (noting section 1.4 of the Policies is "enforceable" because it "serves as NPS's official interpretation of the Organic Act"). They explain that the Park Service "must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise." § 1.4.4. This is the Park Service's "primary

22

responsibility" because it "ensures that park resources and values will continue to exist in a condition that will allow the American people to have present and future opportunities for enjoyment of them." *Id.* The "park resources or values" subject to this standard include "the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system, and the benefit and inspiration provided to the American people by the national park system." *Id.* § 1.4.6. An impact that would "diminish opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values" is unacceptable. *Id.* § 1.4.7.1; *see also Bluewater*, 721 F. Supp. at 21 (Management Policies "guide the agency in determining what constitutes an impairment").

While the Organic Act confers discretion on the Park Service in determining how best to protect Park resources, that discretion is "not unlimited" and is "bounded by the terms of the Organic Act itself." *Greater Yellowstone*, 577 F. Supp. 2d at 193 (quotation marks and citation omitted); *see also, e.g.*, *Sierra Club v. Andrus*, 487 F. Supp. 443, 448–49 (D.D.C. 1980) (Congress "clearly set some limit on the Secretary's discretion in discharging his statutory duties"); Management Policies § 1.4.4 ("While Congress has given the Service the management discretion to allow impacts within parks, that discretion is limited by the statutory requirement (generally enforceable by the federal courts) that the Park Service must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise.").

The Secretary's Order violates the Organic Act and the related Management Policies. Most obviously, the Order fails to leave the parks "unimpaired for the enjoyment of future generations." To the contrary, the Order directs the Park Service to remove any content that does not conform to the administration's preferred viewpoint. This directive has already resulted in the removal of signs and exhibits discussing previously untold histories and important scientific information. *See,*

23

*e.g.*, *supra* n.15 and accompanying text. These removals have "diminish[ed] opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values." *See, e.g.*, Spears Decl. ¶ 37. And with hundreds of other interpretive materials flagged based on the Secretary's Order, including those describing the history of communities with ties to particular land or explaining the interaction between people and the environment, further diminished opportunities are sure to follow. *See, e.g.*, *id.*; *supra*, Sec. II.B; Goepfert Decl.

The Order also violates the Organic Act because it fails to "conserve the scenery, natural and historic objects, and wild life in the System units." 54 U.S.C. § 100101(a). The Organic Act imposes a "conservation mandate" on the Park Service. *Greater Yellowstone*, 577 F. Supp. 2d at 191. This mandate "is independent of the separate prohibition on impairment and applies all the time with respect to all park resources and values." Management Policies § 1.4.3. To that end, "NPS managers must always seek ways to avoid, or to minimize to the greatest extent practicable, adverse impacts on park resources and values." *Id.* The Order does just the opposite. Instead of allowing the Park Service to conserve the natural and historic objects in the parks, not to mention informational resources, the Order requires censorship of disfavored certain historical and scientific information, making it impossible to tell the full story of those sites. Spears Decl. ¶ 38.

### 3. The Secretary's Order violates the Omnibus Management Act.

Finally, the Secretary's Order is contrary to the Omnibus Management Act, which provides that the Secretary of the Interior "shall continually improve the ability of the [Park] Service to provide state-of-the-art . . . interpretation of, and research on, the resources of the [Park] System." 54 U.S.C. § 100701. It further provides that the Secretary "shall ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information." *Id.* § 100702.

The Secretary's Order violates both of these provisions. Rather than bolster the ability to provide state-of-the-art work, the Order actively harms the quality of interpretation and research throughout the parks by limiting the stories and information that may be shared. And the Order runs afoul of the Omnibus Management Act's requirement to use "a broad program of the highest quality science and information" for the same reasons as it violates the similar mandate in the Centennial Act. *See* Argument, Sec. I.C.1 *supra*. The Order casts high-quality science and history aside in favor of a narrow conception of which stories are worth telling. The Omnibus Management Act forbids that dereliction of the Park Service's duty to educate the public.

## II. Plaintiffs are likely to establish standing to challenge the Secretary's Order.

At the preliminary injunction stage, "the plaintiffs need only make a clear showing that they are <u>likely</u> to succeed in establishing Article III standing." *Doe v. Trump*, 157 F.4th 36, 47 (1st Cir. 2025). Plaintiffs easily do so.[24]

### A. All Plaintiffs have organizational standing.

To start, each Plaintiff has established organizational standing. "An organization has standing if it can show that the defendant's actions cause a concrete and demonstrable injury to the organization's activities that is more than simply a setback to the organization's abstract social interests." *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19, 32 (D. Mass. 2023). This is "not a demanding standard, as only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Am. Acad. of Pediatrics v. Kennedy*, No. 25-cv-11916, 2026 WL 33719, at *5 (D. Mass. Jan. 6, 2026) (citation modified).

