**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director, <br><br> *Defendants*. | Civil Action No. 1:26-cv-10877 |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A 5 U.S.C. § 705
STAY OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION
AND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# Table of Contents

INTRODUCTION ............................................................................................................. 1

BACKGROUND................................................................................................................ 2

    I.      The National Park System ................................................................... 2

    II.    The Executive Order and the Secretary's Order ................................. 2

    III.   The Plaintiffs' Suit............................................................................... 4

ARGUMENT ................................................................................................................... 6

    I.      The Court Should Dismiss for Lack of Subject Matter Jurisdiction................................. 6

        A.   Plaintiffs Lack Standing to Challenge the Secretary's Order. ....................................... 7

        B.   Plaintiffs' Challenge to the Secretary's Order Is Not Ripe........................................... 13

    II.    The Court Should Deny Plaintiffs' Motion for a Preliminary Injunction........................ 15

        A.   Plaintiffs Have Failed to Show a Likelihood of Success on the Merits......................... 15

        B.   Plaintiffs Will Not Be Irreparably Harmed if Denied Preliminary Relief..................... 26

        C.   The Public Interest and the Equities Weigh Against Granting Relief .......................... 28

        D.   Plaintiffs' Requested Relief Is Overbroad ................................................................... 30

    III.   The Court Cannot Stay an Order that Has Been Executed............................................... 31

    IV.  The Court Should Dismiss NPCA, AASLH, ANPR, the Coalition, and SEGD for Lack of Venue ........................................................................................................................... 32

    V.    The Court Should Dismiss Counts 5 and 6..................................................................... 34

CONCLUSION................................................................................................................. 35

i

**INTRODUCTION**

This political dispute does not belong in federal court. Plaintiffs disagree with the President's decision to remove properties that inappropriately disparage Americans from federal sites because his decision moves the National Park System in the opposite direction of their vision. To make their objections known, Plaintiffs have posted signs in Washington, D.C., made public statements, written articles, rallied their members, and lobbied Congressmen. Doing so is Plaintiffs' right under the First Amendment; and in our constitutional republic, political organizing and advocacy is the right way to settle political disagreements.

Now, however, Plaintiffs contend that participating in democracy is injurious. Under Plaintiffs' broad theories of mission frustration and resource diversion, any time an organization disagrees with government policy, that organization is entitled to a hearing in federal court. Plaintiffs' position would turn fundamental standing doctrine on its head and have federal courts police the political branches to resolve political disputes. The Supreme Court has rejected this proposition, and has affirmed that in America the ballot box, not the courtroom, is where we decide the direction of the country. The Court should reject Plaintiffs' invitation to the political thicket and dismiss this case for lack of standing.

Plaintiffs' counter-majoritarian case falters over multiple other threshold inquiries that are designed to ensure the primacy of the democratic process. Plaintiffs' case is not ripe because it challenges an overarching plan for the Department of Interior, not a concrete implementation of that plan. Plaintiffs challenge non-final agency action: the Secretary's Order instituted a review process; it did not effect change in the real world. And, regardless, the Administrative Procedure Act does not apply here because the internal management of the Department of Interior is a matter committed to agency discretion. For these reasons, too, the Court should dismiss.

1

On the merits of their motion, Plaintiffs still miss the mark. A § 705 stay is not appropriate relief because the Secretary's Order has been in effect since May 2025. And the 10-month delay between issuance of the Secretary's Order and when Plaintiffs filed for a preliminary injunction negates Plaintiffs' claims of irreparable harm. For these reasons and more, emergency relief is not warranted. The Court should deny Plaintiffs' motion and dismiss this case.

## BACKGROUND

### I.    The National Park System

The National Park Service ("NPS") is the bureau within the Department of Interior ("DOI") that oversees the National Park System. Ex. 1 (Bowron Decl.) ¶¶ 1, 3, 5. The System comprises 433 "units," including 63 National Parks, 87 National Monuments, 76 National Historic Sites, 64 National Historical Parks, 31 National Memorials, and 18 National Recreation Areas. *Id.* ¶ 4. NPS units are found in every state, the District of Columbia, and the U.S. territories. *Id.*

NPS offers "educational and interpretive information" to visitors of NPS units. Ex. 1 ¶ 6. As of 2025, NPS manages over 700 visitor centers and exhibits, over 1,500 audio/visual exhibits, over 8,000 interpretive waysides, and over 350 bookstores. *Id.* ¶ 10. NPS produced around 3,100 publications last year and distributed around 26,300,000 copies of those publications. *Id.* ¶ 10. NPS regularly updates its educational and interpretive information to ensure that it remains accurate, relevant, and useable. *Id.* ¶ 11.

### II.    The Executive Order and the Secretary's Order

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History." Ex. 2 (the "EO"). Section 3 of the EO directed the Secretary of Interior to "provide sufficient funding, as available, to improve the infrastructure of Independence National Historical Park," in time for the 250th anniversary of the Declaration of

2

Independence. *Id*. § 3. Section 4 directed the Secretary of Interior to conduct two reviews. The first was to determine whether "public monuments, memorials, statues, markers, or similar properties" within DOI's jurisdiction had been improperly altered since January 2020 and to restore any properties that had been so altered. *Id.* § 4. The second was to ensure that going forward public monuments and similar properties within DOI's jurisdiction do not "inappropriately disparage Americans past or living." *Id.* § 4. Through the EO, the President made clear that it is his administration's policy to use federal sites to "remind Americans of our extraordinary heritage." *Id.* § 1.

On May 20, 2025, the Secretary of Interior issued Secretary Order 3431, titled "Restoring Truth and Sanity to American History," which "implements provisions of" the EO. Ex. 3 (the "SO") § 1. Section 4 of the SO implements the President's directive to restore Independence Hall in time for the semiquincentennial. *Id.* § 4. Section 5 directs the heads of NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, the "Land Management Bureaus") to conduct the two reviews called for in § 4 of the EO. Section 6 directs the Land Management Bureaus to post public signs with QR codes that allow visitors to provide feedback on the condition of federal sites, the services provided by the Land Management Bureaus, and the informational material available at federal sites. The SO does not order the alteration or removal of any properties. The SO, instead, starts a process by which such properties are assessed under the principles laid out in the EO.

In June 2025, Jessica Bowron, Comptroller for NPS, exercising the delegated authority of the Director of NPS, instructed NPS units to conduct reviews under the SO and to post signage consistent with the SO. Ex. 1 ¶¶ 17-18. In July 2025, a "review team of NPS senior management" began to analyze material submitted for review by NPS units and the public for conformance with

3

the SO. *Id.* ¶ 20. "The review team conducts [its] analysis case-by-case, taking into account the context of the submission, the mission and interpretive purpose of the [NPS] Unit or specified exhibit, and any relevant legal or policy considerations." *Id.* "In many cases," the review team finds that the property under review is in conformance with the SO. *Id.* ¶ 21. In other cases, the review team finds the property is not in conformance. *Id.*

The process of addressing non-conforming content is also case-specific. In some cases, content may be revised. *Id.* ¶ 24. In other cases, content may be temporarily covered or removed until replacement content is developed. *Id.* In a few cases, interpretive content may be permanently removed. *Id.* Permanent removal is generally due to a confluence of factors, such as the planned retirement date of the object. *Id.*

### III.    The Plaintiffs' Suit

Plaintiffs National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks (the "Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS"), are six advocacy organizations interested in the National Park System.

NPCA is a "park advocacy" organization that works to "build[] public and governmental support" to "protect iconic places" and to establish "new park sites." (Doc. No. 29-5) ¶¶ 7, 17, 19-21, 41. Because the SO "moves the park system in the opposite direction" of NPCA's vision, NPCA has advocated against "the effects of the [SO] by tracking sign removals, educating members of Congress and other policy makers" about the SO, writing articles about the SO, and "working to build awareness and transparency around the [SO] and its implementation." *Id.* ¶¶ 34, 41. NPCA asserts that resources spent advocating against the SO would have otherwise been spent

4

on other advocacy initiatives like "getting Congress to appropriate $250 million for Park Service cultural resources." *Id.* ¶ 41.

