# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION )
ASSOCIATION, *et al.*, )
                       )
    Plaintiffs, )
                       )
       v. )      **Case No. 26-cv-10877**
                       )
UNITED STATES DEPARTMENT OF )
THE INTERIOR, *et al*., )
                       )
    Defendants. )

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR 5 U.S.C. § 705 STAY OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

   I.   Plaintiffs are likely to establish standing to challenge the Secretary's Order. ................... 1

      A.   All Plaintiffs have organizational standing. ................................................................ 1

      B.   Plaintiffs NPCA and AASLH have associational standing. ........................................ 3

  II.   Plaintiffs are entitled to a § 705 stay or preliminary injunction. ...................................... 6

      A.   Plaintiffs are likely to show the Secretary's Order violates the APA. .......................... 6

          1.   The Secretary's Order is final agency action. ...................................................... 6

          2.   The Secretary's Order is not committed to agency discretion. ........................... 9

          3.   The Secretary's Order is arbitrary and capricious. ........................................... 11

          4.   The Secretary's Order is contrary to law and exceeds Defendants' statutory authority. .......................................................................................................... 14

      B.   Plaintiffs face irreparable harm absent preliminary relief. ........................................ 16

      C.   The balance of the equities and the public interest favor Plaintiffs. ........................... 17

 III.   The Court should deny Defendants' motion to dismiss. .................................................. 19

      A.   Venue is proper in this District. .................................................................................. 19

      B.   Plaintiffs have stated a claim on all six counts. .......................................................... 19

CONCLUSION.................................................................................................................. 20

**INTRODUCTION**

By law, our national parks must be managed and preserved "for the benefit and inspiration of all the people of the United States" by using "the highest quality science and information" and making available "the highest quality interpretation and education." In adopting and implementing the Secretary's Order, Defendants ignore these mandates in favor of bluster and censorship. But the Administrative Procedure Act (APA) requires reasoned decisionmaking; it does not allow Defendants to erase centuries of history and volumes of science. Because Plaintiffs are likely to show that the Secretary's Order violates the APA in multiple ways, that they are already suffering irreparable harm, and that the balance of equities and public interest weigh in their favor, they have done far more than plausibly allege their claims to survive a motion to dismiss—they have established that they are entitled to a stay or preliminary injunction.

**ARGUMENT**

**I.    Plaintiffs are likely to establish standing to challenge the Secretary's Order.**

**A.  All Plaintiffs have organizational standing.**

All Plaintiffs are likely to show that they have standing to challenge the Secretary's Order because it harms their "core business activities." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). With the issuance and implementation of the Order, the National Park Service has abandoned its statutory duties to share full and accurate historical and scientific information, frustrating Plaintiffs' missions and forcing them to divert resources to counteract the resulting harm. The Union of Concerned Scientists (UCS), for example, cannot produce the same quality of scientific reports as it would in the past because it can no longer count on the Park Service's contributions. (Doc No. 29-12 ¶ 18; *see also, e.g.*, Doc No. 29-5 ¶ 36 (Plaintiff's Park Service collaborations are threatened by Order)). The American Association for State and Local History (AASLH) has been forced to reconsider program offerings and to spend time addressing concerns

1

from members who are under pressure to self-censor or defy best practices for historical interpretation. (Doc No. 29-9 ¶¶ 25–26; *see also, e.g.*, Doc No. 29-6 ¶ 30 (Plaintiff has been forced to respond to member concerns and adapt programming)). These harms confer organizational standing. *See, e.g.*, *Presidents' All. on Higher Educ. & Immigr. v. Noem*, No. 25-cv-11109, 2026 WL 788185, at *9 (D. Mass. Mar. 20, 2026) (finding standing where challenged actions "triggered a flood of requests for assistance from member institutions and caused the organization to divert resources from its other initiatives in order to offer guidance to its members on responding to the federal government's actions").

Defendants overread *Alliance for Hippocratic Medicine* to suggest that a diversion of resources can never constitute injury in fact. (Doc No. 31-1 at 9–11). But *Alliance* does not change Circuit precedent recognizing "an organization's standing if 'the challenged conduct frustrated [its] organizational mission[]' and it 'diverted resources to combat that conduct,' as long as the harm was not to 'the organization['s] lobbying' or 'pure issue-advocacy' activities." *Presidents' All.*, 2026 WL 788185, at *8 (alterations in original) (quoting *Town of Milton v. Fed. Aviation Admin.*, 87 F.4th 91, 99 (1st Cir. 2023), and *Equal Means Equal v. Ferriero*, 3 F.4th 24, 30 (1st Cir. 2021)). As Judge Saris explained, *Alliance* "is not inconsistent with those principles." *Id.* An organization still has standing where, as here, a "diversion of resources furthers a core business activity of the organization that is not issue advocacy or lobbying and, thus, is not merely an effort to oppose the challenged conduct." *Id.*; *see also, e.g.*, *Am. Acad. of Pediatrics v. Kennedy*, 814 F. Supp. 3d 150, 159–60 (D. Mass. 2026) (*Alliance* did not foreclose standing based on organization's impairment of programming and diversion of resources); *N.H. Youth Movement v. Scanlan*, No.

