**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGNERS; and UNION OF CONCERNED SCIENTISTS,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; and JESSICA BOWRON, in her official Capacity as the Official Exercising the Delegated Authority of the Director,<br><br>    Defendants. | Civil Action No. 1:26-CV-10877-AK |

## <u>MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS</u>

**ANGEL KELLEY, D.J.**

Six plaintiff organizations—National Parks Conservation Association ("NPCA"), American Association for State and Local History ("AASLH"), Association of National Park Rangers ("ANPR"), Coalition to Protect America's National Parks ("Coalition"), Society for Experiential Graphic Design ("SEGD"), and Union of Concerned Scientists ("UCS")—filed this action under the Administrative Procedure Act ("APA") against Defendants Department of the Interior, Secretary of the Interior Doug Burgum, the National Park Service ("NPS"), and Director

of the Secretary of the Interior Jessica Bowron, claiming that Defendants' removal of certain displays at National Park sites is arbitrary and capricious, contrary to law, and in excess of statutory authority. Plaintiffs move for a stay under Section 705 of the APA or, in the alternative, a preliminary injunction to restore the sites as they existed prior to Defendants' actions. Defendants filed a consolidated Opposition and Motion to Dismiss, asserting challenges to standing, venue, ripeness, and APA reviewability, and arguing that Plaintiffs fail to state a claim. For the following reasons, Defendants' Motion to Dismiss is **DENIED**.

As for Plaintiffs' Motion for a Stay, the Court notes that motions to dismiss and for preliminary injunctive relief present distinct legal standards and involve different factual and equitable considerations. Accordingly, the Court will address the Motion for a Stay in a separate Order to ensure the application of the proper standard for each Motion.

## I.    BACKGROUND

Unless stated otherwise, all facts are drawn from Plaintiffs' Amended Complaint. Along with their Motion to Stay, Plaintiffs submitted various declarations and exhibits, including standing affidavits from their individual members. Defendants do not contest the veracity or authenticity of Plaintiffs' attachments, and so the Court considers them merged into the pleadings for purposes of this Motion. See Watterson v. Page, 987 F.2d 1, 4 (1st Cir. 1993).

Established in 1916, NPS is a bureau within the Department of Interior that oversees the National Park system. Congress created NPS through the National Park Service Organic Act ("Organic Act"), with a statutory mandate to "conserve the scenery, the natural and historic objects, and wild life [in National Park sites] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a). Pursuant to this

mandate, NPS manages hundreds of parks, monuments, memorials, and recreation areas (collectively, "park sites") across the United States, which collectively host hundreds of millions of visitors each year.  To enrich visitors' experience, the agency provides various educational and interpretive information providing details and context for each park site, including exhibits, interpretive waysides, bookstores, booklets, brochures, and other publications.  The history, quality, and scale of these educational materials have established the National Parks system's reputation as "America's largest classroom."

On March 27, 2025, President Trump issued Executive Order 14253, titled "Restoring Truth and Sanity to American History."  The Executive Order directed the Secretary of the Interior to review all "public monuments, memorials, statues, markers, or similar properties" (collectively, "interpretive materials") at park sites and remove any that met certain characteristics.  Specifically, the Executive Order states:

> Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth.  This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light.  Under this historical revision, our Nation's unparalleled legacy of advancing liberty, individual rights, and human happiness is reconstructed as inherently racist, sexist, oppressive, or otherwise irredeemably flawed.  Rather than fostering unity and a deeper understanding of our shared past, the widespread effort to rewrite history deepens societal divides and fosters a sense of national shame, disregarding the progress America has made and the ideals that continue to inspire millions around the globe.

Exec. Order. No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

To effectuate this mission, the Executive Order directed the Secretary of the Interior to take three actions:

> (i) determine whether, since January 1, 2020, public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction have been removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology;

(ii) take action to reinstate the pre-existing monuments, memorials, statues, markers, or similar properties, as appropriate and consistent with 43 U.S.C. § 1451 *et seq.*, 54 U.S.C. § 100101 *et seq.*, and other applicable law; and

(iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.

Id. § 4.

Two months later, on May 20, 2025, the Secretary of the Interior implemented these directives by issuing Secretary Order 3431, likewise titled "Restoring Truth and Sanity to American History" ("Secretary's Order"). Two sections of the Secretary's Order are relevant to this case. First, Section 5 directed NPS, the Fish and Wildlife Service, the Bureau of Land Management, the Bureau of Indian Affairs, and the Bureau of Reclamation (collectively, "Land Management Bureaus") to conduct the reviews mandated by the Executive Order. It established a two-step review plan. During the initial thirty-day phase, the Land Management Bureaus were to review and remove any interpretive materials that had been "removed or changed to perpetuate a false reconstruction of American history, inappropriately minimize the value of certain historical events or figures, or include any other improper partisan ideology" since January 1, 2020. During the next phase, the scope of review broadened to all park sites, with the agencies directed to review and remove any interpretive material that "inappropriately disparages Americans past or living . . . or, with respect to content describing natural features, that emphasizes matters unrelated to the beauty, abundance, or grandeur of said natural feature" or is otherwise "inconsistent with the purpose of" the Executive Order. This phase was to be completed within 120 days. In addition to the review process set out in Section 5, Section 6 of the Secretary's Order directed the Land Management Bureaus to post quick response ("QR")

4

codes at park sites soliciting help from visitors in identifying content that allegedly violated the Executive Order.  NPS compiled a database of public comments submitted through the QR codes.

In Summer 2025, in compliance with the Secretary's Order, NPS staff began removing material.  Defendants also instituted various internal efforts to speed up removals, leading to a significant escalation in early 2026.  For example, in August and September 2025, Bowron sent letters to park sites that allegedly failed to remove signs as a notice of their "non-compliance," and in November 2025, Bowron issued a separate order to expand the scope of review to include retail items.