---

[24] "So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief." *Am. Acad. of Pediatrics*, 2026 WL 33719, at *6 n.16 (quoting *Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) (en banc), *abrogated on other grounds by Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007)).

The Secretary's Order has directly and concretely harmed Plaintiffs' organizational activities. Defendants have removed, or flagged for removal, hundreds of signs and other materials that share full and accurate historical and scientific information—targeting in particular materials that share undertold histories or information about environmental impacts. Spears Decl. ¶¶ 32–33. This censorship has hindered Plaintiffs' ability to accomplish their missions and has forced them to divert resources from other efforts to fill the gaps created by the Park Service's abandonment of its statutory obligations. For example, NPCA has had to divert time from usual activities, such as new park designation campaigns, to track and respond to erasure at existing parks. *Id*. ¶¶ 36, 41. AASLH, too, has redirected resources to respond to "attacks" on "historical best practices" and history at the national parks, combat historical misinformation, and mitigate harms to history practitioners who have been censored, fear backlash, or lost work as a result of the Order. Dichtl Decl. ¶¶ 21–25. The Coalition authored a report on how to "safeguard the parks from long-term harm due to climate change" to help fill the gap left by the Park Service, Thompson Decl. ¶ 16, and has reallocated resources from "core organizational activities and goals" to "fielding questions about removals from members and partners, developing briefing papers, collaborating with policymakers" on how best to respond to the impact of the Order. *Id*. ¶¶ 14–15. ANPR has publicly denounced the Order and its effects, not only requiring the organization to divert time and resources from its other priorities, but also endangering its relationship with its members. Wade Decl. ¶¶ 20–25. For SEGD, responding to the Order has meant redirecting resources from core activities including new "educational programming" and "research initiatives related to experiential design and interpretation." Jones Decl. ¶ 30. And UCS has redirected "approximately 5% of staff resources and capacity" since issuance of the Order, including "responding to inquiries

26

and strategizing about how to best ensure rigorous, independent scientific principles continue to be reflected in the national parks." Reyes Decl. ¶ 16.

These injuries confer organizational standing because the Secretary's Order "directly affect[s] and interfere[s] with [Plaintiffs'] core business activities." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Several courts in this Circuit have held that comparable injuries establish organizational standing. *See, e.g.*, *Am. Acad. of Pediatrics*, 2026 WL 33719, at *5 (plaintiff alleged that "its ability to provide its regular programming and resources to both its members and others has been impaired by the need to specifically address the Challenged Actions and to divert resources in response to Defendants' actions"); *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (defendants' attacks on DEI impaired organizations' work conducting DEI and social justice trainings for school districts); *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 49 (D. Mass. 2024) (defendants' actions impaired organization's ability "to provide its regular programming and resources," and forced organization "to divert resources to combatting Defendants' actions"); *Louis*, 685 F. Supp. 3d at 33 (organization alleged frustration of mission and diversion of resources). Plaintiffs have amply shown concrete injuries and the "type of diversion of resources [that] goes beyond mere advocacy as to be sufficient for organizational standing." *Am. Acad. of Pediatrics*, 2026 WL 33719, at *6.

The remaining standing requirements are also satisfied. Plaintiffs' injuries are "fairly traceable," *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024), to the Secretary's Order because they flow directly from the adoption and implementation of Defendants' new policy—set out in the Order—of refusing to share whole and accurate historical and scientific information at national parks. *See, e.g.*, Spears Decl. ¶¶ 31–41; Wade Decl. ¶¶ 19–25; Thompson Decl. ¶¶ 12–

27

18; Dichtl Decl. ¶¶ 21–26; Reyes Decl. ¶¶ 15–19; Jones Decl. ¶¶ 24–32 (all describing harms flowing from the Order). Those injuries "may be redressed by," *McBreairty*, 93 F.4th at 518, a judicial order enjoining implementation of the Order and undoing Defendants' efforts to erase historical and scientific information from the parks.

### B. Plaintiffs NPCA and AASLH also have associational standing.

NPCA and AASLH also have associational standing. To establish associational standing, an organization must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 108 (1st Cir. 2006) (citation omitted).