"AASLH's mission is to provide leadership, resources, and advocacy to help the history community thrive and tell a shared history in which everyone belongs." (Doc. No. 29-9) ¶ 8. Because the SO "directly contradicts the professional standards and mission of AASLH," AASLH has "ramp[ed] up its efforts to combat" what AASLH views as "historical misinformation." *Id.* ¶¶ 22- 23. AASLH asserts that it has diverted "resources from organizational needs" so that it can "understand and try to address complaints from members" and fight the SO. *Id.* ¶¶ 21, 25

ANPR "advocate[s] for Park Service employees of all disciplines." (Doc. No. 29-10) ¶ 13. ANPR has "publicly denounced" the SO, including by posting "a series of ANPR-branded ads" at bus stops "across Washington, D.C." *Id.* ¶¶ 21-22. ANPR claims these denunciations "divert[ed] time and resources" from other activities and damaged ANPR's relationships with some of its members. *Id.* ¶¶ 23, 25.

"The Coalition's mission includes building public awareness for issues affecting the National Park System, and to advocate and support solutions that use 'sound science.'" (Doc. No. 29-11) ¶ 9. The Coalition uses its "platform to educate and work with decisionmakers and other constituents about issues affecting the national parks." *Id.* The Coalition has "reallocate[d] its resources to develop informational materials," "investigate claims about the removal of historical and scientific information," "field[] questions about removals from members and partners," and "collaborat[e] with policymakers—including members of Congress—on how best to continue protecting the national parks despite Defendants' actions." *Id.* ¶ 14.

UCS "mobiliz[es] scientists and combin[es] their voices with those of advocates, educators, business people, and other concerned citizens" to "combat[]" what UCS views as "scientific

misinformation" through "advocacy and engagement with government officials and other policy makers." (Doc. No. 29-12) ¶¶ 7-9. UCS produces reports, writes fact sheets, posts on social media, meets with government officials, presents at technical conferences, engages with journalists, and communicates with its network, to advocate for its view of scientific claims. *Id.* ¶¶ 8-9. Since the issuance of the SO, UCS has spent time "responding to inquiries" and "strategizing about how best to" respond to the SO. *Id.* ¶ 16.

"SEGD is committed to advancing the profession of experiential design through education, inspiration, connection, and advocacy." Ex. 4 (SEGD 2025 Strategic Plan) at 8. To "combat" the SO, SEGD has been "coordinating with partner organizations, communicating with members about the potential implications" of the SO, "reviewing SEGD programming and educational materials," "responding to member concerns[,] and adapting programming so that professionals working in government or federally affiliated institutions feel able to participate in professional development and volunteer activities." (Doc. No. 29-6) ¶ 30.

On February 17, 2026—nine months after the SO was issued—Plaintiffs filed suit, alleging the SO violates the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* in six ways. (Doc. No. 1.) A month after that, Plaintiffs filed an Amended Complaint (Doc. No. 28) and a motion for a 5 U.S.C. § 705 stay of the SO or a preliminary injunction (Doc. No. 29).

**ARGUMENT**

## I.      The Court Should Dismiss for Lack of Subject Matter Jurisdiction

Plaintiffs "have the burden of demonstrating the existence of federal jurisdiction." *Acosta-Ramirez v. Banco Popular de Puerto Rico*, 712 F.3d 14, 20 (1st Cir. 2013).[1] If Plaintiffs do not meet their burden, the Court "must dismiss the action." *Carden v. Klucznik*, 775 F. Supp. 2d 247,

---

[1] Unless otherwise noted, all quotation marks, citations, and alterations have been omitted.

250 (D. Mass. 2011).

### A. Plaintiffs Lack Standing to Challenge the Secretary's Order.

"Article III standing is a bedrock constitutional requirement" that "is built on a single basic idea—the idea of separation of powers." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). "Our system of government leaves many crucial decisions to the political processes, where democratic debate can occur and a wide variety of interests and views can be weighed." *Id.* at 380. To cabin the "counter-majoritarian difficulty" presented by federal courts invalidating decisions of the political branches, Bickel, THE LEAST DANGEROUS BRANCH 16 (2d Ed. 1986), federal courts only have jurisdiction over cases where there is "a real need to exercise the power of judicial review in order to protect the interests of the complaining party," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).

For a plaintiff to have standing, he must have a "personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To show the personal stake necessary for Article III standing, "Plaintiffs must demonstrate (i) that they have suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 119 (1st Cir. 2026). "Because standing is not dispensed in gross," plaintiffs must prove facts supporting each element of standing "for each claim that they press against each defendant and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 44 (2024). "[A] plaintiff seeking a preliminary injunction must make a clear showing that it is likely to establish each element of standing." *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." *Lujan v. Defs. of*

7

*Wildlife*, 504 U.S. 555, 562 (1992) (collecting cases).

Organizations like the Plaintiffs here may establish standing in two ways: "Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). When an organization sues in its own right, it "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Alliance*, 602 U.S. at 393–94. To sue on behalf of its members, i.e., to have associational standing, an organization must show, among other things, that "at least one of its members possesses standing to sue." *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).

Neither Plaintiffs nor their members are subject to the SO, which only governs "the internal management" of DOI. Ex. 3 § 7. And Plaintiffs have not been affected by the implementation of the SO—neither they nor their members have visited a site where properties have been altered as a result of the NPS review process established under the SO, and neither they nor their members will imminently visit a site with properties that have been altered as a result of the NPS review process. At bottom, Plaintiffs' case amounts to "general complaints about the way in which government goes about its business" that are unfit for resolution in federal court, *Alliance*, 602 U.S. at 379 (collecting cases). The Court should dismiss..

### 1. *Plaintiffs Do Not Have Organizational Standing Based on Mission Frustration and Resource Diversion*

Plaintiffs are advocacy organizations that oppose the SO because it "moves the park system in the opposite direction" of their vision for national parks. (Doc. No. 29-5) ¶ 34.[2] Plaintiffs

---

[2] *See also* (Doc. No. 29-9) ¶ 23; (Doc. No. 29-10) ¶ 15; (Doc. No. 29-11) ¶ 12; (Doc. No. 29-12) ¶ 15; (Doc. No. 29-6) ¶ 28

contend that they have suffered an injury in fact from the SO because they have chosen to "divert[] resources from other programs and efforts to address the effects of" the SO by, among other things, "tracking sign removals, educating members of Congress and other policy-makers and partners" about the SO, writing articles about the SO and "working to build awareness and transparency around the [SO] and its implementation." *Id.* ¶¶ 34, 41. *See also* (Doc. No. 29-1) at 26-28.

But the Supreme Court in *Alliance for Hippocratic Medicine* held that resource diversion is not a basis for standing. 602 U.S. at 393-96. In *Alliance*, four pro-life medical associations sued FDA to challenge the lawfulness of FDA's approval of mifepristone, an abortion drug, as well as FDA's 2021 actions modifying mifepristone's conditions of use. *Id.* at 376. The associations argued that they had standing to sue FDA because FDA's actions "impaired their ability to provide services and achieve their organizational missions." *Id.* at 394. Specifically, the associations argued FDA "'caused' them to conduct their own studies on mifepristone so that the associations c[ould] better inform their members and the public about mifepristone's risks"; FDA forced the associations to "draft[] citizen petitions to FDA, as well as engag[e] in public advocacy and public education," and the result was that the associations spent "considerable resources to the detriment of other spending priorities." *Id.* at 394. Relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the associations contended that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395. The Court rejected that "expansive theory of standing," which, if accepted, "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* Rather, the Court clarified that entities asserting organizational standing, like all other plaintiffs, must allege a "concrete injury caused by a defendant's action" and they cannot "manufacture" standing "by expending money to gather

information and advocate against the defendant's action." *Id.* at 394.