2

24-cv-291, 2026 WL 323171, at *10 (D.N.H. Feb. 6, 2026) (finding standing where organizations' core activities were impaired and they were forced to redirect staff and financial resources).[1]

The injuries in this case, moreover, are far more concrete than those alleged in *Alliance*. The organization there "ha[d] not suffered a concrete injury" but was trying to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394. The Court rejected a theory that would give organizations standing "to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* at 395. Nothing like that would result from the straightforward conclusion that Plaintiffs have standing here, where they are not attempting to spend their way into court but rather have shown that the Order directly affects and interferes with their core, longstanding activities.

### B.  Plaintiffs NPCA and AASLH have associational standing.

Both the National Parks Conservation Association (NPCA) and AASLH also are likely to show that they have associational standing because "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to protect are germane to the organization[s]' purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 108 (1st Cir. 2006) (citation omitted). Defendants dispute only the first element, and that effort fails.

---

[1] All Defendants can muster to distinguish *American Academy of Pediatrics* is that the organization had to counsel members who were threatened with legal liability. (Doc No. 31-1 at 11 n.5). But nothing turned on that particular detail, and here too Plaintiffs have "needed to divert resources away from [their] usual business activities because of the [Order], including by counseling [members] who have been directly impacted." *Am. Acad. of Pediatrics*, 814 F. Supp. 3d at 160; (*see, e.g.*, Doc No. 29-9 ¶ 25). Defendants also attempt to distinguish other comparable cases on the sole basis that they predate *Alliance*. (Doc No. 31-1 at 11 n.5). As already explained, however, *Alliance* is consistent with First Circuit case law holding that frustration of mission and diversion of resources may confer standing. *See Presidents' All.*, 2026 WL 788185, at *8.

NPCA member Jennifer Goepfert attests that the Secretary's Order jeopardizes her concrete plans to continue using the national parks to educate her daughters. (Doc No. 29-8 ¶ 32). As she explains, "many of the signs and exhibits being removed because of the order are the same descriptions of accurate science and history that [she] relied on to teach [her] daughters over the past year." (*Id.* ¶ 31). Because of the Order, Ms. Goepfert is "rushing to visit parks" before materials are removed, and she "can no longer dependably rely on the Park Service for accurate information about science and history." (*Id.* ¶ 34). Ms. Goepfert "describes how she 'derived aesthetic value'" from the parks as they existed before the Order, and she "explains that her 'future uses' . . . would be diminished" by continued implementation of the Order. *See Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316, 2026 WL 533420, at \*5 (D.D.C. Feb. 26, 2026) (citation omitted) (finding likelihood of standing based on such injuries and collecting cases).

Ms. Goepfert's intentions to continue visiting parks are not mere "vague plans," as Defendants assert. (Doc No. 31-1 at 12). "[T]his coming summer, [Ms. Goepfert] is planning to take [her] daughters on another trip for a couple of months to visit parks," including Brown v. Board of Education National Historical Park and Hot Springs National Park—parks where signs have been flagged for removal. (Doc No. 29-8 ¶ 32).[2] These are not mere "some day" intentions but rather "concrete plans" to visit parks impacted by the Order. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). Nor is this a one-off trip: unlike the *Lujan* affiant who had traveled to Sri Lanka only once, *id.* at 563, Ms. Goepfert has visited at least 66 park sites, and doing so is central to her parenting and lifestyle. (Doc No. 29-8 ¶¶ 8, 13, 16). Plaintiffs "adequately allege injury in

---

[2] *See* Karin Brulliard & Brady Dennis, *Confidential database reveals which items NPS thinks may 'disparage' America*, Wash. Post (Mar. 2, 2026), https://perma.cc/N2FU-RHEM (citing Internet Archive, *DOI Targets for Removal from National Parks under EO14253/SO3431*, https://perma.cc/99YZ-PYGW (last visited Mar. 7, 2026)); SciOp, *DOI Targets for Removal from National Parks under EO14253/SO3431*, https://sciop.net/datasets/doi-targets-for-removal (hereinafter "Censorship Spreadsheet") (last visited Apr. 22, 2026) (to access raw files visit https://archive.org/download/nps-removal-targets, download ".zip" file, open "bird_teeth," and open file "Censorship Spreadsheet.xlsx").

fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 88 (1st Cir. 2025) (citation omitted). So long as the Park Service continues to remove the materials Ms. Goepfert uses to educate her daughters, her enjoyment of parks will continue to deteriorate. (Doc No. 29-8 ¶ 36 (park experience "will not be the same because of the Secretary's Order")).[3]

AASLH member Donna Graves has established standing, too. She attests that "because of the Secretary's Order, [she] was forced into early retirement." (Doc No. 29-7 ¶ 5). That job opportunities are no longer available to Ms. Graves is far from "self-inflicted" harm, as Defendants assert. (Doc No. 31-1 at 13). Ms. Graves's Park Service work once accounted for 40% to 80% of her annual income. (Doc No. 29-7 ¶ 33). But because of the Order, work on "the history of marginalized communities or climate change[] ha[s] completely evaporated," so if she tried to find opportunities with the Park Service now, it would "account for near 0% of [her] income." (*Id.*). That financial harm alone constitutes injury in fact. *E.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