These efforts proved fruitful.  By early 2026, NPS had removed or identified for removal hundreds of interpretive materials from park sites.  By the date of the filing of this action, removed material included, *inter alia*, exhibits at California Golden Gate National Park describing NPS' historical role in eugenics movements and Indigenous history; exhibits at the New York Gateway National Recreation Area concerning climate change, women's rights, slavery, and Japanese internment during World War II; signs from Independence National Historical Park in Philadelphia explaining enslaved people's role in operating the house during George Washington's presidency; films on labor history at Lowell National Historical Park in Massachusetts; signs describing climate change and its impact on glaciers at Glacier National Park in Montana; and an image at Sunset Crater Volcano National Monument in Arizona of a visitor holding a Pride flag.  In addition to materials that have already been removed, hundreds of others have been flagged for removal.  This includes, *inter alia*, civil rights-related exhibits at the Emmett Till and Mamie Till-Mobley National Monument; over thirty plaques and signs at Harpers Ferry National Historic Park detailing the history of slavery and abolitionism;

interpretive materials across the country describing the mistreatment of Indigenous groups; and signs providing scientific information about air pollution, the effects of industrialization on wetlands, global warming, the dangers of grazing, and endangered species.  According to an internal NPS database leaked by anonymous civil servants on March 2, 2026, over five hundred items have been identified for review.

Plaintiffs filed this action on February 17, 2026, arguing that Defendants' actions are arbitrary and capricious, contrary to law, and in excess of statutory authority under the APA, 5 U.S.C. § 706, and seeking declaratory and injunctive relief.  For their APA claims, Plaintiffs allege violations of five statutes: the National Park Service Centennial Act ("Centennial Act"), 54 U.S.C. §§ 100801-100803, the Organic Act, 54 U.S.C. § 100801, the National Parks Omnibus Management Act ("Omnibus Management Act"), 54 U.S.C. §§ 100701-100702, the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*, and the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq.*  On March 18, 2026, Plaintiffs moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction.  On April 8, 2026, Defendants filed a consolidated Opposition and Motion to Dismiss, asserting that Plaintiffs lack standing, the claims are not ripe, venue is improper, the claims are not judicially reviewable under the APA, and that Plaintiffs fail to state a claim.  The Court held a Status Conference with the parties on May 12, 2026.  After conferring with the parties, the Court determined to decide the Motion to Dismiss on the papers and without oral argument.

## II.    LEGAL STANDARD

Defendants bring both jurisdictional challenges to Plaintiffs' claims, which the Court construes as brought pursuant to Federal Rules of Civil Procedure 12(b)(1), and plausibility challenges under Rule 12(b)(6).  "When faced with motions to dismiss under both 12(b)(1) and

6

12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first." Katz v. Pershing, LLC, 806 F. Supp. 2d 452, 456 (D. Mass. 2011) aff'd, 672 F.3d 64 (1st Cir. 2012).  Whether evaluating a motion brought under Rule 12(b)(1) or 12(b)(6), the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006).  To survive dismissal, a complaint must contain sufficient factual material to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

A claim is facially plausible if, after accepting as true all non-conclusory factual allegations, the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 663 (2008)).  A complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citation omitted).  A court may not disregard properly pleaded factual allegations even if "actual proof of those facts is improbable." Ocasio-Hernandez, 640 F.3d at 12 (quoting Twombly, 550 U.S. at 556).  Rather, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Id. at 13.  In making that determination, a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein, and facts susceptible to judicial notice. Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

## III.   DISCUSSION

Defendants raise several threshold jurisdictional challenges, contending that: (1) Plaintiffs lack standing to bring their claims, (2) the claims are not ripe for review, (3) the Secretary's Order is not subject to judicial review under the APA because it is not a final agency

action and because it is committed to agency discretion, and (4) all non-Massachusetts-based Plaintiffs should be dismissed for improper venue.  In addition, Defendants argue that Plaintiffs fail to state a claim under Rule 12(b)(6).  The Court addresses each argument in turn, beginning with the jurisdictional challenges.

### A.    Article III Standing

At the outset, Defendants contend that Plaintiffs have not established standing.  To plead standing, a plaintiff must demonstrate (1) he has suffered "injury in fact," (2) the injury is "fairly traceable" to the actions of the defendant, and (3) the injury will likely be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  A plaintiff "must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester v. Laroe Ests., Inc., 581 U.S. 433, 434 (2017).  In a multi-plaintiff suit, only one plaintiff needs to meet the standing requirements for the case to proceed. Biden v. Nebraska, 600 U.S. 477, 489 (2023) (citing Rumsfeld v. Forum for Acad. & Institutional Rts., Inc., 547 U.S. 47, 52, n.2 (2006)).  An organization (as opposed to an individual) can establish standing in two ways: first, an organization can sue for harm to its own interests under a theory of organizational standing; and second, an organization may sue in a representative capacity for harm impacting its individual members under a theory of associational standing. See Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023).  Here, Plaintiffs assert they have standing under both theories.

### 1.    Organizational Standing

The standard for organizational standing is the same as "the usual standards for injury in fact, causation, and redressability that apply to individuals." FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367, 393-94 (2024).  Defendants argue that Plaintiffs have failed to

demonstrate the first element of injury-in-fact because their only alleged harm is resource diversion, and, according to Defendants, the Supreme Court in Alliance for Hippocratic Medicine held that resource diversion can essentially never constitute injury-in-fact outside of the narrow factual circumstances recognized in Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982).  This Court disagrees.

For an organization to demonstrate injury-in-fact, the defendant's actions must have caused an injury to the organization's activities that is "more than simply a setback to the organization's abstract social interests." Nat'l Ass'n of Consumer Advocates v. Uejio, 521 F. Supp. 3d 130, 142 (D. Mass. 2021).  This is "not a demanding standard," as "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." Id. Theories of harm based on diverting organizational resources to issue advocacy or lobbying activities are insufficient to establish standing. Alliance, 602 U.S. at 393-94; see also Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021).