Each requirement is satisfied here. NPCA members, including Jennifer Goepfert, regularly visit, study, work, and recreate at national parks, seeking complete and accurate historical and scientific information. Spears Decl. ¶¶ 42–44. The Secretary's Order has harmed these members' informational, recreational, scientific, and educational interests and has degraded their experiences at the parks. *Id.* Ms. Goepfert, for example, visited 66 Park Service–managed sites in one year while homeschooling her twin daughters, and relied on interpretive materials to educate them. Goepfert Decl. ¶¶ 8–30. Because of Defendants' actions, Ms. Goepfert can "no longer dependably rely on the Park Service for accurate information about science and history to teach" her children. *Id.* ¶ 34. She hopes to continue her daughters' education this way, but the Secretary's Order "jeopardize[s]" her ability "to continue using the parks to educate" her children. *Id.* ¶¶ 32–34, 36. Ms. Goepfert also fears the Park Service has or will imminently remove the very interpretive materials that were "critical" to their place-based learning. *Id.* ¶¶ 12, 31–35. Even if Ms. Goepfert

28

is able to continue using the parks as a "canvas for teaching [her] daughters about this country and the environment," as a result of the Secretary's Order and its implementation, she knows that she will have considerably more work to do and her job as an educator will be much harder. *Id.* ¶¶ 36, 34. NPCA may sue on Ms. Goepfert's behalf because ensuring that members can access accurate historical and scientific information in the parks is germane to NCPA's purpose of protecting and enhancing the parks and ensuring that they tell a more inclusive, complete story of U.S. history. Spears Decl. ¶¶ 19–22.

Similarly, AASLH members, including public historian Donna Graves, have suffered harms traceable to the Order from (1) lost income because the Order "has effectively censored their specialties" focused on historically marginalized communities; (2) chilled expression because "the only way to continue to work with the Park Service and stay out of the agency's crosshairs is to adopt the censored narrative" and not discuss anything the Park Service might consider "disparaging"; and (3) reputational harm because the Order "baselessly describes their work" as "improper partisan ideology." Dichtl Decl. ¶¶ 28–30; *see also* Graves Decl. ¶¶ 28–34 (describing same harms). Ms. Graves is a public historian who worked with the Park Service for over 25 years, focusing on projects that emphasized social equity and inclusive history. Graves Decl. ¶¶ 3–5. However, in 2025, given her specialty and her prior work, her career was cut short by "the administration's attacks on accurate historical interpretation in national parks, highlighted by the Secretary's Order." *Id.* ¶ 28. AASLH may sue on her behalf because protecting these interests is germane to AASLH's purpose of helping practitioners tell a shared history in which everyone belongs. Dichtl Decl. ¶ 8.

The claims asserted and relief requested here do not require the participation of either organization's individual members. *See, e.g.*, *New York*, 2025 WL 3514301, at *6 (concluding that

29

individual members' participation was unnecessary where organization sought prospective relief—specifically, declaratory relief and vacatur—that would "inure to the benefit of those members of [the organization] actually injured" (quoting *Housatonic River Initiative v. EPA*, 75 F.4th 248, 265 (1st Cir. 2023))). NPCA and AASLH therefore have associational standing.

### III.    Plaintiffs will suffer irreparable harm absent preliminary injunctive relief.

The Secretary's Order has imposed—and will continue to impose—irreparable harm on Plaintiffs and their members. "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citation omitted). The "measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." *Id.*

It is well settled that "[i]f the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). As several courts in this District have recognized, "[o]bstacles that unquestionably make it more difficult for the plaintiff to accomplish its primary mission provide injury for purposes of irreparable harm." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (citation modified); *accord, e.g.*, *New York v. McMahon*, 784 F. Supp. 3d 311, 362 (D. Mass. 2025).

"Here, even though the likelihood of success on the merits is great, which would allow a movant to show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." *Victim Rts. L. Ctr. v. Dep't of Educ.*, 788 F. Supp. 3d 70, 97 (D. Mass. 2025) (citation modified). The Secretary's Order has substantially frustrated Plaintiffs' missions, making it more difficult for them to protect the parks, preserve history,