*Alliance*, therefore, corrected the associations' "overread[ing]" of *Havens* as holding that resource diversion is an adequate injury for organizational standing. *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols.,* LLC, 167 F.4th 605, 617 (2d Cir. 2026). In *Havens*, the Supreme Court considered whether an organization, HOME, had standing to sue Havens, the owner of two housing complexes, for violations of the Fair Housing Act based on the owner's false statements to HOME's black employee about apartment availability. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 366-8, 378-79 (1982). "Critically, HOME not only was an issue-advocacy organization, but also operated a housing counseling service." *Alliance*, 602 U.S. at 395. So "when Havens gave HOME's employees false information about apartment availability, HOME sued Havens because Havens 'perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers.'" *Id.* (quoting *Havens*, 455 U.S. at 379). As the *Alliance* court explained, HOME only had standing because "Havens's actions directly affected and interfered with HOME's core business activities" in a way "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.* While the Court clarified that *Havens* was an application of ordinary standing principles, the Court also emphasized that "*Havens* was an unusual case" and that the Court "has been careful not to extend" *Havens* beyond its specific fact pattern. *Id.* at 396.[3]

Under *Alliance*, Plaintiffs' alleged resource diversions are not cognizable injuries in fact. Organizations "cannot manufacture its own standing" "simply by expending money to gather information and advocate against the defendant's actions." *Alliance*, 602 U.S. at 394. Where, as

---

[3] *See also Deep S. Ctr. for Env't Just. v. United States Env't Prot. Agency*, 138 F.4th 310, 319 (5th Cir. 2025) (In *Alliance*, "the Supreme Court has limited *Havens* to its facts."); *Wisconsin Voter All. v. Millis*, 166 F.4th 627, 639 (7th Cir. 2026) (Brennan, J concurring) ("In [*Alliance*], the Supreme Court cabined *Havens* to its unique facts.").

here, a party has "redirected resources to conducting research," "creating an education campaign," "lobbying," or otherwise responding to government action of which the party disapproves, courts dismiss for lack of standing. *Deep S. Ctr.*, 138 F.4th at 318.[4]

Plaintiffs assert that they have standing under *Alliance* "because the Secretary's Order directly affects and interferes with Plaintiffs' core business activities." (Doc. No. 29-1) at 27. But Plaintiffs do nothing to show how the SO is analogous to the "unusual" fact pattern in *Havens. Alliance*, 602 U.S. at 396; *Deep S. Ctr.*, 138 F.4th at 319; *Millis*, 166 F.4th at 639 (Brennan, J concurring). Plaintiffs are not subject to the SO, so it does not "directly affect[]" them and any changes to their business activities were self-imposed. *Alliance*, 602 U.S. at 395. Under *Alliance*, Plaintiffs lack standing and the Court should dismiss.[5]

### 2. NPCA and AASLH Do Not Have Standing Based on Their Unharmed Members

Although NPCA and AASLH claim associational standing, (Doc. No. 29-1) at 28-30, neither has made a clear showing of an "imminent future injury" to their members, as required for the "forward-looking relief" Plaintiffs seek. *Murthy*, 603 U.S. at 59. NPCA's member Jennifer Goepfert intends to visit three NPS sites this summer: Brown v. Board of Education National Historical Park, Hot Springs National Park, and Little Rock Central High School. (Doc. No. 29-8.) ¶ 32. "Although each of those NPS sites submitted interpretive content materials for review

---

[4] *See also Conn. Fair Hous.,* 167 F.4th at 619; *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992 (6th Cir. 2025); *Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025).

[5] Plaintiffs string cite district court cases they claim "have held that comparable injuries establish organizational standing." (Doc. No. 29-1) at 27. Those cases are not on point. *Louis v. Saferent Sols., LLC*, 685 F. Supp. 3d 19 (D. Mass. 2023) and *Alianza Americas v. DeSantis*, 727 F. Supp. 3d 9, 26 (D. Mass. 2024) predate *Alliance* and do not apply its standard for organizational standing. The organization in *AAP v. Kennedy* had to counsel its members who had been "directly impacted," including with "threatened legal liability." 2026 WL 33719, at *3-*6 (D. Mass. Jan. 6, 2026). And the Court in *NEA v. U.S. Dep't of Justice* held that the organizations had demonstrated "organizational injuries akin to those suffered by HOME" because their core business activities had been disrupted and one organization might be "put…out of business entirely." 779 F.Supp. 3d 149, 176 (2025). Here, the SO does not effect change in the real world or impact the Plaintiffs, their members, or their core business activities.

11

under [the SO], no changes have been made to date to any interpretive content under review." Ex. 1 ¶ 27. As for Goepfert's vague plans to visit other NPS sites "down the line," (Doc. No. 29-8) ¶ 33, those "some day intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the actual or imminent injury that" Article III requires. *Lujan*, 504 U.S. at 564. There is zero evidence Goepfert will be affected by the SO or any action taken to implement the SO in any way.

AASLH's member Donna Graves claims the SO "delegitimizes [her] work" and "damages [her] professional reputation by removing or threatening to remove the work that comprises [her] portfolio." (Doc. No. 29-7) ¶ 34. But Graves is not subject to the SO, she is not named in the SO, her work is not called out in the SO, and she does not identify any of her work that has been or will be removed under the SO. At most, Graves states that she is "concerned" that one of the exhibits she worked on might at some point be "removed because of the [SO.]" *Id.* ¶ 31. But no NPS properties at that site have been submitted for review. Ex. 1 ¶ 28. At this stage, removal of Graves's work is "conjectural or hypothetical," not "imminent." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). And Graves's statement that if NPS were to remove her work—without publicly criticizing her by name—that removal would harm her reputation is the kind of "conclusory" averment insufficient to establish standing. *Kolackovsky v. Town of Rockport*, 165 F.4th 114, 120 (1st Cir. 2026). The bottom line is that NPS owns those properties, NPS has the right to alter or remove them at its discretion, and doing so does not harm Graves, even if she worked on those properties in the past. Graves is not entitled to force NPS to display her work into perpetuity.

Graves states that she "made the decision to retire" because of the SO. (Doc. No. 29-7) ¶ 33. Voluntary retirement is not an injury. *Cf. Monahan v. Romney*, 625 F.3d 42, 47 (1st Cir. 2010) (holding that a voluntary resignation is not a due process deprivation). The SO does not bar

Graves from working with NPS, so her decision to retire, if anything, is a self-inflicted cost that is insufficient to "manufacture standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). And "none of the relief that [Plaintiffs] seek would" bring Graves out of retirement. *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 995 F.3d 18, 22 (1st Cir. 2021). Graves retired because she "understood that [her] work was being defunded, devalued, and even denounced, by the Park Service." (Doc. No. 29-7) ¶ 33. Staying the SO or enjoining Defendants from implementing the SO will not change Defendants' or the President's past statements about material at NPS sites and will not make anyone fund or evaluate Graves's work any differently.

Because Goepfert and Graves lack standing, NPCA and AASLH lack associational standing.[6] The Court should dismiss.

### B. Plaintiffs' Challenge to the Secretary's Order Is Not Ripe.

"Ripeness is a doctrine of justiciability originating in the case or controversy requirement of Article III." *Jensen v. Rhode Island Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025). The "basic rationale" of ripeness "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). To determine whether a case is ripe, the Court considers two factors: (i) "the fitness of the issues for judicial decision" and (ii) "the hardship to the parties of withholding" court consideration. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, (1998). "The fitness

---

[6] Although NPCA and AASLH gesture at other, unnamed members' standing, (Doc. No. 29-1) at 28-30, to establish an injury in fact in support of associational standing, "the association must, at the very least, identify" by name the "member who has suffered the requisite harm." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016). NPCA's and AASLH's unnamed members cannot provide bases for associational standing.

prong "has both jurisdictional and prudential components," *Reddy v. Foster*, 845 F.3d 493, 501 (1st Cir. 2017), while the "hardship prong is prudential." *Penobscot Nation v. Frey*, 3 F.4th 484, 509 (1st Cir. 2021) (en banc). If a case is not ripe, the Court dismisses it for lack of subject matter jurisdiction. *Id.*.