Ms. Graves has also suffered reputational harm because the Order brands her kind of work as "improper partisan ideology" that perpetuates a "false reconstruction of American history." (Doc No. 29-7 ¶ 34). That impedes Ms. Graves's ability to secure future work, and it harms her reputation "more generally within the public history field." (*Id.*). This harm to Ms. Graves's

---

[3] Defendants assert that no changes have been made at those sites, but that is beside the point: first materials are flagged, then removed. *See* Censorship Spreadsheet, *supra* (listing examples of flagged materials). Park Service staff have flagged a panel about segregation at Hot Springs, *see id.* (cell AL855), and the other sites Ms. Goepfert plans to visit this summer also contain the kinds of materials on Black history that have been targeted under the Order. It follows that there is a "substantial risk" of removals at these sites that will further detract from Ms. Goepfert's experience. *See Massachusetts v. HHS*, 923 F.3d 209, 225 (1st Cir. 2019) ("a plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about'" (citation omitted)); *cf. N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021) ("history of past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical'" (citation omitted)).

reputation also constitutes injury in fact. *See, e.g.*, *Victim Rts. L. Ctr. v. Dep't of Educ.*, 788 F. Supp. 3d 70, 85 (D. Mass. 2025) (plaintiff showed that challenged action would "harm [its] reputation in the community").

Defendants misunderstand the redressability standard. (Doc No. 31-1 at 13). Ms. Graves need only "show that the court can fashion a remedy that will at least lessen [her] injury"—not that her "entire injury will be redressed by a favorable judgment." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 995 F.3d 18, 22 (1st Cir. 2021) (citation omitted). Ms. Graves explains that "[s]o long as the Trump administration continues to effectuate this new ideologically-motivated system of historical interpretation and removals, [she] do[es] not have opportunities to continue using [her] expertise." (Doc No. 29-7 ¶ 28; *see id.* ¶ 27). If the Order were stayed or enjoined, and the Park Service resumed the status quo of telling a more accurate and complete history, Ms. Graves would have opportunities to work on such projects, which would at least partially redress her injuries.[4]

## II.   Plaintiffs are entitled to a § 705 stay or preliminary injunction.

### A.  Plaintiffs are likely to show the Secretary's Order violates the APA.

#### 1.   The Secretary's Order is final agency action.

The Secretary's Order is final agency action because it marks the consummation of Defendants' decisionmaking process and results in legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The Order mandates that the land management bureaus "conduct a review" of changed or removed properties and "immediately undertake such actions as are necessary to reinstate" properties altered or removed because they contain a perspective the Order disfavors. Sec. Order § 5(a). The Order further requires that the bureaus review all properties for

---

[4] Defendants insist that Ms. Graves "is not entitled to force NPS to display her work into perpetuity," but no one argues otherwise. (Doc No. 31-1 at 12). The point is that Ms. Graves has worked on "public history projects that emphasize social equity" (Doc No. 29-7 ¶¶ 4, 9–27), which are exactly the kinds of materials the Park Service has flagged or removed as "improper partisan ideology." *See* Censorship Spreadsheet, *supra*.

"inappropriate content"; "remove any content . . . inconsistent with the purposes of EO 14253"; and "take action to replace the removed content." *Id.* § 5(b). By its terms, the Order is a mandatory directive from the Secretary of the Interior requiring subordinates to accomplish specific tasks on specific timetables. That is textbook final agency action. *See, e.g.*, *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 139 (D.D.C. 2025) (memorandum to agency heads "replete with specific tasks and bolded and underlined deadlines" was final action); *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *8 (D.D.C. Mar. 30, 2021) (final agency action where Park Service directive articulated agency's overall approach, used mandatory language, and required park superintendents to take concrete steps).

Defendants are thus wrong to characterize the Order as a "preliminary step" that, "standing alone, has no legal or practical effect." (Doc No. 31-1 at 15, 16). The Order immediately imposed binding obligations on the Park Service. That its "ultimate impact . . . rests on some other occurrence," such as "a future site-specific application," does not render agency action nonfinal. *Prutehi Litekyan: Save Ritidian v. Dep't of Air Force*, 128 F.4th 1089, 1110 (9th Cir. 2025), *cert. granted sub nom. Dep't of Air Force v. Prutehi Guahan*, No. 25-579, 2026 WL 642829 (U.S. Mar. 9, 2026); *see also, e.g.*, *Biden v. Texas*, 597 U.S. 785, 793, 808 (2022) (memorandum directing agency personnel to "take all appropriate actions to terminate [program]" was final action); *Nat'l Council of Nonprofits v. OMB*, 775 F. Supp. 3d 100, 123–24 (D.D.C. 2025) (memorandum was final action although individual agencies carried out freeze); *Pub. Emps.*, 2021 WL 1198047, at *8 (directive was final even though park superintendents retained ability to impose limits or conditions because "they were still required to first impose the overarching NPS policy").