Here, Plaintiffs allege concrete injuries to their core activities that extend beyond resource diversion.  For example, NPCA alleges they have historically hosted site visits, educational programming, and events at park sites that focus on topics such as marginalized groups and civil rights.  Because of the removal of interpretive materials related to these topics, it is plausible that NPCA can no longer host these events at the sites without sacrificing the quality of the programming. See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric., 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding organizational standing where agency "deprived [the organization] of key information that it relies on to educate the public").  Similarly, SEGD alleges that they use interpretive materials from park sites for internal training materials and as reference guides.  As these materials are being removed, SEGD's ability to rely on them for

9

training is reduced.  As another example, ANPR hosts activities and conferences for its members, who are primarily current and former National Park Rangers.  ANPR alleges that because of the policies in the Secretary's Order, attendance at these events has decreased, thus also reducing their revenues. See Am. Ass'n of Univ. Professors v. Rubio, 780 F. Supp. 3d 350, 380 (D. Mass. 2025) (finding organizational standing where agency action deterred members from participating in organization's activities).  Because these harms involve Plaintiffs' core organizational activities, Plaintiffs have plausibly alleged injury-in-fact.

Even to the extent Plaintiffs cite resource diversion as a basis for standing, their arguments are not foreclosed by Alliance.  Defendants' reading—that Alliance essentially precludes *any* form of resource diversion as constituting injury-in-fact—is overly broad.  The defect in the plaintiff-organizations' standing theory in Alliance was that the activities solely comprised issue advocacy and lobbying in opposition to the challenged agency action. See 602 U.S. at 394.  These activities—including compiling pro-life studies, "drafting citizen petitions," and "engaging in public advocacy and public education" campaigns—arose only after, and directly in response to, the Food and Drug Administration's approval of an abortion medication. Id.  The Supreme Court explained that recognizing such expenditures as an injury-in-fact would permit an organization "to challenge almost any federal policy that they dislike, provided they spend a single dollar opposing those policies." Id. at 395.

But the principle that a plaintiff may not "manufacture" standing by voluntarily expending resources opposing a governmental action through lobbying or advocacy does not extend to cases in which a plaintiff is compelled to divert resources to counteract the effects of a government action on its existing operations and members. See id. (discussing Havens Realty, 455 U.S. at 379, in which the Supreme Court found standing where organization diverted

resources to counteract discriminatory steering practices, detracting from their ability to provide affordable housing counseling and referral services).  Indeed, other courts in this district assessing organizational standing have rejected the interpretation of Alliance that Defendants urge. See, e.g., Presidents' All. v. Noem, 2026 WL 788185, at *8-9 (quoting Town of Milton v. Fed. Aviation Admin., 87 F.4th 91, 99 (1st Cir. 2023)) (finding standing where organization diverted resources to respond to member questions regarding federal government visa revocations); Am. Acad. of Pediatrics v. Kennedy, 814 F. Supp. 3d 150, 159-60 (D. Mass. 2026) (same for member counseling regarding federal government's changes to COVID vaccine recommendations).

Here, unlike the organizations in Alliance, at least some of Plaintiffs' resource diversion is allegedly intended to address the Order's negative effects on existing activities and members. For example, Plaintiffs allege that they have diverted resources to respond to member concerns about the impact of the Secretary's Order on their careers and ethical standards for historical interpretation.  Due to the time and resource investment required to respond to these inquiries, Plaintiffs' ability to pursue other core activities like organizing events, providing member services, and promoting research initiatives and reports has been stymied.  Plaintiffs' allegations are thus distinguishable from the advocacy and lobbying activities in Alliance and are sufficient to establish injury-in-fact. See Kennedy, 814 F. Supp. 3d at 159 (holding that organization's "diver[sion of] resources away from its usual tasks and initiatives aimed at children's health" constituted "sufficient injury to [its] core business activities for the purposes of organizational standing").

In addition to their broader injury-in-fact challenges, Defendants independently argue that Plaintiffs' Paperwork Reduction Act claim should be dismissed for failure to demonstrate

11

injury-in-fact.  According to Defendants, Plaintiffs have failed to allege any actual injury resulting from Defendants' purported failure to follow the statute's procedural requirements.  However, at least one court has held that the federal government's failure to follow the Paperwork Reduction Act's procedures can cause informational injury.  In Doctors for America v. Office of Personnel Management, 766 F. Supp. 3d 39 (D.D.C. 2025), a nonprofit organization representing health care professionals brought claims against the Office of Personnel Management under the Paperwork Reduction Act, contending that the agency failed to follow the statute's notice requirements prior to terminating public webpages hosted by the Centers for Disease Control ("CDC"), which contained certain medical information. Id. at 52.  The court granted a preliminary injunction in favor of the plaintiff, finding that the organization's individual members had established standing. Id. at 47-49.  Specifically, the court explained that the physician affiants "regularly rel[ied]" on information the CDC publishes and that "alternatives are limited." Id. at 48.  As a result, "[t]he denial of 'information' these doctors 'wish[ed] to use in their routine' activities ha[d] 'inhibit[ed] . . . their daily operations' and thereby caused 'an injury both concrete and specific to the work in which they are engaged.'" Id. (quoting People for the Ethical Treatment of Animals, 797 F.3d at 1094).

Here, like the plaintiff in Doctors for America, Plaintiffs have plausibly alleged that Defendants have caused them informational injury by removing the interpretive materials without notice and depriving them of the content therein.  As explained, Plaintiffs allege that historically, they regularly relied on interpretive materials at park sites for internal training, events, site visits, and education, and that the removal of these materials has disrupted such activities.  Thus, Plaintiffs have adequately alleged injury-in-fact as to their Paperwork Reduction Act claims.