30

promote access to high-quality scientific information, and provide high-quality interpretive materials for park visitors. Spears Decl. ¶¶ 34–41 (describing undoing of years of work to make parks more inclusive and scientifically sound); Dichtl Decl. ¶¶ 21–26 (describing impediments to continuing work to tell whole history); Wade Decl. ¶¶ 19–20 (describing unfeasibility of supporting current iteration of Park Service in achieving its lawful mission, including telling accurate history and science); Thompson Decl. ¶ 12 (similar); Jones Decl. ¶¶ 24–32 (describing rollback of inclusive and accessible design practices); Reyes Decl. ¶¶ 15–18 (describing deterioration of a long partnership with the Park Service in providing accurate science and increasing scientific literacy and access). The Order has also caused Plaintiffs to forgo efforts that are key to preserving the parks for future generations, as they have had to "abandon a cultural resource challenge" (Spears Decl. ¶ 41), redirect efforts for "new park designation campaigns" (*id.*), pass up "developing additional educational programs" (Wade Decl. ¶ 25), "put on hold several long-term projects" (Reyes Decl. ¶ 16), and pull back from "research initiatives related to experiential design and interpretation" (Jones Decl. ¶ 30), and other similar efforts. *See* Thompson Decl. ¶¶ 14–16; Dichtl Decl. ¶¶ 23–25. This "detriment to Plaintiffs' organizational missions . . . cannot be remedied through retroactive relief." *New York*, 784 F. Supp. 3d at 362.

Moreover, because of Defendants' actions, several Plaintiffs have suffered and will continue to suffer irreparable harm to their relationships with members and their reputations more broadly. "By its very nature, injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, the kind of harm is often held to be irreparable." *Ross-Simons*, 102 F.3d at 20 (finding irreparable harm where distributor of prestigious product refused to sell to a retailer, which would likely lead customers to choose not to use company's services); *Victim Rts.*, 788 F. Supp. 3d at 96 ("Where it can no longer provide direct representation, has

already turned away clients, and is expected to turn away more, VRLC has shown that it will suffer irreparable harm absent an injunction."). Because of the Secretary's Order, the Coalition, SEGD, ANPR, and AASLH can no longer provide the services and support to their members in the same manner, straining those relationships, leading to loss of goodwill, and harming their reputations. For example, the Coalition finds itself in a lose-lose situation where if it "remain[s] silent on the violation of the mission of the Park Service and the National Park System by erasing history and science, we violate the trust of our members who have spent their careers pursuing that mission. By contrast, describing accurate history and science as crucial to protecting the parks means effectively denouncing the Park Service and effectively asking our members to choose sides between the Coalition and their current or former employer." Thompson Decl.¶ 13. The same is true for SEGD. *See* Jones Decl. ¶¶ 28, 30–31 ("SEGD is caught between abandoning our mission and our vision and abandoning our members who rely on contracts with the Park Service for their livelihood."). And ANPR, the Coalition, and AASLH member Ms. Graves all have already suffered harm to their reputations stemming from the Order. ANPR saw a drop off in participation for fear of being seen as opposing the Secretary's Order, Wade Decl. ¶ 23, and the Coalition understands that associating with them equates to "being perceived as opposing the current administration's policies, actions, or campaigns," Thompson Decl. ¶ 13. And for AASLH members, including Ms. Graves, "the Secretary's Order baselessly declares their work . . . to be no more than 'improper partisan ideology' that is not appropriately considered part of the country's 'extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing.'" Dichtl Decl. ¶ 30; *see also* Graves Decl. ¶ 34 (explaining that Defendants' actions "damage [her] professional reputation by removing or threatening to remove the work that comprises [her] portfolio"). The types of harm

32

to goodwill and reputation that the Coalition, SEGD, ANPR, and AASLH members have already suffered, and will continue to suffer absent court intervention, are irreparable.

Further, the loss of income that AASLH members and ANPR suffer stemming from the Secretary's Order is irreparable because it "is not accurately measurable or adequately compensable by money damages." *Ross-Simons*, 102 F.3d at 19.[25] Opportunities for history practitioners like Ms. Graves to work with the Park Service "have completely evaporated," whereas in the past such work accounted for 40% to 80% of her annual income. Graves Decl. ¶ 33; *see also* Dichtl Decl. ¶ 28. The impact of the Order "is so great as to threaten the existence of [her] business." *Vaqueria Tres Monjitas*, 587 F.3d at 485 (citation omitted). But even that kind of existential threat is not necessary: "To establish irreparable harm . . . a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business." *Ross-Simons*, 102 F.3d at 18. For ANPR, the funds generated from its annual "Ranger Rendezvous" are "critical" to the organization's "continued viability," but attendance has dropped due to "fear among current Park Service staff that attending . . . would be seen as opposing the Park Service and, by extension, the Secretary's Order." Wade Decl. ¶¶ 16, 23. Because money damages cannot adequately compensate for the financial harm caused by the Order, the financial harm that AASLH members and ANPR have suffered is irreparable.