In *Ohio Forestry*, the Supreme Court held that a challenge to "a plan that the Forest Service ha[d] developed" was not ripe for review. 523 U.S. at 728-29. "Although the plan set[] logging goals, select[ed] the areas of the forest that are suited to timber production, and determine[d] which 'probable methods of timber harvest' [were] appropriate, it [did] not itself authorize the cutting of any trees." *Id.* at 729. The Court held that withholding review would not "cause the parties significant 'hardship'" because the plan did not "give anyone a legal right to cut trees" or "abolish anyone's legal authority to object to trees being cut" and that the challengers would not face hardship by waiting to challenge "site specific" logging. *Id.* at 733-35. Judicial review of the plan, however, would "hinder agency efforts to refine its policies: (a) through revision of the Plan, … or (b) through application of the Plan in practice." *Id.* at 735. The Court also held that the case was not yet fit for judicial review and would "benefit" from "the focus that a particular logging proposal could provide." *Id.* at 736. Because the case was not ripe, the Court remanded with instructions to dismiss. *Id.* at 739.

*Ohio Forestry* dictates dismissal here. The SO does not direct NPS to remove or modify any sign. NPS is refining its application of the SO in practice as it reviews submissions and determines whether material should be altered and how it should be altered, consistent with applicable legal and policy considerations. Ex. 1 ¶ 20. And the Court would benefit from withholding review until Plaintiffs challenge a particular action by NPS under the SO because "further factual development would significantly advance [the Court's] ability to deal with the

14

legal issues presented." *Ohio Forestry*, 523 U.S. at 737. As presented, this case "threatens the kind of abstract disagreements over administrative policies, that the ripeness doctrine seeks to avoid." *Id.* at 736. The Court should dismiss.

**II.    The Court Should Deny Plaintiffs' Motion for a Preliminary Injunction**

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8–9 (1st Cir. 2012). "A plaintiff seeking a preliminary injunction must establish" four factors: (i) "that he is likely to succeed on the merits," (ii) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (iii) "that the balance of equities tips in his favor," and (iv) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court should deny the motion if the movant fails "to satisfy any one of the four criteria." *City of Chelsea v. Trump*, 802 F. Supp. 3d 289, 294-95 (D. Mass. 2025).

**A.  Plaintiffs Have Failed to Show a Likelihood of Success on the Merits**

***1.  The Secretary's Order Is Not Final Agency Action***

Judicial review under the APA is limited to challenges to "final agency action." 5 U.S.C. § 704. "[T]wo conditions must be satisfied for agency action to be final": (i) "[T]he action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature" and (ii) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Challenges to agency work other than final agency actions are unreviewable and must be dismissed. *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 246-47 (1980).

First, the SO is not final agency action because it is preliminary step "far upstream of" any consequences for Plaintiffs. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024). The SO directs

the heads of the Land Management Bureaus to investigate whether DOI properties comply with the principles announced by the President.  Ex. 3 § 5.  An NPS property is only altered or removed once it has been identified, submitted for review, reviewed, and found not to be in conformance with the SO, and after a plan for alteration has been developed and implemented by the review team and the NPS unit.  Ex. 1 ¶¶ 17-24.  The SO marks the start, not the "consummation," of the decision-making process.  *Bennett*, 520 U.S. at 177–78.

Second, the SO is not final agency action because it "has no direct or immediate impact on the parties."  *Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Mass. Dep't of Env't Prot.*, 208 F.3d 1, 5 (1st Cir. 2000).    The SO does not determine whether any NPS property should be altered or removed:  That determination is made at the end of the review process initiated by the SO.  Thus, the SO, standing alone, has no legal or practical effect.

To argue for finality, Plaintiffs focus solely on the SO and ignore the remainder of the decision-making process.  (Doc. No. 29-1) at 13.  Plaintiffs are correct that "Defendants have made a decision" by issuing the SO, *id.*, but because the SO is an "interlocutory" decision, it is not final agency action.  *Bennett*, 520 U.S. at 177–78.

Plaintiffs further confuse the issue by claiming that the SO "directly affects" them because "hundreds of signs and exhibits have already been flagged or removed."  (Doc. No. 29-1) at 13.  Each of those removals may be a final agency action with an independent administrative record and different practical effects.  *See, e.g.*, *City of Philadelphia v. Burgum*, 2026 WL 431943, at *10 (E.D. Pa. Feb. 16, 2026) (removing particular displays is final agency action).  But it does not follow that "the entire program—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—can[] be laid before the courts for wholesale correction under the APA."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990).

16

Instead, the "normal[] mode of operation of the courts" in APA suits is to take a "case-by-case approach." *Id.* at 894. Because Plaintiffs seek the reinstatement of NPS properties, Plaintiffs need to challenge removal or revision decisions, not the SO.

### 2. *The Internal Management of DOI Is Committed to Agency Discretion*

Agency action that "is committed to agency discretion" is not reviewable under the APA. 5 U.S.C. § 701(a)(2). "Such a commitment exists" in two circumstances: (i) "when the agency action is of a kind traditionally regarded as committed to agency discretion" or (ii) "when the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 17 (1st Cir. 2020). Both circumstances apply here, and Plaintiffs' claims are unreviewable.

First, the internal management of an agency is traditionally regarded as an action committed to agency discretion. In *Webster v. Doe*, for example, the Supreme Court held that the CIA director's decision to terminate an employee was not "reviewable by the courts." 486 U.S. 592, 601 (1988). And in *Lincoln v. Vigil*, the Court held that "an agency's allocation of funds from a lump-sum appropriation" was "unreviewable under § 701(a)(2)." 508 U.S. 182, 193 (1993). The SO directs DOI employees to review DOI properties and is only "intended to improve the internal management of the Department and to ensure implementation of" the EO. Ex. 3 § 7. Because the Court is "ill-equipped to superintend" the agency's "managerial decisions," the SO is unreviewable. *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970).

Second, the statutory provisions Plaintiffs rely on are too broad to provide "meaningful standard[s] against which to judge the agency's exercise of discretion." *Union of Concerned Scientists*, 954 F.3d at 17. Plaintiffs argue the SO violates the Centennial Act and the Omnibus Management Act by failing to provide "'the highest quality" interpretive materials and violates the

17

Organic Act's general purpose. (Doc. No. 29-1) at 20-24. Whether interpretive or educational materials are of the "highest quality" is subjective, so this is not a meaningful standard for the Court to apply. 54 U.S.C. § 100802 (Centennial Act); 54 U.S.C. § 100702 (Omnibus Management Act). And DOI decisions about how best to achieve the Organic Act's purpose involve "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and "the agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Lincoln*, 508 U.S. at 193. *See also Webster*, 486 U.S. at 600-01. The only clear statutory obligation Plaintiffs identify is that the Secretary establish and maintain a program of education and interpretation. (Doc. No. 29-1) at 21. But Plaintiffs do not argue that the Secretary has not complied with his obligation to ensure that such program exists, only that the SO somehow prevents the program from being of the "highest quality." Plaintiffs offer no evidence that any removed or altered properties meet this "highest quality" standard or that any replacement content would not meet this "highest quality" standard, much less that the SO *per se* prevents NPS from offering "highest quality" materials. Ultimately, NPS "has not ignored a plain statutory duty, it has merely interpreted that duty in a fashion other than what plaintiffs consider proper." *Falzarano v. United States*, 607 F.2d 506, 512 (1st Cir. 1979).

### 3. The Secretary's Order Is Not Arbitrary and Capricious

In Count One, Plaintiffs assert that the SO is unlawful because it is arbitrary or capricious under the APA. (Doc. No. 28) at ¶¶ 131-45. This claim fails for many reasons.

First, "[c]ourts have required parties seeking" to invoke the APA's waiver of sovereign immunity "to show a statutory or regulatory violation." *N.A.A.C.P. v. Donovan,* 2009 WL 792301,

18

at *5 (D. Mass. Mar. 17, 2009) (collecting cases).[7]  Because Count One does not allege a substantive violation, it is unreviewable under the APA.