Defendants' assertion that the Order lacks legal or practical consequences (Doc No. 31-1 at 16) fails for similar reasons. *See Drs. for Am.*, 793 F. Supp. 3d at 139 (memorandum bound

agency staff by "requiring them to take certain actions"). The "limited discretion reserved to" the officials implementing the Order "does not negate that the [Order] had concrete legal consequences." *See Pub. Emps.*, 2021 WL 1198047, at *9. And the Park Service has already removed or flagged hundreds of interpretive materials pursuant to the Order, which has directly affected Plaintiffs. (Doc No. 29-1 at 13–14); *see also Pub. Emps.*, 2021 WL 1198047, at *9 (directive "created legal consequences and obligations for park superintendents managing individual NPS Parks and for park patrons"); *Ass'n of Am. Univs. v. Dep't of Energy*, 789 F. Supp. 3d 118, 139 (D. Mass. 2025) (if policy "left any room for doubt as to whether Plaintiffs would experience any legal effect," agency's subsequent conduct "removed any such doubt").

Nor do Plaintiffs "need to challenge removal or revision decisions" instead of the Secretary's Order. (Doc No. 31-1 at 17).[5] Plaintiffs challenge the issuance and implementation of a single, sweeping order. The Supreme Court has "recognized that if 'some specific order or regulation[] appl[ies] some particular measure across the board to all individual classification terminations and withdrawal revocations, and . . . that order or regulation is final . . . it can of course be challenged under the APA.'" *New York v. Trump*, 171 F.4th 1, 18 (1st Cir. 2026) (alterations and omissions in original) (quoting *Lujan*, 497 U.S. at 890 n.2). Plaintiffs thus appropriately seek to "rein in the direct effects" of the Order. *See Pub. Emps.*, 2021 WL 1198047, at *10; *id.* at *12–13 (plaintiffs need not separately challenge 380 park designations that flowed from single mandatory directive); *see also Drs. for Am.*, 793 F. Supp. 3d at 141 (plaintiffs properly challenged "a cohesive directive . . . with a single set of commands for the entire agency").

---

[5] Defendants' suggestion here is at odds with the government's position in a case challenging individual removals. *See* Defs.' Opp. to Pl.'s Mot. for Prelim. Inj. 12–15, *City of Philadelphia v. Burgum*, No. 26-cv-434 (E.D. Pa. Jan. 28, 2026), Dkt. No. 27 (arguing removal of exhibit panels was not final agency action).

Defendants' arguments fare no better as a ripeness objection. (Doc No. 31-1 at 13–15). It is disingenuous to say the Order "does not direct NPS to remove or modify any sign." (*Id.* at 14). The Order *requires* the removal of "any content . . . inconsistent with the purposes of EO 14253." Sec. Order § 5(b)(2). That alone distinguishes this case from *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998), where the plan at issue did not authorize immediate logging and there were several procedural steps before the Forest Service could permit logging. *Id.* at 733–34. Here, Plaintiffs have already been harmed by removals and modifications under the Order and will not have "ample opportunity later to bring [their] legal challenge at a time when harm is more imminent and more certain." *Id.* at 734. Nor could judicial review "hinder agency efforts to refine its policies." *Id.* at 735. The Order has been issued and is being implemented. Plaintiffs' claims do not depend on "uncertain and contingent events that may not occur as anticipated or may not occur at all." *New York v. McMahon*, 784 F. Supp. 3d 311, 342 (D. Mass. 2025) (citation omitted).

## 2. The Secretary's Order is not committed to agency discretion.

In another attempt to avoid judicial review, Defendants argue the Order falls under the APA's carve-out for action that is "committed to agency discretion." (Doc No. 31-1 at 17–18 (quoting 5 U.S.C. § 701(a)(2))). Given the "strong presumption favoring judicial review of administrative action," the Supreme Court reads this exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citations omitted). The Court has "generally limited the exception to certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (internal quotation marks and citations omitted); *see also Dugan v. Ramsay*, 727 F.2d 192, 195 (1st Cir. 1984) (APA review "typically" precluded where "review involves foreign affairs, the

9

military, or other areas in which the very act of reviewing may impede the agency's ability to carry out its functions").

The statutes at issue here provide meaningful standards. Defendants essentially admit as much, either in this litigation or in their own policies. Courts routinely review the Park Service's exercise of discretion under the Organic Act. *See, e.g.*, *Davis v. Latschar*, 202 F.3d 359, 365–66 (D.C. Cir. 2000). And the Park Service's own Management Policies acknowledge that the statute is "generally enforceable by the federal courts." (Doc No. 29-3 § 1.4.4).