Accordingly, Plaintiffs have pleaded sufficient facts to meet the requirements of organizational standing.  And because at least one Plaintiff has demonstrated standing, all Plaintiffs may proceed with the action.

### 2.    Associational Standing

Having found that Plaintiffs have demonstrated organizational standing, the Court is not required to address associational standing. See, e.g., President & Fellows of Harvard Coll. v. U.S Dep't of Health & Hum. Servs., 798 F. Supp. 3d 77, 114 (D. Mass. 2025).  But "[b]ecause the Plaintiffs' standing theories may affect the relief this Court can offer, this Court proceeds to analyze associational standing as well." Kennedy, 814 F. Supp. 3d at 161 (quoting Rubio, 780 F. Supp. 3d at 379).

Two Plaintiffs—NPCA and AASLH—claim associational standing in addition to organizational standing.  To establish associational standing, an organization must demonstrate (1) at least one of its members "would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Council of Ins. Agents & Brokers v. Juarbe-Jimenez, 443 F.3d 103, 108 (1st Cir. 2006) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).  Defendants challenge only the first element, contending that the NPCA's and AASLH's members have failed to establish standing in their own right.  As explained below, the Court finds otherwise.

First, NPCA member Jennifer Goepfert asserts that the Secretary's Order jeopardizes her ability to continue using park sites to educate her homeschooled children on topics such as science and history.  She describes how she derived aesthetic value from the park sites as they existed before the Order, and that her future uses would be diminished by continued

13

implementation of the removal plan.  Defendants contend that Goepfert has failed to demonstrate injury-in-fact because her alleged harms are insufficiently imminent.

To show injury-in-fact, a plaintiff must show the injury is "(a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." Sea Shore Corp. v. Sullivan, 158 F.3d 51, 55 (1st Cir. 1998) (quoting Lujan, 504 U.S. at 560).  Defendants do not contest that the alleged harms are concrete and particularized, instead raising arguments primarily as to imminence.  To show imminence in a case where equitable or declaratory relief is sought, as is the case here, a plaintiff must show "a real and immediate threat" that he will suffer a future injury; a prior injury will not suffice. Gray v. Cummings, 917 F.3d 1, 19 (1st Cir. 2019); Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (citing Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)).  The threatened injury must be "certainly impending," or there must be a "substantial risk" that the alleged injury will occur. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014); see also Berner v. Delahanty, 129 F.3d 20, 24 (1st Cir. 1997) (concluding that plaintiff had standing to pursue injunctive relief where he "face[d] a realistic risk of future exposure to the challenged policy").

Here, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact. She alleges she has visited at least 66 park sites, and that these visits are a regular and significant part of her parenting method and lifestyle.  Moreover, she alleges specific plans to take her children to visit various park sites in Summer 2026, including the Brown v. Board of Education National Historical Park, Hot Springs National Park, and Little Rock Central High School—sites where signs have been flagged for removal.  While Defendants highlight that no interpretive materials have been removed from these three park sites to date, as implied by the word "imminent," a harm need not have already occurred to constitute injury-in-fact. See Gray, 917

14

F.3d at 19.  It is reasonable to infer that removal could occur soon given these park sites are flagged, and similar materials have already been removed from dozens of other park sites over the past year.  See Massachusetts v. HHS, 923 F.3d 209, 225 (1st Cir. 2019) ("[A] plaintiff need not 'demonstrate that it is literally certain that the harms they identify will come about'" (citation omitted)); cf. N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 50 (1st Cir. 2021) ("[H]istory of past enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (citation omitted)).  Thus, Goepfert's alleged injuries are sufficiently imminent to constitute injury-in-fact.

Defendants argue that Goepfert's summer plans are merely a "some day intention[]," citing the Supreme Court's opinion in Lujan. 504 U.S. at 564.  However, Goepfert's stated intentions of future travel are a far cry from those found insufficient in Lujan.  The Lujan affiant had traveled to Sri Lanka only once and merely "hope[d]" to observe endangered species without any actual or ongoing plans to do so. Id. at 563.  By contrast, Goepfert has visited 66 out of 433 park sites and relies on them as a primary source of education for her daughters.  See Drewniak v. U.S. Customs & Border Prot., 554 F. Supp. 3d 348, 363 (D.N.H. 2021) (finding standing for "avid outdoorsman who travels to the White Mountains virtually every week of the year to recreate").  She has also identified three specific locations that she plans to visit mere months after the filing of the Amended Complaint.  Goepfert's intentions thus are not "vague plans," as Defendants assert.  Goepfert has sufficiently demonstrated imminence, and NPCA accordingly has associational standing to sue on her behalf.

Second, AASLH member Donna Graves claims that the Secretary's Order has harmed her career as a research historian specializing in, among other things, marginalized communities and climate change.  Graves alleges that dozens of her projects on these topics are installed at

15

park sites, and she fears that Defendants will remove these materials pursuant to the Secretary's Order, thereby undermining her portfolio and reputation. Moreover, she claims that the Order has "forced [her] into early retirement" because job opportunities and grant funding from NPS, which comprise 40% to 80% of her annual income, have "evaporated." Finally, she contends that the Order damages her professional reputation by labelling her work as "improper partisan ideology" and suggesting that it perpetuates a "false reconstruction of American history." Defendants contend that Graves' alleged harms are insufficiently imminent to constitute injury-in-fact, are not caused by the Secretary's Order, and are not redressable by the Court. The Court addresses each argument in turn.