Finally, NPCA's members and the millions of other park visitors face irreparable harm to their enjoyment and that of future generations, 54 U.S.C. § 100101(a), from not having access to the statutorily-mandated "highest quality science and information," 54 U.S.C. § 100701, and the "highest quality interpretation and education" that "reflect[s] different cultural backgrounds" and

---

[25] *See also Concord Hosp., Inc. v. N.H. Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 362 (D.N.H. 2024) ("[I]f a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future[,] financial loss can constitute irreparable injury.") (citation modified).

"scientific and academic research." *Id.* at § 100803. *See Philadelphia*, 2026 WL 431943 at \*18 ("Each person who visits [the park] and does not learn of the realities of founding-era slavery receives a false account of this country's history."). Goepfert Decl. ¶¶ 34, 36 (noting that she is "rushing to visit parks" before interpretive materials disappear and that she knows in the future, "the experience [visiting parks] will not be the same because of the Secretary's Order").

Because Plaintiffs have demonstrated irreparable harm to their missions and reputations, along with non-compensable economic loss, they warrant preliminary relief. *See, e.g.*, *Victim Rts.*, 788 F. Supp. 3d at 97 (finding irreparable harm where organization showed "that their ability to fulfill their core mission has been impeded"); *Nat'l Educ. Ass'n*, 779 F. Supp. 3d at 200 (finding irreparable harm where plaintiffs "face injuries to their organizational missions and core activities because the 2025 Letter diminishes or eliminates the value of much of their programming and grants"); *Mass. Fair Hous.*, 496 F. Supp. 3d at 611 (finding irreparable harm where rule posed "a real and substantial threat of imminent harm to [the organization's] mission" . . . and noting that "because the APA does not provide for monetary damages, these harms are not recoverable if the 2020 Rule is allowed to go into effect but later vacated").

## IV.   The balance of the equities and the public interest favor Plaintiffs.

The final two factors— balance of the equities and the public interest—merge where the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, both strongly favor Plaintiffs. As shown above, the Order is arbitrary and capricious, violates at least three statutes governing the role and duties of the Park Service, denies park visitors access to statutorily required "highest quality interpretation and education," and threatens "the enjoyment of future generations." There is "no public interest in upholding unlawful agency action," and "the government cannot suffer harm from an injunction that merely ends an unlawful practice."

34

*Massachusetts*, 770 F. Supp. 3d at 326–27 (quotation marks and citation omitted). To the contrary, "there is 'substantial public interest in having governmental agencies abide by the federal laws.'" *Id.* at 326 (quotation marks and citation omitted). This is especially true here where—because of the Order—"'America's largest classroom' has essentially shut its doors." Goepfert Decl. ¶ 34.

## CONCLUSION

Because all four factors weigh in favor of Plaintiffs, this Court should preliminarily enjoin the Secretary's Order or stay the Order under § 705 of the APA. As set forth in Plaintiffs' motion, the Court should enjoin Defendants from giving effect to the Order and require Defendants to restore the status quo as it existed prior to the Order's issuance.[26]

Date: March 18, 2026                                Respectfully submitted,

                                                    /s/ *Brooke Menschel*
                                                    Brooke Menschel* (NY Bar No. 5004692)
                                                    Michael J. Torcello* (DC Bar No. 90014480)
                                                    Pablo A. Moraga* (DC Bar No. 90037895)
                                                    Mark B. Samburg (Mass. BBO No. 680099)
                                                    Steven Y. Bressler* (DC Bar No. 482492)
                                                    Robin F. Thurston* (DC Bar No. 1531399)
                                                    DEMOCRACY FORWARD FOUNDATION
                                                    P.O. Box 34553
                                                    Washington, D.C. 20043
                                                    T: (202) 448-9090
                                                    F: (202) 796-4426

---

[26] The Court should not require Plaintiffs to post bond. Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount" of a bond, "including the discretion to require no bond at all." *Woonasquatucket River Watershed Council v. Dep't of Agric.*, 778 F. Supp. 3d 440, 477 (D.R.I. 2025) (quotation marks and citations omitted). In "suits to enforce important federal rights or 'public interests,'" courts generally do "not require posting of a substantial bond." *Maine v. Dep't of Agric.*, No. 25-cv-00131, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025). Accordingly, the Court should waive bond or impose no more than a nominal bond here. *See, e.g.*, *Woonasquatucket*, 778 F. Supp. 3d at 477 (waiving bond for nonprofit in APA case).

*Counsel for the Plaintiffs*
*Admitted *pro hac vice*

36