Second, Count One's failure to reference any statute or regulation other than the APA means the Court lacks "a meaningful standard" it can "apply in evaluating the legality of agency action." *Lunney v. United States*, 319 F.3d 550, 559 n.5 (2d Cir. 2003).  The First Circuit has not decided whether a court can "entertain a so-called 'pure APA' action without reference to another substantive statute." *Union of Concerned Scientists*, 954 F.3d at 22.  But other circuits have held that "the provisions of the APA do not declare self-actuating substantive rights, but rather, merely provide a vehicle for enforcing rights which are declared elsewhere." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 n.14 (5th Cir. 1998).

Plaintiffs' argument that the SO "failed to consider important aspects of the problem" illustrates why the arbitrary and capricious standard is not self-effectuating.  (Doc. No. 29-1) at 15.  As the Ninth Circuit has explained, "[w]hether an agency has overlooked 'an important aspect of the problem,'…turns on what a relevant substantive statute makes 'important.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996).  Administrative law is trans substantive, so there are no across-the-board rules on what is "necessarily important or relevant." *Id.*  Because Plaintiffs have not based Count One on any statute, it is impossible for the Court to discern what "important aspects" of the problem the SO should have, but failed, to address.

Third, even if the Court were to address Count One on its own terms, none of Plaintiffs' arguments demonstrate the SO is arbitrary and capricious.  Plaintiffs argue that the SO fails "to provide any explanation" for why implementing the EO is warranted.  (Doc. No. 29-1) at 14-15.

---

[7] *See also Am. Waterways Operators v. United States Coast Guard*, 613 F. Supp. 3d 475, 486 (D. Mass. 2020).  *Sierra Club v. Martin*, 110 F.3d 1551, 1555 (11th Cir. 1997); *Preferred Risk Mut. Ins. Co. v. United States*, 86 F.3d 789, 792 (8th Cir.1996); *El Rescate Legal Servs., Inc. v. Exec. Off. of Immigr. Review*, 959 F.2d 742, 753 (9th Cir.1991).

But DOI could "not simply disregard" the EO. *Sherley v. Sebelius,* 689 F.3d 776, 784 (D.C. Cir. 2012). Indeed, defying the EO "would clearly constitute an arbitrary and capricious agency action." *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 731 (10th Cir. 2024). Plaintiffs have not sought to challenge the EO, and it constitutes a valid presidential directive binding on Defendants. Accordingly, implementing the EO was sufficient explanation for the SO. *See Chamber of Com. of U.S. v. U.S. Dep't of Homeland Sec.*, 2025 WL 3719234, at *25 (D.D.C. Dec. 23, 2025).[8]

Plaintiffs argue that "Defendants failed to consider important aspects of the problem the [SO] purports to address," (Doc. No. 29-1) at 23, but their objections are to the basic premise of the EO—which is that federal sites should be used to remind Americans of their extraordinary heritage and should not contain properties that inappropriately disparage Americans. Ex. 2 § 1. Plaintiffs' disagreement with the President's "policy decision" is not a basis to invalidate the SO as arbitrary and capricious. *Plunkett v. Castro*, 67 F. Supp. 3d 1, 15 (D.D.C. 2014). Given that their concerns do not address "any factor relevant to implementing the Executive Order," but rather disagreement with the EO's directive, failing to consider them was not arbitrary and capricious. *Sherley*, 689 F.3d at 785.

Plaintiffs argue that Defendants "failed to account for reliance interests of Plaintiffs and countless others when issuing" the SO but do not show how they have relied on any prior policy or practice. (Doc. No. 29-1) at 16. To have reliance interests, plaintiffs must show that they changed their behavior based on a government policy and that changing the policy would impose

---

[8] Plaintiffs argue in passing that the SO has been arbitrarily applied because a sign about President Harding has been submitted for review while signs about President Obama and President Biden have been displayed. (Doc. No. 29-1) at 15 n.9. This argument is irrelevant because Plaintiffs challenge the SO on its face, not applications of the SO. And Plaintiffs have not proven their claim of arbitrary application. Plaintiffs provide no evidence of the review team's ultimate decision on whether these displays are allowed under the SO. Plaintiffs only cite hearsay news articles about the installation of the Obama and Biden plaques—not whether they have been submitted for review or are even subject to review—and an article stating that the Harding sign was submitted for review but not providing the result of that review.

hardship on them. In *DHS. v. Regents of the University of California*, for example, the Court noted that beneficiaries of the Deferred Action for Childhood Arrivals program had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the program. 591 U.S. 1, 31 (2020). Here, although Plaintiffs allege that they "rely on" NPS, they do not identify a specific NPS policy they have relied on, how they have changed their behavior based on that policy, or specifically how they would suffer a hardship now that they can no longer "rely on" NPS. (Doc. No. 29-1) at 16. Plaintiffs point to no reliance interests that should have been considered.

Plaintiffs argue that the SO lacks support and runs counter to the evidence but ignore the evidence that was "before the agency" when it issued the SO. (Doc. No. 29-1) at 17-18. "Courts are to determine whether an agency's action was arbitrary or capricious in light of the information it confronted." *Bradley v. Weinberger*, 483 F.2d 410, 415 (1st Cir. 1973). The pertinent support for the SO was the direction from the President in the EO—which Defendants could not legally defy. *See Sherley*, 689 F.3d at 785; *Bradford*, 101 F.4th at 731. Although Plaintiffs reference comments that oppose the SO, (Doc. No. 29-1) at 18, those comments were received after the SO issued and thus were not before the agency at the time of its decision-making. Plaintiffs also gesture at research "demonstrating the accuracy of the information Defendants have erased," *id.* at 17-18, but again ignore that the SO only directs a review of properties and does not itself direct the removal of any property. While that research might be relevant to whether the decision to remove a particular property is arbitrary and capricious, it has nothing to do with the antecedent decision to obey the EO and institute reviews of DOI properties.

Plaintiffs argue that the SO includes factual findings via "insinuation" and "suggestion." (Doc. No. 29-1) at 17-18. But the SO makes no factual findings; it merely directs the Land

21

Management Bureaus to conduct reviews so that they can make factual findings.  Ex. 3.

Plaintiffs argue that under the SO, Defendants arbitrarily changed direction without explanation, but identify only an alleged amorphous "practice of seeking to share full and accurate historical and scientific information." (Doc. No. 29-1) at 18.  An arbitrary and capricious challenge based on a change in policy requires the Plaintiffs to show that there was in fact a change.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217, 222 (2016) (prior policy documented in an agency opinion letter and handbook and changed via rulemaking).  Plaintiffs can point to no prior policy document inconsistent with the SO.

Finally, Plaintiffs make a series of undeveloped arguments, none of which establish "a strong likelihood of success" on the merits."  *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010).  Plaintiffs assume the SO directs NPS to "abandon[]" various statutory requirements and the NPS Management Policies, but Plaintiffs fail to explain what violations they allege.  (Doc. No. 29-1) at 18.  Plaintiffs suggest the SO's implementation may run afoul of various parks' Foundation Documents, but any alleged violation of a park document is an argument for why a certain implementation of the SO might be improper, not a basis to invalidate the SO.  *Id.* at 19. Finally, Plaintiffs portray an article about a sign at Muir Woods National Monument as an official NPS  policy  statement.  *Id.*  (citing  *History  Under  Construction*,  Nat'l  Park  Serv., https://perma.cc/AQ5V-37E4 (last visited April 1, 2026)).  Plaintiffs cite nothing for the notion that an article can bind an agency.  Plaintiffs have not met the burden of showing preliminary relief is warranted.