As for the Centennial Act and the Omnibus Management Act, Defendants appear to concede that the Secretary's obligation to establish and maintain a program of education and interpretation is reviewable. (Doc No. 31-1 at 18); *see* 54 U.S.C. §§ 100802, 100702. Defendants instead try to insulate those contrary-to-law claims from review by arguing that whether the program includes the "highest quality" materials is unreviewable because the term is "subjective." (Doc No. 31-1 at 17–18). That a statute may leave "a great deal of discretion to the agency," however, does not "make actions taken pursuant to it unreviewable." *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 19 (1st Cir. 2020). Defendants fail to "point to any analogous case" indicating that decisions about education and interpretation fall "within the narrow exception to judicial review under the APA." *See New York*, 784 F. Supp. 3d at 355. Nor do they offer any authority to support their assertion that subjectivity of a statutory provision triggers the exception. And in fact, courts have found meaningful standards where statutes use similarly broad language. *See, e.g.*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971) ("prudent" provided meaningful standard); *NAACP v. Sec'y of HUD*, 817 F.2d 149, 158 (1st Cir. 1987) (drawing standard from statutory requirement that HUD "'administer' its programs 'in a manner affirmatively to further the policies' of 'fair housing'" (citation omitted)); *Am. Acad. of Pediatrics*

10

*v. Kennedy*, No. 25-cv-11916, 2026 WL 733828, at \*9 (D. Mass. Mar. 16, 2026) (language concerning "prevention and suppression of communicable diseases" and "preservation and improvement of the public health" provided manageable standards (citation omitted)).

Finally, Defendants cannot shoehorn the Order into this narrow exception by claiming it merely "improve[s] the internal management of the Department." (Doc No. 31-1 at 17 (quoting Sec. Order § 7)). The Order dictates a sweeping change in how the Park Service approaches interpretation, censoring any content that is allegedly "disparaging." The Order is thus nothing like the termination decision in *Webster v. Doe*, 486 U.S. 592 (1988), or the allocation of a lump-sum appropriation in *Lincoln v. Vigil*, 508 U.S. 182 (1993). It is a "major policy decision" with wide-reaching effects. *See NTEU v. Horner*, 854 F.2d 490, 497 (D.C. Cir. 1988).

### 3. The Secretary's Order is arbitrary and capricious.

As the Order did not provide any reasoning for its mandate to remove disfavored content, failed to account for longstanding reliance interests before departing from the agencies' previous approach to interpretation, and disregarded important statutory and policy considerations, it is arbitrary and capricious. (Doc No. 29-1 at 14–19).

Defendants do not meaningfully rebut these defects. They suggest that Plaintiffs' arbitrary-and-capricious challenge is unreviewable because it does not assert "a statutory or regulatory violation." (Doc No. 31-1 at 18–19 (citation omitted)). Not so. A plaintiff seeking APA review need only show that "the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan*, 497 U.S. at 883. Given their interests in promoting, protecting, and enjoying the parks, Plaintiffs easily fall within the zone of interests protected by statutes requiring high-quality interpretation, 54 U.S.C. §§ 100802, 100701, and that the parks be left unimpaired for the enjoyment of future generations, *id.* § 100101(a). *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388,

399 (1987) (review denied only if "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit").

Defendants also rehash their argument that the Court lacks meaningful standards to apply. (Doc No. 31-1 at 19). But "statutes constraining or guiding the relevant agency's discretion surely qualify [as meaningful] if they create 'judicially manageable standards,' as required by § 701(a)(2)." *Union of Concerned Scientists*, 954 F.3d at 21 (citation omitted). As explained above, the Organic Act, Centennial Act, and Omnibus Management Act provide such standards.

Next, Defendants contend that no reasoned explanation was required because the Secretary's Order implemented the Executive Order (Doc No. 31-1 at 19–21), but agencies cannot avoid APA review in this manner. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 70 n.17 (1st Cir. 2025). The logic is obvious: "Insulating an agency action from arbitrary-and-capricious review in such a circumstance would undermine the APA and 'shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.'" *New York v. Trump*, 811 F. Supp. 3d 215, 238 (D. Mass. 2025) (quoting *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024)). The Secretary's Order was not "reasonably explained"—and Defendants point to no explanation—and that alone renders the Order arbitrary and capricious. *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted); *see also Drs. for Am.*, 793 F. Supp. 3d at 145 ("[T]he existence of an executive order does not automatically render an agency's implementing actions adequately reasoned.").[6]

---

[6] Defendants' reliance on *Sherley v. Sebelius*, 689 F.3d 776 (D.C. Cir. 2012), fares no better. The court there emphasized that an agency "must implement the President's policy directives *to the extent permitted by law*." *Id.* at 784 (emphasis added); *accord Chamber of Com. of U.S. v. DHS*, No. 25-cv-3675, 2025 WL 3719234, at *25 (D.D.C. Dec. 23, 2025). The whole point of Plaintiffs' challenge is that the Secretary's Order and its implementation violate statutes governing education and interpretation in the parks and were unreasoned. And *Bradford v. Department of Labor*, 101 F.4th 707 (10th Cir. 2024), is even further afield because the statute at issue "committed to the President himself, not to an agency, the determination of what 'policies and directives' to 'prescribe' for federal contracting."