As to imminence, Defendants argue that Graves has not identified a specific project that she has created that has been removed or flagged for removal. However, given Graves' specialty in marginalized communities and climate change, and the volume of similar works that have already been removed at other park sites, it is reasonable to infer that Graves' works are also at risk of removal. See Massachusetts v. HHS, 923 F.3d at 225 (noting that "recast[ing] the imminence requirement as one of near certainty does not comport with the law"). Indeed, while not installed at a park site, she alleges that one of her projects, an LGBTQ+ theme study, was removed from NPS' website in 2025, overlapping with the promulgation of the Executive Order and the Secretary's Order, thus providing at least some support for her fear that her projects could be removed in the near future.

As to causation, Defendants characterize Graves' retirement as "self-inflicted" rather than caused by the Secretary's Order. According to Defendants, Graves could continue receiving grant funding from NPS by changing specialties. This argument, however, is unpersuasive. Causation requires only that the plaintiff show that her injury is "fairly traceable to the

16

defendant's conduct, rather than the result of 'independent action' by some other party not before the court." Wiener v. MIB Grp., Inc., 86 F.4th 76, 84 (1st Cir. 2023) (quoting Lyman v. Baker, 954 F.3d 351, 361 (1st Cir. 2020)).  The Supreme Court "ha[s] made clear that an injury resulting from the application or threatened application of an unlawful enactment remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." Fed. Election Comm'n v. Cruz, 596 U.S. 289, 297 (2022).  Under this broad conception of causation, courts have found lack of standing based on "self-inflicted" injuries only where a plaintiff incurs costs to counteract entirely speculative harms. See Wiener, 86 F.4th at 88 (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 402 (2013) (finding no injury where plaintiff expended resources to protect against fear, with little factual basis, that government will target and surveil him)).  Here, Graves' harm is not speculative because she has a substantial number of projects at park sites, and those projects are similar to materials that have already been flagged or removed pursuant to the Secretary's Order.  Whether she voluntarily continues to pursue the same type of work is irrelevant.  Indeed, taking Defendants' argument to its logical conclusion, *any* plaintiff could change their mission, career, or business model to avoid being negatively affected by an agency action, even if completely counter to the plaintiff's original mission.  But causation does not require Graves to pivot her lifelong career before being able to demonstrate harm.

Finally, as to redressability, Defendants argue that Graves' financial and reputational injuries are not redressable by the Court because staying the Secretary's Order will not retract Defendants' past allegedly derogatory statements about her field of work nor require Defendants to provide her with grant funding.  However, to establish redressability, Graves need only show that a remedy "will at least lessen [her] injury," not that her "entire injury will be redressed by a

17

favorable judgment." In re Fin. Oversight & Mgmt. Bd. for P.R., 995 F.3d 18, 22 (1st Cir. 2021).

If the Order were stayed or enjoined, NPS could not remove Graves' projects based on the

Order's directive. A favorable judgment would thus at least lessen one potential source of

injury, which is sufficient at this stage to establish standing.

In sum, both Goepfert and Graves have demonstrated individual standing to sue.

Consequently, NPCA and AASLH maintain associational standing to sue in a representative

capacity on their behalf.

### B.    Reviewability Under the APA

Defendants argue that the Court does not have jurisdiction to review Plaintiffs' APA

claims because the Secretary's Order is not a final agency action and because the Order involves

internal agency management, which is committed to agency discretion by law. For the reasons

set forth below, the Court rejects both arguments.

### 1.    Final Agency Action/Ripeness

First, Defendants argue that the Secretary's Order is not a final agency action, and,

relatedly, that the case is not ripe for review. The First Circuit has explained that finality under

the APA overlaps substantially with the doctrine of ripeness under Article III. See W.R. Grace &

Co. Conn. v. EPA, 959 F.2d 360, 364 (1st Cir. 1992) (citing Abbott Lab'ys v. Gardner, 387 U.S.

136, 149 (1967), abrogated by Califano v. Sanders, 430 U.S. 99 (1977); Lujan v. Nat'l Wildlife

Fed'n, 497 U.S. 871 (1990)) ("Under the 'fitness for review' inquiry [of ripeness], we consider

whether the issue presented is purely legal, as opposed to factual, and the degree to which any

challenged agency action is final."). Because Defendants' arguments under the two doctrines

overlap, the Court combines the analyses for efficiency.

The APA provides for judicial review only where there is "final agency action." 5 U.S.C.

18

§ 704.  To qualify as final, the challenged action must (1) "mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quoting Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970)).  Importantly, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." Abbott Lab'ys, 387 U.S. at 149.  Specifically, courts consider whether the action's "impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" Franklin v. Massachusetts, 505 U.S. 788, 796-97 (1992) (quoting Abbott Lab'ys, 387 U.S. at 152).

Plaintiffs have demonstrated that the Secretary's Order is a final agency action.  First, the Order is the consummation of a decision-making process, not interlocutory or tentative.  As the D.C. Circuit has explained, "[t]he consummation prong of the finality inquiry requires us to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" Nat'l Res. Def. Council v. Wheeler, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting Soundboard Ass'n v. Fed. Trade Comm'n, 888 F.3d 1261, 1267 (D.C. Cir. 2018)).  Actions that bind and direct subordinate agency personnel are final, even if what they authorize is an ongoing process.[1] See Biden v. Texas, 597 U.S. 785, 808-09, 793 (2022) (holding

---

[1] In challenging this conception of finality, Defendants raise a hypothetical example where the Secretary sends an email directing his assistant to schedule a meeting for Tuesday.  Defendants argue that, under the proffered rule, such an email would constitute a final agency action, which Defendants imply would be an absurd result.  However, this hypothetical is a red herring; the email may not constitute an "agency action" within the meaning of the APA, making finality an

internal memos were final because they "bound DHS staff" and "direct[ed] DHS personnel to take all appropriate actions"); Bowser v. Noem, No. 26-CV-10382, 2026 WL 555624, at *5 (D. Mass. Feb. 27, 2026) ("The issue before the Court is not if the decision regarding the benefits is final; it is if the Policy Memoranda themselves are final."). As a result, orders setting mandatory tasks and deadlines, even those articulating broad policy goals, have been found to be final agency actions. E.g., Drs. for Am. v. Off. of Pers. Mgmt., 793 F. Supp. 3d 112, 139 (D.D.C. 2025) (finding final agency action where agency memorandum was "replete with specific tasks and bolded and underlined deadlines"); Pub. Emps. for Env't Resp. v. Nat'l Park Serv., No. 19-CV-3629, 2021 WL 1198047, at *8-9 (D.D.C. Mar. 30, 2021) (finding final agency action where NPS directive used mandatory language and required park superintendents to take concrete steps).