### 4.  *The Secretary's Order Is Not Contrary to Law*

Because Plaintiffs bring a facial challenge to the SO, they must show that the SO is contrary to law "in all its applications." *Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 619 (1991).  Plaintiffs

ignore the standard for a facial challenge and ignore the text of the SO, focusing instead on how the SO has been applied. (Doc. No. 29-1) at 19-25. But Plaintiffs' arguments about "how the [SO] has been applied" are irrelevant here. *McGuire v. Reilly*, 386 F.3d 45, 57 (1st Cir. 2004). "[I]t is not enough for the plaintiffs to show the [SO] could be" or has been applied unlawfully. *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011). Plaintiffs must show that there is "no set of circumstances exists under which the [SO] would be valid." *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 213 (D.C. Cir. 2010); *Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*, 2025 WL 1725826, at *5 (D. Mass. June 20, 2025). Plaintiffs cannot meet their burden.

As to Count 2, Plaintiffs misrepresent the Centennial Act's directive. (Doc. No. 28) ¶¶ 146-59; (Doc. No. 29-1) at 21. The Act states that the Secretary must implement a "broad program" of "highest quality interpretation and education." 54 U.S.C. § 100802. Plaintiffs do not allege that such a program no longer exists—indeed, they attach to their Motion the current NPS Management Policies, which detail NPS's "broad program" for education and interpretation. (Doc. No. 29-3.) That program satisfies the Centennial Act.

Even if the Centennial Act required NPS to generally enhance "opportunities for people to form intellectual and emotional connections in the parks," the SO would survive a facial challenge. (Doc. No. 29-1) at 21. First, the SO directs all the Land Management Bureaus, not just NPS, to conduct reviews and the other Land Management Bureaus are not governed by the Centennial Act. Second, identifying and removing content that "inappropriately disparages Americans past or living" would enhance opportunities for people to connect to the parks, because such content can detract from park visitors' experience. Ex. 3 § 5. For similar reasons, identifying and removing inappropriate content would benefit the public's understanding of park sites and resources. (Doc.

23

No. 29-1) at 21.  Although Plaintiffs try to shore up their claim by referencing "[t]he content being removed," *id.* at 21-22, arguments about "how the [SO] has been applied" are irrelevant to Plaintiffs' facial challenge, *McGuire*, 386 F.3d at 57.  Finally, the SO cannot violate 54 U.S.C. § 100803 because that provision only provides that the Secretary "*may* undertake a program of regular evaluation of interpretation and education programs," not that he must.  54 U.S.C. § 100803 (emphasis added).  Plaintiffs have not shown that the SO can never be applied consistent with the Centennial Act.

As to Count 3, Plaintiffs cite provisions of the National Park Service Organic Act that are irrelevant to interpretive material in parks.  (Doc. No. 29-1) at 22-24.  Plaintiffs argue that the SO "fails to leave the parks unimpaired for the enjoyment of future generations" because the SO has "already resulted in the removal of signs and exhibits."  (Doc. No. 29-1) at 23.  But the Organic Act provision that Plaintiffs cite identifies a purpose of conserving "the scenery, natural and historic objects, and wild life in the System units" and providing "for the enjoyment of the scenery, natural and historic objects, and wild life."  54 U.S.C. § 100101.  Signs and exhibits are properties NPS adds to units to improve visitor experiences, not object or wildlife intrinsic to NPS units that are subject to § 100101.  Reviewing such signs and exhibits for conformance with the SO is not a violation of the Organic Act.  Nor are signs and exhibits subject to the Management Policies prohibition on impairment.  Under the Management Policies, park resources and values include "scenery, natural and historic objects, and wildlife"; "appropriate opportunities" to enjoy those resources; "the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system"; and "the benefit and inspiration provided to the American people by the national park system."  (Doc. No. 29-3) § 1.4.6.  Signs and exhibits are not items intrinsic to the parks or values that cannot be impaired.

24

In any event, Plaintiffs cannot show that the SO necessarily impairs park resources and values. The SO does not itself alter any NPS properties. And implementing the SO by identifying and removing properties that inappropriately disparage Americans would, among other things, improve NPS's ability to "contribut[e] to the national dignity," (Doc. No. 29-3) § 1.4.6, and better provide "for the enjoyment of the scenery, natural and historic objects, and wild life," 54 U.S.C. § 100101. And as with the Centennial Act, the Organic Act does not govern the other Land Management Bureaus that are subject to the SO, so not every application of the SO is subject to the Organic Act. Plaintiffs' facial challenge under the Organic Act fails.

As to Count 4, Plaintiffs fail to prove a violation of the Omnibus Management Act. First, § 100701 requires "the secretary" to "improve the ability of the Service to provide state-of-the-art management, protection, and interpretation of, and research on, the resources of the System" 54 U.S.C. § 100701. Section 100701 is a broad instruction to guarantee that NPS has the "ability" to steward the National Park System, not a requirement to provide particular interpretive materials. Second, even if Plaintiffs were correct that § 100701 instructs the Secretary to provide particular interpretive materials, Plaintiffs' conclusory assertion that "the [SO] actively harms the quality of interpretation and research throughout the parks by limiting the stories and information that may be shared." (Doc. No. 29-1) at 24-25, at most is an argument that the SO has in some cases been applied unlawfully, not that there is "no set of circumstances exists under which the [SO] would be valid." *Air Transp.*, 613 F.3d at 213. Finally, Plaintiffs' arguments under 54 U.S.C. § 100702 fail because that provision requires NPS to use "a broad program of the highest quality science and information," 54 U.S.C. § 100702, and Plaintiffs attach to their Motion the current NPS Management Policies, detailing NPS's program. (Doc. No. 29-3.).

In sum, Plaintiffs have failed to show that there are no circumstances under which the SO

would be valid under the relevant statutory provisions.  The Court should deny Plaintiffs' motion.[9]

## B.  Plaintiffs Will Not Be Irreparably Harmed if Denied Preliminary Relief

Plaintiffs' "cries of urgency" and irreparable harm "are sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief."  *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004).  Plaintiffs waited nine months after the Secretary issued his order to file suit.  (Doc. No. 1.)  Plaintiffs then waited another month after filing suit to file a motion for a preliminary injunction.  (Doc. No. 29).  Waiting ten months to file for a preliminary injunction is sufficient to negate any claims of irreparable harm.  *See HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp. 3d 303, 323-25 (D.N.H. 2018).

In any event, Plaintiffs will not "suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  As explained above, Plaintiffs' allegations of mission frustration and resource diversion are not legally cognizable at all, much less irreparable.  *Supra* § I.A.1. Plaintiffs cite this Court's opinion in *Massachusetts v. NIH*, 770 F. Supp. 3d 277 (D. Mass. 2025) for the proposition that mission frustration is an irreparable harm but ignore the very different context of that case.  (Doc. No. 29-1) at 30.  There "slashing and capping" funding for biomedical research without notice would have led to significant disruptions in lifesaving research.  *NIH*, 770 F. Supp. 3d at 287, 322.  Plaintiffs cite *New York v. McMahon*, 784 F. Supp. 3d 311 (D. Mass. 2025) for the same mission-frustration proposition, (Doc. No. 29-1) at 30, but similarly ignore that case held that schools were irreparably harmed by threats to their ability to educate children. *McMahon*, 784 F. Supp. 3d at 362-63.  Plaintiffs' abstract objections to the management of the National Park System are nothing like the concrete harms in *NIH* and *McMahon*. [10]

---

[9] For the same reasons Plaintiffs cannot, as a matter of law, show a likelihood of success on the merits, Plaintiffs cannot state a claim upon which relief can be granted.  The Court should dismiss claims 1-4 under Rule 12(b)(6).

[10] Plaintiffs string cite additional inapposite cases for this mission-frustration proposition without explanation.  (Doc. No. 29-1) at 34.  *Victim Rights Law Center. v. United States Department of Education,* 788 F. Supp. 3d 70 (D. Mass.