The Secretary's Order also fails to consider substantial reliance interests, described at length in Plaintiffs' declarations. NPCA, for instance, explains that the Park Service "has made tremendous strides toward ensuring that the parks tell the stories of all Americans." (Doc No. 29-5 ¶ 27). Plaintiffs detailed the hardship imposed by Defendants' change in position as well. (*E.g.*, *id.* ¶¶ 31, 34 (Order threatens Park Service's progress and impedes "years' long work"); Doc No. 29-9 ¶ 23 (Order is "upending [AASLH's] relationship with a key partner")). Defendants provide no basis for asserting that Plaintiffs need to describe their reliance interests with even more specificity. *Cf. Drs. for Am.*, 793 F. Supp. 3d at 146 (failure to consider reliance interests where defendants "changed course from a policy of public access to certain health care webpages to a policy of broad rescission"). Nor do Defendants dispute that they shirked their duty to consider whether any meaningful reliance interests existed in the first place. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 31 (2020) (consideration of reliance interests "must be undertaken by the agency in the first instance").

Instead, Defendants implausibly assert that Plaintiffs have not identified a change in direction at all. (Doc No. 31-1 at 22). But the Executive Order itself—which Defendants concede is the sole justification for the Secretary's Order—shows otherwise. The President claimed that "the past decade" had seen "a concerted and widespread effort to rewrite our Nation's history," including at specific park sites. Exec. Order § 1. Likewise, the Secretary's Order targets properties altered or removed since January 1, 2020, and directs bureaus to "reinstate" properties modified for disfavored reasons. Sec. Order § 5(a). The orders thus plainly constitute a change in direction,

---

*Id.* at 732 (citation omitted). The relevant statutes here do no such thing. *See also New York*, 811 F. Supp. 3d at 237 (distinguishing cases where a statute "expressly delegates discretion to the President himself").

even if Defendants fail to acknowledge it. And Plaintiffs' declarations illustrate how that change has manifested in practice. (*E.g.*, Doc No. 29-5 ¶¶ 31–34).[7]

### 4. The Secretary's Order is contrary to law and exceeds Defendants' statutory authority.

Plaintiffs are also likely to show that the Secretary's Order is contrary to the Organic Act, the Centennial Act, and the Omnibus Management Act, and exceeds Defendants' authority under those statutes. (Doc No. 29-1 at 19–25). Defendants' opposition falters at the outset because they wrongly invoke the "no-set-of-circumstances" test from *United States v. Salerno*, 481 U.S. 739 (1987). (Doc No. 31-1 at 22–23). But "*Salerno* applies to challenges based on hypothetical applications of a statute, not to challenges based on the particular facts of a case." *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 15 (D.D.C. 2009). Here, Plaintiffs' challenge "does not hypothesize how [the Order] could be applied in the abstract"; it is "based on how [Defendants] actually administer[] [the Order]." *See id.* And regardless, *Salerno* is not the right standard for APA claims. "[I]f the no-set-of-circumstances test applied to APA challenges, it would gut the APA causes of action of their power, rendering them useless." *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 904 (S.D. Ohio 2016); *see also Bondi v. VanDerStok*, 604 U.S. 458, 496 (2025) (Thomas, J., dissenting) (if "no-set-of-circumstances" were the standard, "it is difficult to understand how an agency would ever promulgate an invalid" regulation); *id.* at 516 (Alito, J., dissenting).[8]

---

[7] Plaintiffs do not suggest that the Park Service's statements about telling accurate history are an "official NPS policy statement." (*Contra* Doc No. 31-1 at 22). The point is that the Park Service's own words illustrate its previous approach to interpretation, which focused on "shar[ing] an accurate and comprehensive history" that includes "the good, the bad, the ugly, and everything in between." *History Under Construction*, Nat'l Park Serv., https://perma.cc/AQ5V-37E4 (last visited Feb. 16, 2026); *see also* (Doc No. 29-5 ¶ 27 (describing how "the Park Service has increased the breadth, depth, and diversity of the stories it tells")).

[8] On Defendants' account, because the Secretary's Order applies to other bureaus that—unlike the Park Service—are not subject to the Centennial Act and Organic Act, Plaintiffs have failed to show that the Order can never be applied consistent with those statutes. (Doc No. 31-1 at 23, 25). But if Defendants are correct on that point, the Court could stay or enjoin the Order only in part—as Defendants appear to suggest elsewhere. (*Id.* at 30 (asserting that sections of the Order are severable)). The solution would not be to allow unlawful provisions or implementations of the Order to remain in effect.

On the merits, Defendants do not dispute that their removal efforts have targeted content focused on previously undertold histories—particularly Black, LGBTQ+, and Indigenous history—and environmental impact. Instead, Defendants claim that a "broad program" of "highest quality interpretation and education" still exists. (Doc No. 31-1 at 23 (citation omitted)). But they fail to explain how the Order could enhance "opportunities for people to form intellectual and emotional connections" in the parks, 54 U.S.C. § 100801(1)(A), when it brands some history as "improper partisan ideology" not worth telling. Defendants also suggest § 100803 is not mandatory because it provides that the Secretary "may undertake a program of regular evaluation of interpretation and education programs." Yet they neglect the statutory mandate that immediately follows, which tells the Secretary to "ensure" those programs reflect "different cultural backgrounds" and "current scientific and academic research." *Id.* § 100803(2), (4). Defendants do not even attempt to argue the Order complies with those criteria.