Here, the Secretary's Order "speaks for the [Department], articulating the agency's overall policy and approach" with respect to interpretive materials at park sites. Id. at *8. It was issued by the Secretary, the highest-ranking official at the Department, rather than by subordinate staff. Id. The Order issues binding—not tentative—directives to the Land Management Bureaus, mandating that they "conduct a review" of interpretive materials at certain park sites, "immediately undertake such actions as are necessary to reinstate" properties altered in a manner disfavored by the Order, and post QR codes to solicit information from the public. It leaves little ambiguity over the type of interpretive materials to remove, targeting those that "inappropriately disparage Americans past or living," "perpetuate a false reconstruction of American history," "inappropriately minimize the value of certain historical events or figures,"

---

irrelevant inquiry. See 5 U.S.C. § 702 (defining "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof").

or "include any other improper partisan ideology."  To implement the mandates, the Order sets near-term deadlines on a two-phase schedule for completion.  Taken together, these factors indicate that the Order meets the first prong of the finality inquiry, and is not a preliminary step far upstream of any consequences, as Defendants suggest.

Second, the Secretary's Order are actions "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennett, 520 U.S. at 178 (quoting Port of Bos., 400 U.S. at 71).  The Order imposes legal obligations on Land Management Bureau personnel, who must review interpretive materials at park sites, post QR codes, and remove purportedly violative materials. See Pub. Emps., 2021 WL 1198047, at *9 (finding that directive "created legal consequences and obligations for park superintendents managing individual NPS Parks and for park patrons"); Bennett, 520 U.S. at 178 (finding final agency action where action would "alter the legal regime to which the action agency is subject").  Thus, the Order constitutes a final agency action subject to judicial review.

Defendants argue that Plaintiffs must challenge individual removal decisions rather than the Secretary's Order as a whole.  However, multiple circuits, including the First Circuit, have explained that an agency's action in "applying some particular measure across the board . . . [can] of course [still] be challenged under the APA." Hisp. Affs. Project v. Acosta, 901 F.3d 378, 388 (D.C. Cir. 2018) (alteration in original) (quoting Nat'l Wildlife Fed'n, 497 U.S. at 890 n.2); accord New York v. Trump, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once."); Drs. for Am., 793 F. Supp. 3d at 141 (finding plaintiffs properly challenged "a cohesive directive . . . with a single set of commands for the entire agency"); Biden v. Texas, 597 U.S. at 793, 808 (2022); Pub. Emps., 2021 WL

21

1198047, at *8 (noting directive was final even though park superintendents retained ability to impose limits or conditions because "they were still required to first impose the overarching NPS policy").  Because the Secretary's Order itself constitutes a final agency action for the reasons explained above, Plaintiffs may challenge the Secretary's Order as a whole and need not pursue piecemeal litigation for each discrete removal.

Defendants also argue that this case is like Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), in which the Supreme Court held that a challenge to a logging plan developed by the U.S. Forest Service was not ripe for review.  There, the plan set logging goals, identified areas of the forest suitable for timber production, and determined preferred harvesting methods, but did "not itself authorize the cutting of any trees." Id. at 729.  Defendants contend that, like in Ohio Forestry, the Secretary's Order does not itself mandate any specific removal, instead only kickstarting a review plan for interpretive materials at park sites.  However, this analogy is inapt. In Ohio Forestry, the Supreme Court emphasized that the agency had not yet begun implementing the challenged policy. 523 U.S. at 735-36.  By contrast, here, pursuant to the Secretary's Order, the Land Management Bureaus have already commenced implementation, with dozens of interpretive materials removed to date and hundreds more flagged for removal. See California v. Trump, 786 F. Supp. 3d 359, 378-89 (D. Mass. 2025) (finding ripeness where agency had started implementing Executive Order).  Ohio Forestry thus does not dictate dismissal here.

Accordingly, the Secretary's Order is both a final agency action and is ripe for review by this Court.

### 2.    Committed to Agency Discretion

Defendants next argue that the Secretary's Order is not subject to judicial review because

it involves internal agency management decisions, which are inherently committed to agency discretion by law.  The Court is unpersuaded.

Under APA Section 701(a)(2), a court does not have jurisdiction to review an agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  An action is committed to agency discretion when the agency action is of a kind "traditionally regarded as committed to agency discretion," or when the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 17 (1st Cir. 2020) (quoting Lincoln v. Vigil, 508 U.S. 182, 191-92 (1993)).  This exception is "quite narrow[]," Weyerhaeuser Co. v. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018), and there is "a strong presumption in favor of review, which is overcome only by 'clear and convincing evidence' that Congress intended to cut off review above the agency level," Hahn v. Gottleib, 430 F.2d 1243, 1249 (1st Cir. 1970) (quoting Barlow v. Collins, 397 U.S. 159, 167 (1970)).