Plaintiffs complain that some members do not want to associate with them because doing so "equates to being perceived as opposing the current administration's policies, actions, or campaigns." (Doc. No. 29-1) at 32. But that perception is due to Plaintiffs' actual advocacy against the current administration. *See e.g.*, (Doc. No. 29-10) ¶ 21 (ANPR's "publicly denounc[ing]" of NPS and the SO has "distanc[ed] [its] relationship with some current Park Service employees."). So any harm is "self-inflicted" and therefore insufficient to "satisfy the irreparable harm requirement." 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.); *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024). Plaintiffs' claim boils down to this: They voluntarily decided to advocate against the SO—which advocacy they say is an Article III injury—and that advocacy caused some third parties to distance themselves—which they say is irreparable harm. This manufactured irreparable harm finds no support in precedent. Moreover, the Court should "not consider" harms "that the award of an injunction will not alleviate or prevent." *Defs. of Wildlife v. United States Army Corps of Eng'rs*, 730 Fed. App'x 413, 415 (9th Cir. 2018); *Gedeon v. City of Springfield*, 2017 WL 4212334, at *8 (D. Mass. Feb. 24, 2017). Plaintiffs winning an injunction preventing DOI from implementing the SO would bolster the perception that Plaintiffs are opposed to the administration and would further distance their members. Lastly, irreparable harm "must be demonstrated," and Plaintiffs' conclusory assertions of loss of goodwill are insufficient to meet their burden. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–7 (1st Cir. 1991).

Plaintiffs' alleged reputational harms rely on a counterfactual. (Doc. No. 29-1) at 32-33.

2025), held an organization had shown irreparable harm based on an imminent threat to its "ability to provide direct legal services to victims of sexual and gender-based violence." 788 F. Supp. 3d at 95. *National Education Association v. United States Department of Education*, 779 F. Supp. 3d 149 (D.N.H. 2025) held that loss of First Amendment rights and threats to an organization's "very existence" were irreparable harms. 779 F. Supp. 3d at 200. And the holdings in *Massachusetts Fair Housing Center v. United States Department of Housing & Urban Development,* 496 F. Supp. 3d 600 (D. Mass. 2020) that resource diversion and mission frustration can support standing and irreparable injury have been abrogated by *Alliance*. 496 F. Supp. 3d at 608, 611. These cases are irrelevant here.

They say the SO "declares "their work . . . to be no more than 'improper partisan ideology,'" (Doc. No. 29-1) at 32, but the SO says nothing about Plaintiffs or their work.  Ex. 3.

AASLH alleges an irreparable pocketbook injury, (Doc. No. 29-1) at 33, because Graves "made the decision to retire."  (Doc. No. 29-7) ¶ 33.  As explained above, Graves's voluntary retirement is not an injury, was self-imposed, was not caused by the SO, and an injunction would not change Graves's willingness to work with NPS.  *Supra* § I.A.2.  ANPR's drop in attendance at its events and the subsequent decline in revenue is due to ANPR's outspoken opposition to NPS. (Doc. No. 29-1) at 33.  This loss of income is self-inflicted and would not be remedied by an injunction.

Finally, NPCA alleges that its unnamed members and millions of non-party park visitors, both living and "future generations," will suffer irreparable harm from missing out on removed NPS properties.  (Doc. No. 29-1) at 33.  Plaintiffs cannot claim the alleged injuries of unnamed members *Cf. Draper*, 827 F.3d at 3 ("The association must, at the very least, identify" by name the "member who has suffered the requisite harm.").  Harms to "third parties" do not support a movant's claim for a preliminary injunction.  *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 622 (1st Cir. 1995).  And Plaintiffs cannot allege an informational injury without an "entitle[ment]" to that specific information.  *TransUnion*, 594 U.S. at 441.

Because Plaintiffs will not "suffer irreparable harm in the absence of preliminary relief," the Court should deny their motion for a preliminary injunction.  *Winter*, 555 U.S. at 20.

## C.  The Public Interest and the Equities Weigh Against Granting Relief

Even if Plaintiffs could show irreparable harm and likelihood of success on the merits, "proper consideration" of the public interest and the balance of the equities would "require[] denial of the requested injunctive relief."  *Winter*, 555 U.S. at 23.  Plaintiffs ignore the final two factors

28

for a preliminary injunction, and instead merge their equitable arguments with their merits arguments. (Doc. No. 29-1) at 34-35. Since Plaintiffs have failed to carry their burden on these two factors, the Court should deny the preliminary injunction. *Winter*, 555 U.S. at 32-33.

Regardless, the public interest and the equities weigh against granting preliminary relief. Because the EO is the basis for the SO, Plaintiffs' requested relief implicates "the President's strong interest in managing the executive branch," which should "be central to the equitable balancing inquiry." Nachmany, *Equitable Regulatory Balancing* 67 B.C. L. REV. 531, 565 (2026). A preliminary injunction or a stay of the SO would be detrimental to interbranch comity because it has the effect of dictating how the President can manage an executive agency. *See id.* at 575-577. And there is an anti-democratic effect to blocking the President's agenda that should not be discounted. Bickel, THE LEAST DANGEROUS BRANCH 16 (describing the "counter-majoritarian difficulty"); Kagan, *Presidential Administration* 114 HARV. L. REV. 2245, 2331-39 (2001) (praising the pro-democratic benefits of initiating agency action by Executive Order).

As a practical matter, Plaintiffs' requested relief would impose administrative burdens on DOI. Plaintiffs seek a mandatory injunction requiring Defendants to restore and preserve all NPS properties that have been modified since May 2025, whether or not they were modified under the SO. (Doc. No. 29-2). NPS manages over 400 sites, over 350 book stores, over 700 visitor center exhibits, and over 8,000 interpretive wayside signs nationwide. Ex. 1 ¶ 10. NPS distributed 26.3 million publication last year. *Id.* Restoring all NPS properties to exactly as they were in May 2025 would be onerous. And freezing in amber all NPS properties as they were in May 2025 would prohibit NPS from making the routine updates that are inherent in its stewardship of the National Park System. *Id.* ¶ 26

### D. Plaintiffs' Requested Relief Is Overbroad

Although Plaintiffs seek relief as to the entire SO and its implementation, Plaintiffs only complain about § 5 of the SO and only the portion of § 5 that governs NPS. "An injunction should be narrowly tailored to give only the relief to which plaintiffs are entitled." *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 361 (1st Cir. 1989). Plaintiffs request more relief than the Court can provide on a motion for a preliminary injunction and more relief than Plaintiffs need to remedy their alleged injuries. The Court should deny their overbroad injunction.

First, even if the Court were to enjoin § 5's implementation by NPS, the Court should not disturb the remainder of the SO, which is not at issue and which is severable. To determine whether an agency action is severable, courts ask two question: (i) "whether the agency would have adopted the same disposition regarding the unchallenged portion of the [agency action] if the challenged portion were subtracted" and (ii) "whether the remaining parts of the [agency action] would function sensibly without the stricken provision." *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 224 (D.C. Cir. 2025). The SO implements the EO, so the Secretary would have been bound to adopt the same disposition regarding the remainder of the SO if the portion regarding NPS were subtracted. *See Sherley*, 689 F.3d at 784. *Bradford*, 101 F.4th at 731. And the portions of the SO governing the restoration of Independence Hall, the other Land Management Bureaus, and public feedback on the quality of NPS sites, are workable without the SO's directions to NPS. Any relief in this case should be limited to the portion of § 5 that applies to NPS.