With respect to the Organic Act, Defendants maintain that park signs and exhibits can be freely impaired because they are not "objects" or "wildlife." (Doc No. 31-1 at 24). But interpretive materials in the national parks plainly contribute to "the enjoyment of the scenery, natural and historic objects, and wild life," 54 U.S.C. § 100101, and are thus subject to the Organic Act. Moreover, the Management Policies provide that the Act's non-impairment standard encompasses "the park's role in contributing to the national dignity, the high public value and integrity, and the superlative environmental quality of the national park system." (Doc No. 29-3 § 1.4.6). Defendants fail to rebut Plaintiffs' showing that the Order "diminish[es] opportunities for current or future generations to enjoy, learn about, or be inspired by park resources or values," which constitutes an impermissible impairment. (*Id.* § 1.4.7.1).

As for the Omnibus Management Act, Defendants misinterpret the statute to require only that the Park Service have "the 'ability' to steward the National Park System." (Doc No. 31-1 at 25 (citation omitted)). This ignores the Act's full text, which allows no discretion in directing that "the Secretary shall continually improve" the Park Service's ability to provide "state-of-the-art" interpretation and research, 54 U.S.C. § 100701, and "shall ensure" a program of "the highest quality science and information," *id.* § 100702. Not only does the Order fail to meet those mandates, it directly contradicts them by ordering the erasure of the "highest quality" scientific and historical accounts.

### B. Plaintiffs face irreparable harm absent preliminary relief.

Plaintiffs have also shown that they will suffer irreparable harm if the Order remains in effect because it "make[s] it more difficult" for them "to accomplish [their] primary mission." *See Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (citation omitted). Defendants do not refute that showing. Instead, they claim this case presents a "different context" compared to those finding that frustration of mission is irreparable. (Doc No. 31-1 at 26 & n.10). The facts may be different, but the legal principle is the same: harm to a plaintiff's mission "cannot be remedied through retroactive relief." *New York*, 784 F. Supp. 3d at 362. And Defendants' characterization of Plaintiffs' injuries as "abstract objections to the management of the National Park System" is baseless. (Doc No. 31-1 at 26). Plaintiffs' unrefuted declarations show that the Order impairs their core activities by making it more difficult for them to protect the parks, promote high-quality historical and scientific information, and provide high-quality interpretive materials. (*See* Doc No. 29-1 at 26–27, 30–31).

Defendants' claim that Plaintiffs' reputational injuries are "self-inflicted" is equally misguided. (Doc No. 31-1 at 27 (citation omitted)). Those injuries flow directly from the Order, which has upended the Park Service's longstanding approach to interpretation and prevents

16

Plaintiffs from providing the same level of services and support to their members. (Doc No. 29-1 at 31–33). A stay or injunction barring enforcement of the unlawful Order would restore the status quo and allow Plaintiffs to resume the partnerships with the Park Service on which they long relied. (*E.g.*, Doc Nos. 29-9 ¶¶ 18–23; 29-12 ¶ 18).

Defendants' suggestion that Plaintiffs have taken a "leisurely approach" to seeking preliminary relief is also wrong. (Doc No. 31-1 at 26 (citation omitted)). Delay in seeking a preliminary injunction detracts from claims of irreparable harm only where the delay is "not attributable to intervening events." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004). Here, the Park Service's January 2026 escalation in implementing the Order—removing dozens of signs detailing the contributions of historically marginalized populations, describing atrocities perpetrated against particular communities, and explaining the long-term impact of scientific developments—exacerbated the harm to Plaintiffs and increased the need for preliminary relief. (Doc No. 29-1 at 6–8). The urgency thus is of Defendants' own making, and the timetable in this case does nothing to undermine Plaintiffs' straightforward showing of irreparable harm.

### C.  The balance of the equities and the public interest favor Plaintiffs.

The balance of equities and public interest also favor preliminary relief. Plaintiffs have detailed the weighty interests the public has in full and accurate information being shared in "America's largest classroom." (*E.g.*, Doc Nos. 29-8 ¶¶ 7–8; 29-7 ¶ 36). And the only alleged "harms" Defendants face are wholly illusory.

Defendants' claim that the requested relief here would harm "interbranch comity" by "dictating how the President can manage an executive agency" is unavailing. (Doc No. 31-1 at 29). The President is free to "manage" the Park Service and other agencies—but those agencies may not act arbitrarily or violate their enabling statutes and then argue their actions were justified

17

by a presidential directive. Nor is there anything "anti-democratic" about requiring agencies to comply with congressional mandates and the APA. (*Id.* at 29). It is the Secretary's Order that contravenes the democratic principles on which the Park System is premised by decreeing that some history is not worth sharing. *See, e.g.*, 54 U.S.C. § 100101(b)(1)(C).

Defendants' complaints of "administrative burdens" ring hollow, too. (Doc No. 31-1 at 29). Defendants have had no trouble finding the administrative capacity to flag and remove hundreds of interpretive materials pursuant to the Order. If undoing the damage they have done is a significant undertaking, that is a problem of Defendants' own creation. And nothing about Plaintiffs' requested relief would prohibit Defendants from making "routine updates" (*id.*); they simply cannot make changes to implement the unlawful Order.