Here, the Secretary's Order is not committed to agency discretion by law.  First, the Secretary's Order is not "of a kind traditionally regarded as committed to agency discretion." Vigil, 508 U.S. at 192.  Few actions are recognized as falling under this category.  They include "foreign affairs, the military," Dugan v. Ramsay, 727 F.2d 192, 195 (1st Cir. 1984), "decision[s] not to institute enforcement proceedings," and internal agency operations and management decisions, such as allocation of lump-sum appropriations or personnel and hiring decisions. Wheeler, 954 F.3d at 18 (citing Dep't of Com. v. New York, 588 U.S. 752, 771 (2019)); see, e.g., Ward v. Skinner, 943 F.2d 157 (1st Cir. 1991); Webster v. Doe, 486 U.S. 592, 601 (1988); Vigil, 508 U.S. at 193.  The Secretary's Order does not clearly fall into any of these categories. It does not involve foreign affairs, military decisions, enforcement actions, financial or budgetary

23

decisions, or human resources.  Nor do Defendants provide any cases that involve similar facts (i.e., the systematic removal of signage at park sites), undercutting their argument that such decisions are "traditionally" regarded as committed to agency discretion. See Wheeler, 954 F.3d at 18 ("[A]s to whether the make-up of agency advisory committees is an area traditionally left to agency discretion, the EPA has pointed us to nary a case that would suggest as much."); Am. Acad. of Pediatrics v. Kennedy, No. 25-CV-11916, 2026 WL 733828, at *9 (D. Mass. Mar. 16, 2026) ("Defendants point the Court to no cases, nor could the Court find any such case, suggesting that the kind of regulatory power at issue in this case has been 'traditionally' recognized as committed to agency discretion.").  Instead, Defendants only quote the Order's conclusory statement that it is "intended only to improve the internal management of the Department."  This characterization, however, is belied by the Order's directives, which are not merely internal, but instead have the express intention of shaping the public's experience at park sites.  Thus, the Order is not of a type traditionally regarded as committed to agency discretion.

Second, the statutes at issue—the Centennial Act, the Organic Act, and the Omnibus Management Act[2]—provide "meaningful standard[s] against which to judge the agency's exercise of discretion." Wheeler, 954 F.3d at 17.  "When determining whether a statute falls within [the no-meaningful-standards provision of the APA], 'careful examination of the statute' is required." Cowels v. Fed. Bureau of Investigation, 327 F. Supp. 3d 242, 249 (D. Mass. 2018) (quoting Webster, 486 U.S. at 600).  Here, the language of each statute reflects environmental and conservation mandates that provide clear standards against which to assess the Secretary's Order.  The Organic Act, for example, requires Defendants to "promote and regulate the use of

---

[2] Defendants do not expressly challenge Plaintiffs' FLPMA and Paperwork Reduction Act claims on this ground, so the Court does not address those statutes here.

24

the National Park System" in a manner that "conserve[s]," "provide[s] for the enjoyment of," and leaves "unimpaired for the enjoyment of future generations" the "scenery, natural and historic objects, and wild life" therein.[3] 54 U.S.C. § 100101(a). The Centennial Act, likewise, requires the Department of the Interior to enhance the management of park sites through a program of "the highest quality interpretation and education." Id. § 100802. While Defendants argue that this phrase is vague, the statute defines the terms and provides guiding context. "Interpretation" is defined as "providing opportunities for people to form intellectual and emotional connections to gain awareness, appreciation, and understanding of the resources of the System." Id. § 100801(1)(A). "Education" is defined as "enhancing public awareness, understanding, and appreciation of the resources of the System through learner-centered, place-based materials, programs, and activities that achieve specific learning objectives as identified in a curriculum." Id. § 100801(2). To further elucidate these terms, the Act provides that the educational program may be updated regularly to "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" and "reflect current scientific and academic research, content, methods, and audience analysis." Id. § 100803. The Omnibus Management Act provides similar directives, requiring the Department of the Interior to provide "state-of-the-art management, protection, and interpretation of, and research on, the resources" in the park site and to utilize "the highest quality science and information." Id. §§ 100701-100702.

This statutory language provides clear and manageable standards for judicial review. The concepts of public education, environmental conservation, intellectual discourse, scientific rigor,

---

[3] In response to Plaintiffs' Organic Act claim, Defendants cite a single First Circuit case for the proposition that the Act contains "incommensurable values such as safety and aesthetics, and the Judicial Branch is ill-equipped to rework that balance." Shansky v. United States, 164 F.3d 688, 694 (1st Cir. 1999). However, that case involved the discretionary-function exemption to the Federal Torts Claims Act, a different context than here.

and diversity are not foreign to courts and provide an intelligible guidepost for review. Indeed, courts have found meaningful standards where statutes use similarly broad and aspirational language. See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 411 (1971) (finding "prudent" provided meaningful standard); NAACP v. Sec'y of Hous. & Urb. Dev., 817 F.2d 149, 158 (1st Cir. 1987) (drawing standard from statutory requirement that agency administer its programs "in a manner affirmatively to further the policies" of "fair housing"); Kennedy, 2026 WL 733828, at *9-10 (holding that language concerning "prevention and suppression of communicable diseases" and "preservation and improvement of the public health" provided judicially manageable standards). Even if the statutory language contains some amount of ambiguity, that does not foreclose judicial review. See Dugan, 727 F.2d at 195; Wheeler, 954 F.3d at 18-19 (finding that courts can "enforce at least the outer boundaries" of a statutory mandate that an agency apply "fair balance and inappropriate influence"). Thus, the statutes provide meaningful standards for judicial review.

Accordingly, the Secretary's Order is not committed to agency discretion by law.

## C.      Venue

Defendants move the Court to dismiss the five non-Massachusetts-based Plaintiffs for improper venue. For suits against a federal agency, venue is proper "in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Defendants urge the Court to interpret the words "the plaintiff" to require *each* plaintiff to reside in this judicial district rather than *any* plaintiff.