Plaintiffs also lack standing to seek relief pertaining to the SO's various provisions that are irrelevant to Plaintiffs' alleged injuries. *See In re Fin. Oversight & Mgmt. Bd.*, 995 F.3d at 22. Plaintiffs allege no harms from § 4, which directs NPS to restore Independence Hall in advance of the United States' semiquincentennial. Ex. 3 § 4. Plaintiffs do not allege any injury caused by the

other Land Management Bureaus.  And while Plaintiffs challenge § 6 of the SO in their Amended Complaint, (Doc. No. 28) ¶¶ 60, 63-64, 209, Plaintiffs have not moved on that claim and nowhere state how alleged procedural violations of the Paperwork Reduction Act "affected" their "concrete interest" as is required for standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Enjoining DOI from enforcing any portion of the SO other than § 5 as it pertains to NPS would not remedy Plaintiffs' alleged injuries

Second, Plaintiffs' requested relief seeks to "alter[] rather than preserve[] the status quo" by compelling NPS to restore NPS properties to their state as of a year ago.  *Seafreeze Shoreside, Inc v. United States Dep't of Interior*, 2023 WL 3660689, at *6 n.7 (D. Mass. May 25, 2023).  For purposes of a preliminary injunction, the status quo is "the last uncontested status which preceded the pending controversy."  *Braintree Labs., Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010).  This dispute began when Plaintiffs filed their February 17, 2026 Complaint (Doc. No. 1), so their request to compel the alteration of NPS properties to their May 19, 2025 state is a request to change the status quo and grant Plaintiffs the ultimate relief they seek in this case.  *See Seafreeze*, 2023 WL 3660689, at *6 n.7.  A preliminary injunction, however, is not "a mechanism for accelerated resolution of the merits."  Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 840 (2025).  A preliminary injunction is a stop-gap measure that "preserve[s] the relative positions of the parties" and the Courts' remedial options "until a trial on the merits" with proper procedural and evidentiary guardrails "can be held."  *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025).  The Court should deny any relief beyond what is necessary to preserve the status quo as of February 17, 2026.

### III.    The Court Cannot Stay an Order that Has Been Executed

Section 705 empowers "the reviewing court" to "issue all necessary and appropriate

process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Section 705 "was primarily intended to reflect existing law under the Scripps-Howard doctrine." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). That doctrine empowered federal courts to stay agency actions under review in the same way a court of appeals "can stay the enforcement of a judgment pending the outcome of an appeal." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 10 (1942).

A stay pending appeal maintains "the status quo" "by temporarily suspending the source of authority to act." *Nken v. Holder*, 556 U.S. 418, 428–29 (2009). Because courts issue stays to maintain the status quo, "an order, once executed, cannot be 'stayed.'" *Graddick v. Newman*, 453 U.S. 928, 936 (1981) (Powell, J., in chambers) (collecting cases). In contrast, requests to alter the status quo are "injunctive." *Nken*, 556 U.S. at 429 (collecting cases).

The SO was issued in May 2025, has been implemented across the country, and cannot be stayed. *Graddick*, 453 U.S. at 936. Because the pre-SO status quo has already been changed, a stay would not preserve that status quo "pending conclusion of the review proceedings." 5 U.S.C. § 705. And an order directing Defendants to alter the current status quo and restore NPS properties to their pre-SO state would be "injunctive," *Nken*, 556 U.S. at 418 (collecting cases), and thus beyond the authority granted in § 705. The Court should deny Plaintiffs' request for a § 705 stay.

## IV. The Court Should Dismiss NPCA, AASLH, ANPR, the Coalition, and SEGD for Lack of Venue

Plaintiffs allege that venue is proper under 28 U.S.C. § 1391(e)(1) because this is an action against officers and agencies of the United States and UCS is headquartered in this district. (Doc. No. 28) ¶ 13. But while venue may be proper for UCS, none of the other Plaintiffs have established venue because all the other plaintiffs reside outside this district. *Id.* ¶¶ 14-18.

"The Supreme Court long ago held that venue must be proper as to each party," and "in

32

cases laying venue where 'the plaintiff' resided, venue was improper for a co-plaintiff who resided in a different district." 14D Wright & Miller, Fed. Prac. & Proc. Juris. § 3807 (4th ed.) (citing *Smith v. Lyon*, 133 U.S. 315, 318 (1890); *Camp v. Gress*, 250 U.S. 308, 316–317 (1919)). Congress "legislate[d] against th[is] backdrop of existing law," *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019), in 1962 when it amended the venue statute to include subsection (e). Pub. L. 87–748, §2, 76 Stat. 744 (1962). Subsection (e) provides that in suits against agencies of the United States or officers of the United States acting in their official capacities, venue is proper "in any judicial district in which … *the plaintiff resides* if no real property is involved in the action." 28 U.S.C. § 1391(e)(1) (emphasis added). By limiting venue to the judicial district of "the plaintiff," Congress only granted venue to the plaintiff in the district and not to co-plaintiffs who reside in different districts.

Section 1391(e)'s broader grant of venue based on defendant residency reinforces the conclusion that 1391(e)'s grant of venue based on plaintiff residency hews to the traditional rule. Congress provided venue "in any district in which *a defendant in the action resides*." 28 U.S.C. § 1391(e)(1) (emphasis added). So long as any defendant to the action resides in the district in which the action is pending, venue is proper for all plaintiffs. "That Congress used different language" in the provision granting venue based on defendant residency than in the provision granting venue based on plaintiff residency "strongly suggests that it meant" for those provisions "to work differently." *Stanley v. City of Sanford*, 606 U.S. 46, 53 (2025).

To be sure, some courts have misinterpreted § 1391(e)'s reference to "'the plaintiff' to mean 'any plaintiff.'" *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 344 (6th Cir. 2005). But neither the Supreme Court nor the First Circuit has provided a binding interpretation of § 1391(e). And the leading cases holding that any one plaintiff can provide venue for all plaintiffs

33

in a suit against the government are out of step with current Supreme Court case law.

*Exxon Corp. v. F.T.C.* limits its analysis of § 1391(e) to a single paragraph based on pragmatic concerns about the potential for "unnecessary multiplicity of litigation," not the statute's text.  588 F.2d 895, 898 (3d Cir. 1978).  The Supreme Court has "emphasized many times" that "policy concerns cannot trump the best interpretation of the statutory text." *Patel v. Garland*, 596 U.S. 328, 346 (2022).  In any event, not allowing a co-plaintiff to sue in another plaintiff's district would not result in multiplicity of litigation since all plaintiffs can sue in any defendants' district.

*Sidney Coal* relied heavily on the "statute's legislative history" while disregarding the text.  427 F.3d at 344.  Courts cannot "rely on legislative history alone to interpret statutory text." *ST Eng'g Marine, Ltd. v. Thompson, Maccoll & Bass, LLC, P.A.*, 88 F.4th 27, 38 (1st Cir. 2023). *Sidney Coal* shows why:  The Court there applied the legislative history's broad purpose of "mak[ing] it more convenient for an aggrieved person to file suit against a federal entity" to conclude, contrary to the text, that any plaintiff could provide venue for all co-plaintiffs.  427 F.3d at 344.  But an intent "to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia," does not suggest an intent to allow co-plaintiffs to survey their residences and select the most favorable forum. *Id*.  The natural reading of § 1391(e) accomplishes Congress's goal of allowing "the plaintiff" to file suit locally without opening an avenue for forum-shopping.

Because NPCA, AASLH, ANPR, the Coalition, and SEGD reside outside this district, (Doc. No. 28) ¶¶ 14-18, the Court should dismiss them for lack of venue.

## V.    The Court Should Dismiss Counts 5 and 6

Although Plaintiffs do not move on Counts 5 and 6 of their Amended Complaint, (Doc. No. 29-1) at 12 n.7, the Court should dismiss both Counts.  As to Count 5, Plaintiffs fail to allege a violation of the Federal Land Policy Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et*

34

*seq*. (Doc. No. 28) ¶¶ 185-96.  FLPMA applies only to "public lands," which are statutorily defined as lands managed by the Bureau of Land Management.  *See* 43 U.S.C. § 1702(e).  Because Plaintiffs' allegations relate solely to lands within the National Park System, which is managed by NPS, the Court should dismiss Count 5 for failure to state a claim.

As to Count 6, Plaintiffs allege a violation of the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.* based on Defendants' purported decision not to follow the procedures for a "collection of information" when posting signs and QR codes under the SO.  (Doc. No. 28) ¶¶ 197-209.  "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."  *Summers*, 555 U.S. at 496.  Because Plaintiffs do not allege any concrete injuries from Defendants' alleged failure to follow the procedures for a collection of information, Count 6 should be dismissed for lack of standing.

## CONCLUSION

The Court should deny Plaintiffs' motion and dismiss this case.

Dated:  April 8, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Ian M. Swenson*
Ian M. Swenson
Counsel
Environment and Natural Resources Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, District of Columbia 20530
(202) 532-5139
Ian.Swenson@usdoj.gov

35