\*   \*   \*

Because all four factors weigh in Plaintiffs' favor, the Court should stay or preliminarily enjoin the Secretary's Order. Whichever form of relief the Court enters, it should also restore the status quo by directing Defendants to undo the removals and modifications undertaken pursuant to the Order and to return Park Service properties to the state they were in before the Order was issued. *See, e.g.*, *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 74 (D.D.C. 2025) (purpose of § 705 stay is to "return[] things to the *status quo ante* while this case proceeds"). Contrary to Defendants' claims, the "last uncontested status which preceded the pending controversy," *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010) (citation omitted), is the status quo as it existed prior to the Order's issuance. *See, e.g.*, *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 835 (N.D. Cal. 2025) (status quo ante was time before Secretary's challenged action). And courts have soundly rejected Defendants' argument that a §

18

705 stay cannot apply to agency action that has already taken effect. *See, e.g.*, *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 182 (D. Mass. 2025).

### III.    The Court should deny Defendants' motion to dismiss.

#### A.  Venue is proper in this District.

Venue is proper here for all Plaintiffs under 28 U.S.C. § 1391(e)(1) because UCS resides in Massachusetts. Defendants' argument that all Plaintiffs except UCS should be dismissed is wholly unfounded. (Doc No. 31-1 at 32–34). That Defendants fail to identify a single case accepting their position is unsurprising: "For over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3) regarding the residency of 'the plaintiff' should be interpreted to mean *any* plaintiff rather than *all* plaintiffs." *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (collecting cases).[9]

The rule Defendants now propose "would result in an unnecessary multiplicity of litigation," and "[t]he language of the statute itself mandates no such narrow construction." *Exxon Corp. v. FTC*, 588 F.2d 895, 898–99 (3d Cir. 1978), *overruled on other grounds*, *Reifer v. Westport Ins. Corp.*, 751 F.3d 129 (3d Cir. 2014). Defendants try, without support, to brush away the "plethora of case law interpreting [§ 1391(e)]" by inviting this Court to adopt a novel rule that contradicts the overwhelming weight of precedent. *See, e.g.*, *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 344 (6th Cir. 2005). The Court should decline Defendants' request.

#### B.  Plaintiffs have stated a claim on all six counts.

Plaintiffs have stated a claim on all six counts of the amended complaint. At the pleading stage, this is a low bar that Plaintiffs easily clear. *See Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 88 (1st Cir. 2015) (factual allegations need only "nudge the claim 'across the line

---

[9] *See also, e.g.*, *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350, 2025 WL 2243619, at *6 (N.D. Cal. Aug. 5, 2025); *Kolluri v. USCIS*, No. 20-cv-02897, 2021 WL 183316, at *3 (N.D. Tex. Jan. 17, 2021).

from conceivable to plausible'" (citation omitted)). On their first four counts, Plaintiffs have done so for the same reasons they are likely to succeed on the merits. *See supra* section II. Defendants' cursory arguments for dismissal of the fifth and sixth counts are meritless. On Count 5, Plaintiffs have plausibly alleged that the Secretary's Order is contrary to the Federal Land Policy Management Act of 1976, which requires that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). The Order clarifies that it applies to subagencies other than the Park Service, including the Bureau of Land Management—as Defendants recognize. Sec. Order § 5; (Doc No. 31-1 at 23, 25). Defendants do not argue that the Order accounted for the statute's requirement that management of the public lands protect the quality of scientific and historical values.

On Count 6, Plaintiffs have plausibly alleged the Order is contrary to the Paperwork Reduction Act (PRA). Defendants do not dispute that Plaintiffs' allegations would constitute a violation of the PRA, arguing instead that they have not alleged any concrete injuries based on Defendants' failure to follow the law. (Doc No. 31-1 at 35). As described above, however, Plaintiffs have shown concrete injuries stemming from the Order and its implementation—and part of that implementation included Defendants' removing materials and collecting information without observing the procedures required by the PRA. (Doc No. 28 ¶¶ 60–64); *see Drs. for Am. v. OPM*, 766 F. Supp. 3d 39, 51 (D.D.C. 2025) (plaintiff likely to succeed on PRA contrary-to-law claim where agency terminated webpages without adequate notice).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for § 705 stay or preliminary injunction and deny Defendants' motion to dismiss.

20

Date: April 22, 2026

Respectfully submitted,

/s/ Michael J. Torcello
Michael J. Torcello* (DC Bar No. 90014480)
Brooke Menschel* (NY Bar No. 5004692)
Pablo A. Moraga* (DC Bar No. 90037895)
Mark B. Samburg (Mass. BBO No. 680099)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426
mtorcello@democracyforward.org
bmenschel@democracyforward.org
pmoraga@democracyforward.org
msamburg@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for the Plaintiffs*
*Admitted *pro hac vice*

21

**CERTIFICATE OF SERVICE**

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Michael J. Torcello*
Michael J. Torcello

22