The Court declines to adopt Defendants' reading. While the First Circuit has not yet interpreted how this statutory language applies in multi-plaintiff suits, persuasive authority in other circuits and the statute's legislative history instruct that the venue statute does not require

26

all plaintiffs to reside in the same district.  "For over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3) regarding the residency of 'the plaintiff' should be interpreted to mean *any* plaintiff rather than *all* plaintiffs." A.J. Taft Coal Co. v. Barnhart, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (emphases in original) (collecting cases).  This interpretation makes sense; Defendants' reading would require plaintiffs residing in different districts to file a suit in their own states, resulting in multiple parallel lawsuits, piecemeal litigation for each plaintiff, and "unnecessary multiplicity of litigation." Exxon v. F.T.C., 588 F.2d 895, 898 (3d Cir. 1978), overruled on other grounds by Reifer v. Westport Ins. Corp., 751 F.3d 129 (3d Cir. 2014).  Though plaintiffs could alternatively file a consolidated action in the District of Columbia, the purpose of the venue statute was to "make it possible to bring actions against Government officials and agencies in U.S. district courts *outside* the District of Columbia." Sidney Coal Co. v. Soc. Sec. Admin., 427 F.3d 336, 344 (6th Cir. 2005) (emphasis added) (quoting Stafford v. Briggs, 444 U.S. 527, 539-40 (1980)).

In response, Defendants cite no case law in support of their argument, instead merely insisting that all the cases discussed hereto were wrongly decided and contravene the plain text of the statute.  However, this Court aligns with the weight of authority in finding that the legislative history and congressional intent point strongly in favor of an expansive interpretation of venue.  Thus, the residency requirement of the venue statute is satisfied if at least one plaintiff—here, UCS—resides in Massachusetts.  Accordingly, the Court declines to dismiss the non-Massachusetts-based Plaintiffs for improper venue.

**D.      Merits**

Having determined that the Court maintains jurisdiction over this action, the Court proceeds with Defendants' 12(b)(6) arguments regarding Plaintiffs' arbitrary-or-capricious and

contrary-to-law claims.  Notably, the First Circuit has instructed that the standard 12(b)(6) plausibility analysis "has no place in APA review" because "[t]he relevant inquiry is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." Atieh v. Riordan, 727 F.3d 73, 76 (1st Cir. 2013).  The court explained that, in light of the unique procedures outlined in the APA's judicial review provision, APA claims "must proceed on the administrative record" and "involve[] neither discovery nor trial." Id. at 75-76.  Accordingly, at the motion to dismiss stage, courts may not assess the factual plausibility of a complaint. Id.  At most, courts may determine whether "the underlying premise of the complaint is legally flawed." Id. at 76 n.4.  For example, a court can dismiss claims where the plaintiff fails to identify any regulatory or statutory authority with which the government action has allegedly failed to comply. See Roe v. Mayorkas, No. 22-CV-10808, 2023 WL 3466327, at *11 (D. Mass. May 12, 2023); e.g., Zixiang Li v. Kerry, 710 F.3d 995, 1000-01 (9th Cir. 2013) (concluding plaintiffs failed to state APA claim where statutory and regulatory provisions did not actually impose procedural requirements suggested by plaintiffs).

Applying Atieh, at this stage, the Court addresses only those arguments from Defendants that challenge the facial validity of Plaintiffs' legal arguments.  Any remaining arguments that contest the plausibility of Plaintiffs' APA claims may not be assessed at the motion to dismiss stage and thus do not require extended analysis here. See Massachusetts v. Trump, 790 F. Supp. 3d 8, 29 (D. Mass. 2025) (applying Atieh and declining to dismiss, or analyze in detail, defendants' challenges to plaintiffs' arbitrary-or-capricious and contrary-to-law claims); Claudio Mendez v. Wolf, No. 20-CV-11598, 2021 WL 877886 (D. Mass. Mar. 9, 2021) (same).

First, Defendants contend that Count 1 (arbitrary or capricious) fails because Plaintiffs do

28

not cite a specific substantive statute, and the APA does not permit a free-standing arbitrary-or-capricious claim. However, it is sufficiently clear from the Amended Complaint that Plaintiffs' argument is that Defendants acted arbitrarily or capriciously by failing to adhere to the statutes cited in their other claims. Cf. Wheeler, 954 F.3d at 22 (interpreting standalone arbitrary-or-capricious claim as "subsumed" in other substantive statutory claims). Plaintiffs represent as much in their Opposition. The Amended Complaint provides sufficient notice to Defendants of the relevant challenged conduct and statutory standards, and the Court declines to dismiss on this pleading technicality. See Sisbarro v. Warden, 592 F.2d 1, 2 (1st Cir. 1979) ("[A] Rule 12(b)(6) motion to dismiss is not the proper remedy for inartful pleading." (citing Haines v. Kerner, 404 U.S. 519, 520 (1972))).

Next, Defendants contend that Plaintiffs fail to allege a violation of the FLPMA. They argue that Plaintiffs' allegations relate solely to lands managed by NPS, whereas the FLPMA applies to "public lands," which are separately managed by the Bureau of Land Management. 43 U.S.C. § 1702(e). The Court disagrees and finds that Plaintiffs have adequately identified a legal basis for their FLPMA claim. The Secretary's Order directs all Land Management Bureaus, including the Bureau of Land Management, to review interpretive materials for conflict with the Executive Order. Moreover, the Bureau of Land Management is an agency under the Department of Interior, a defendant in this action. Whether Defendants, in fact, removed any materials from public lands—as opposed to only from NPS park sites—is a question of fact to be reviewed at later stages of this action.

On the Court's review, Defendants' remaining arguments involve factual issues or mixed questions of fact and law. Pursuant to Atieh, these arguments may not be resolved on a motion to dismiss. Accordingly, Plaintiffs have sufficiently stated a claim for purposes of Rule 12(b)(6).

29

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **DENIED**.

**SO ORDERED.**

Dated: June 4, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge