# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL PARKS CONSERVATION ASSOCIATION; AMERICAN ASSOCIATION FOR STATE AND LOCAL HISTORY; ASSOCIATION OF NATIONAL PARK RANGERS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; SOCIETY FOR EXPERIENTIAL GRAPHIC DESIGN; UNION OF CONCERNED SCIENTISTS, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF THE INTERIOR; DOUG BURGUM, in his official capacity as Secretary of the Interior; NATIONAL PARK SERVICE; JESSICA BOWRON, in her official capacity as the Official Exercising the Delegated Authority of the Director, <br><br> *Defendants*. | Civil Action No. 1:26-cv-10877-AK |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF EXPEDITED MOTION FOR STAY PENDING APPEAL

**INTRODUCTION**

Defendants have filed a notice of appeal (Doc. No. 43) of this Court's June 4, 2026 Memorandum and Order on Defendants' Motion to Dismiss (Doc. No. 37) and its June 12, 2026 Memorandum and Order on Plaintiffs' Motion for 5 U.S.C. § 705 Stay or, In the Alternative, Preliminary Injunction ("Injunction Order") (Doc. No. 41). Defendants move to stay the Injunction Order, pending the resolution of the appeal. *See* Fed. R. Civ. P. 62(c). The Injunction Order compels certain prescribed government speech on government property. (*See* Doc. No. 41) at 62 (requiring Defendants within 21 days to "restore and reinstall all interpretive materials at park sites managed by the NPS [National Park Service] that, pursuant to" the Secretary of the Interior's Order 3431, "Restoring Truth and Sanity to American History" (the "Secretary's Order"), "have been altered, removed, or damaged in the process of such removal since May 20, 2025," when the Secretary issued the Order).

A stay of the Injunction Order pending resolution of the appeal is appropriate because Defendants are likely to prevail on appeal and will be irreparably harmed absent a stay. Plaintiffs, by contrast, are not likely to suffer any significant injury if a stay is granted, and the public interest favors a stay.

On the merits, the Secretary's Order fails to satisfy a fundamental prerequisite to judicial review under the Administrative Procedure Act ("APA") because it is not final agency action. Neither final agency action requirement is met: (1) no legal consequences flow from the Secretary's Order; and (2) the Secretary's Order merely instituted an ongoing, internal agency review process that did not make a final decision with respect to any particular NPS interpretive material. This Court wrongly concluded the Secretary's Order imposes obligations because it binds agency personnel. (Doc. No. 37 at 21). But that misunderstands the finality analysis, which

asks whether the action imposes obligations on, or affects the legal rights of, a third party. The Order only starts a review process, and the Secretary does not impose reviewable obligations or legal consequences when he directs agency subordinates to review issues that he has identified. And this is particularly true when the review will not lead to legal consequences on or affect the legal rights of a third party. The Secretary's Order imposes no obligations—indeed, it does not regulate private parties at all. Nor does the Order affect a private party's right because there is no legal right to a specific sign in a federal park.

The balance of the harms and equities likewise weigh in the government's favor. The Injunction Order compels government speech about policy priorities—on federal property—that the government does not want to convey. This is inconsistent with the government speech doctrine, which recognizes that the government "has the right to speak for itself . . . to say what it wishes . . . and to select the views that it wants to express." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467–68 (2009) (internal quotations and citations omitted). The Order thus interferes with comity between the different government branches. The federal government is irreparably harmed by such undue encroachment upon inherently policy-based decision-making and its right to convey its preferred speech. The public interest thus tips sharply in favor of a stay to avoid this irreparable harm.

Beyond that grave intrusion, the Injunction Order presents severe logistical difficulties and monetary costs by requiring the government to comply in full within 21 days. The mandatory injunction requires Defendants to restore and reinstall materials at parks across the country. By contrast, the Secretary's Order itself contemplated 150 days for implementation. Practical barriers make the 21-day implementation infeasible, including the impracticalities of replacing instructional materials that may have been discarded and no longer available for re-

installation. This shortened timeframe also threatens a disruption in programming at parks and

the distribution of safety information to members of the public when the parks are at their

busiest. No urgency justifies the timeline, either. After all, Plaintiffs waited ten months after the

Secretary issued his Order to even file their motion.

Plaintiffs would suffer no comparable harm from a stay. They disagree with the speech

now conveyed or not conveyed at some parks, but that is not irreparable harm justifying the

extraordinary relief awarded here. They are not regulated or harmed at all. For that reason, they

have not even shown Article III standing.

The motion to stay the Injunction Order should be granted.

## STANDARD OF REVIEW

District courts have authority to stay their injunctive orders pending appeal. Fed. R. Civ.

P. 62(c). The factors governing the grant of a stay pending appeal are:

> (1) whether the stay applicant has made a strong showing that he is likely to
> succeed on the merits; (2) whether the applicant will be irreparably injured absent
> a stay; (3) whether issuance of the stay will substantially injure the other parties
> interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). "When the request for a stay is made to a district

court, common sense dictates that the moving party need not persuade the court that it is likely to

be reversed on appeal." *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D.

Mass. 1998). "Rather, with regard to the first prong of the *Hilton* test, the movant must only

establish that the appeal raises serious and difficult questions of law in an area where the law is

somewhat unclear." *Id*.

## ARGUMENT

**I.**     **Defendants are Likely to Prevail on Appeal.**

Defendants are likely to prevail on their appeal for many of the reasons they explained in their brief in support of their motion to dismiss and in their brief in opposition to Plaintiffs' motion for a stay or preliminary injunction.[1] (*See* Doc. Nos. 31-2, 34). For the sake of brevity and reserving the right to pursue all arguments on appeal, Defendants incorporate these arguments by reference rather repeating them all at length, given that they were recently presented to the Court.

**A.**     **Plaintiffs Have Not Challenged Final Agency Action**

The most apparent reason that Defendants are likely to succeed on appeal is that Plaintiffs have not challenged final agency action. Our motion, at a minimum, raises "serious and difficult questions of law." *See Pantry*, 999 F. Supp. at 150.

"[T]wo conditions must be satisfied for agency action to be final": (1) "[T]he action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Challenges to agency work other than final agency actions are unreviewable and must be dismissed. *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 246-47 (1980). Neither requirement is satisfied here. We consider them in reverse order.

---

[1] These reasons include lack of standing, lack of ripeness, lack of final agency action, the challenged action is committed to agency discretion, failure to state a claim for relief, the lack of meaningful standards against which to judge the agency's exercise of discretion, failure to show arbitrary and capricious action or that the Secretary's Order is contrary to the law, lack of irreparable harm, the equities and public interest weigh against the requested relief, Plaintiffs' requested relief is overbroad, the Court cannot stay an order that has already been executed, and improper venue for the majority of the Plaintiffs.

The Secretary's Order does not determine rights or obligations or have legal consequences. It instead provides for a review process that may result in changes to how *the government* chooses to exercise government speech through signage and other information on federal lands managed by the Department of the Interior. The only obligations or legal consequences identified by the Court as a result of the Secretary's Order are internal to the government—the directive by the Secretary to his subordinates to undertake further review. But that directive is not a legal consequence under the finality test—when an agency head directs subordinate staff to review an issue, the agency head has not determined a right or obligation or created a legal consequence. And the process here, once completed, is untethered to third parties' rights or responsibilities. Even when the review is complete, there still will not be a legal consequence. Indeed, internal agency directives that lack legal consequences—and thus do not affect individual rights or obligations—fall far short of meeting the second prong of final agency action. *See*, *e.g.*, *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question on regulated entities. . . . The Final Guidance does not tell regulated parties what they must do or may not do in order to avoid liability. The Final Guidance imposes no obligations or prohibitions on regulated entities."). The public at large is not regulated by the Secretary's Order and has no legal right to particular language in signage posted or materials distributed on federal lands managed by NPS.

Think of it this way: If the Secretary himself removed signs from a national park, it would not be final agency action. Deciding which sign to remove, and then removing a sign, does not determine any "legal rights or obligations" or have any "legal consequences." *Bennett*, 520 U.S. at 178. No one has a legal right or obligation to a particular sign in a national park, and

5

legal consequences do not "flow" from removing a government sign or deciding to remove a government sign on government property. The sign is simply government speech on the government's own property.

The Secretary's directive to subordinates—and the corresponding obligations on those subordinates—does not change this. Intra-agency directives do not turn non-final action into final action. The Court's contrary conclusion allows Plaintiffs to fabricate final agency action from a communication between superior and subordinate within an agency. But just as there would be no final agency action if the Secretary ordered an assistant to use a certain type of paper in a printer, there is likewise no final agency action here where the Secretary ordered subordinates to review and remove certain material on federal property. Neither intra-agency directive implicates a third party's rights or obligations. That distinguishes this case from the cases this Court relied on. For instance, in *Biden v. Texas*, the Supreme Court held that an internal DHS agency memorandum that "bound DHS staff by forbidding them to continue the [Remain in Mexico] program" was final agency action. 597 U.S. 785, 808 (2022). But that internal memorandum required subordinates to refuse to recognize immigration status and thus, unlike the Secretary's Order, affected legal rights. *See id.* at 808–09. And in *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, "the OMB Pause Memorandum issued a mandatory command to other federal agencies that produced legal consequences for Plaintiffs and others." 775 F. Supp. 3d 100, 124 (D.D.C. 2025). The Secretary's Order, however, produces no legal consequences for Plaintiffs or others.

Nor does the Secretary's Order consummate the agency's decision-making process. It initiates, rather than concludes, DOI's decision-making process in the on-going agency review of NPS interpretive materials. (*See* Doc. No. 31-1) at 15-17; (Doc. No. 34) at 7-10. The Order itself

removes no particular interpretive materials and merely constitutes the first step in an on-going review process of NPS signage across the agency at large. Additional steps, including identification by individual park units of materials that potentially were inconsistent with the Secretary's Order, evaluating those materials, and ultimately determining whether the materials should be removed, modified, or replaced, must occur at the park level before agency decision-making at the park is complete. By definition, the Secretary's Order is not the "consummation" of the agency's decision-making process and thus fails to satisfy the first requirement of final agency action.

### B.    Plaintiffs Have Not Shown the Secretary's Order Exceeds Statutory Authority

Plaintiffs also fall far short with their statutory arguments. Because there is no final agency action, Plaintiffs do not have a justiciable APA claim and, if any judicial review is available, they would need to plead and meet the more rigorous standard for ultra vires review to challenge the Secretary Order. That is because ultra vires review is a claim of last resort that may be invoked where plaintiffs, as here, lack an express statutory cause of action under the APA or otherwise. *See*, *e.g.*, *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (ultra vires review is only available when, among other things, "there is no alternative procedure for review of the statutory claim"). Such review is extremely narrow and exacting. As the Supreme Court reiterated just last year, *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025), non-statutory *ultra vires* review has an "extremely limited scope," *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988), and thus an *ultra vires* claim "rarely succeeds," *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The doctrine permits judicial review of alleged statutory violations "only where," among other requirements, "the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition

7

in the' statute that is 'clear and mandatory.'" *Nyunt*, 589 F.3d at 449; *see also Nuclear Regul. Comm'n*, 605 U.S. at 681 (requiring action "entirely" in excess of delegated powers and "contrary to a *specific prohibition*"). Such a claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nyunt*, 589 F.3d at 449.

Plaintiffs fail to show any statutory violation and fall well short of the showing required for an APA claim, much less an ultra vires claim.

At the outset, because Plaintiffs bring a facial challenge, they must show that the Secretary Order is contrary to law "in all its applications." *Am. Hosp. Ass'n v. N.L.R.B.*, 499 U.S. 606, 619 (1991). The Court refused to apply this framework, in part, because "Plaintiffs allege dozens of existing removals pursuant to the Secretary's Order." (Doc. No. 41) at 42. But Plaintiffs do not challenge any specific removal and instead challenge the Order itself in all applications.

Regardless, Plaintiffs' statutory claims (which are really ultra vires claims in this context) fail. All three statutes—the Centennial Act, the Omnibus Management Act, and the National Park Service Organic Act—delegate broad discretion to the agency. *See* 54 U.S.C. § 100802 (Centennial Act) ("The Secretary shall ensure that management of System units and related areas is enhanced by the availability and use of a broad program of the highest quality interpretation and education."); 54 U.S.C. § 100702 (Omnibus Management Act) ("The Secretary shall ensure that management of System units is enhanced by the availability and utilization of a broad program of the highest quality science and information."); 54 U.S.C. § 100101 (Organic Act) ("The Secretary, acting through the Director of the National Park Service, shall promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and

8

historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."). These broad directives give the agency substantial discretion and lack the specific commands that Plaintiffs purportedly seek to enforce.  (*See* Doc. No. 31-1) at 22-26.

The Court's decision is grounded in subjective disagreement, not clear statutory violations. (*See, e.g.*, Doc. No. 41) at 45 ("These climate-related interpretive materials further the Organic Act's conservation mandate by fostering public awareness and informing visitors about environmental degradation and the threats facing protected ecosystems, landscapes, and other park resources."); *id.* at 48 (concluding that "NPS' interpretation and education program must incorporate marginalized voices in telling a full history"); *id.* at 49-50 (noting that the Secretary's Order "fosters alienation and disengagement by removing a source of potential connection that diverse communities could form with park resources"); *id.* at 53 ("the Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory").

Plaintiffs' statutory arguments fail.

### C.    Plaintiffs Have Not Shown the Secretary's Order Is Arbitrary and Capricious

Even were Plaintiffs to have demonstrated final agency action sufficient to plead a justiciable APA claim (they have not), they would also fall far short of demonstrating arbitrary and capricious action. Among the litany of defects in their APA claim, (1) the statutes upon which Plaintiffs rely do not provide a "meaningful standard" against which to assess their claims; (2) Plaintiffs have failed to show what "important aspects of the problem" the Secretary's Order fails to address; (3) NPS is not at liberty to disregard the President's Executive Order that led to

adoption of the Secretary's Order; (4) Plaintiffs' disagreement with the President's policy decision is not a valid basis to invalidate the Secretary's Order; (5) Plaintiffs have demonstrated no reliance interest that should be considered; (6) the Secretary's Order includes no factual findings subject to challenge, and (7) Plaintiffs have shown no prior policy document inconsistent with the Secretary's Order. (*See* Doc. No. 31-1) at 18-22.

Plaintiffs have failed to demonstrate a viable APA claim, even were the Court to overlook their failure to establish final agency action.

For these and the many other reasons raised in the government's prior brief, the government has raised serious legal questions that justify a stay pending appeal.

## II. Defendants Will be Irreparably Injured Absent a Stay.

The Injunction Order requires, among other things, the reinstallation and/or redistribution of removed signage, brochures, and other interpretive materials within 21 days. This injunctive command will have a direct and irreparable impact on government speech. One of the consequences of free elections is the prerogative of the elected administration to espouse and implement its favored policies, including in NPS units. The Injunction Order would diminish this prerogative by allowing the courts, rather than the duly-elected administration, to police which of the administration's views are acceptable and which are not suitable for public viewing. For instance, the Injunction Order would require NPS to uninstall and reinstall signage and other informational materials on a range of topics—which the government has itself decided *not* to communicate—in a manner that does not align with the government's views. This direct incursion on the government's right to "say what it wishes" and to select the views it wants to express is contrary to settled law and an irreparable harm to the government that weighs heavily in favor of staying the Injunction Order. *See*, *e.g.*, *Summum*, 555 U.S. at 467–68 (a government

entity "is entitled to say what it wishes" and to select the views that it wants to express) (citations omitted); *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 329-30 (1st Cir. 2009) (same).

Beyond these grave injuries and for the many reasons explained in the attached Second Declaration of Jessica Bowron, the Injunction Order imposes a herculean and unmanageable task on NPS that will irreparably harm it and its programming in many practical ways. Initially, there are the practical difficulties of implementing the Injunction Order on this short timeline. Consistent with the scale of NPS and the number of affected units, the Secretary's Order provided for implementation over two phases—an initial thirty-day phase and a second 120-day review and implementation phase. *See* (Doc. No. 41) at 4. However, as indicated in Ms. Bowron's first declaration, dated April 4, 2026 Declaration (Doc. No. 31-3) ¶ 23—and recognized in the Court's Injunction Order—NPS' implementation of the Secretary's Order was not completed even after the 150 days contemplated in the order. Indeed, as Ms. Bowron explains in her Second Declaration, NPS undertook an individualized, case-by-case analysis. Ex. 1 (Second Bowron Decl.) ¶ 6.

Moreover, the review identified in the Secretary's Order was interwoven into NPS' long-standing and ongoing regular review of its interpretive materials, such that some decisions to remove materials may have been ultimately other factors in addition to the guidance from the Order. *Id.* The Injunction Order now compresses the unwinding process to a mere 21 days, which is impractical under the circumstances and overbroad in its application to park units across the country, irrespective of any demonstrated connection between Plaintiffs and these units. The overbroad scope of the Injunction Order has, in fact, resulted in a conflict between its commands and those of a separate order issued by the Third Circuit in *City of Philadelphia v. Dep't of Interior*, No. 26-1348, wherein the Court of Appeals stayed the district court's preliminary

11

injunction ordered in Civil No. 2:26-cv-00434 (E.D. Pa. Jan. 22. 2026). That preliminary injunction had similarly required restoration of instructional materials at the "President's House" in Philadelphia that NPS had likewise recently removed.  The end result is that the Third Court has allowed NPS to display only the materials that it wants at the President's House, pending resolution of that appeal, whereas this Court has required NPS to restore materials that it does not want to display. This conflict is untenable.

In terms of the broad scope of activities required by the Injunction Order, "[t]he National Park System is comprised of four hundred and thirty-three (433) units, including sixty-three (63) National Parks, eighty-seven (87) National Monuments, seventy-six (76) National Historic Sites, sixty-four (64) National Historical Parks, thirty-one (31) National Memorials, and eighteen (18) National Recreation Areas, among others," spread across all fifty states, the District of Columbia, and the U.S. territories. Ex. 1 ¶ 4. This is a vast territorial framework to manage on a compressed timeframe. And the interpretive media at issue span many forms, "including waysides and exhibits, park unigrid brochures (the iconic NPS park brochures/maps), program brochures, park newspapers, and educational handouts, audiovisual materials that play in NPS facilities such as visitor centers and museums, online content, and other information that is necessary to educate and inform the visitor experience." *Id.* ¶ 5. The time it will take to reinstall—and, in some cases, re-fabricate or reprint these interpretive materials—is likely to extend well beyond 21 days. (*See id.* ¶¶ 7-18.) Though some of the removed materials are likely still available for reinstallation and distribution, others may have been disposed of, thus requiring re-fabrication and reprinting, in some cases by outside vendors or the Government Printing Office, and subsequent distribution to individual park units. *Id.*

Not only is this process time consuming and expensive, but also it would take place during the busy summer season and while the parks are all preparing for their own Semiquincentennial activities. *Id.* ¶ 12. Park visitors would likely feel resulting impacts through limited closures and disruption of visitor services to facilitate the reinstallation on site. *Id.* For instance, brochures for the Junior Ranger program may not be available for use, resulting in temporary disruption of the program by young park visitors. *Id.* ¶19. What's more, visitor enjoyment of parks—even their safety—could also be compromised if newly printed brochures, with Park road and safety information, are not available for distribution. *Id.* ¶ 17.

Further, the Court's Injunction Order will substantially interfere with NPS' ability to continue its ongoing interpretation responsibilities to the American public and System unit visitors. As Ms. Bowren explained, NPS' implementation of the Secretary's Order is interwoven into the NPS's existing interpretive activities—and requiring NPS to cease any removal or alteration of interpretive content and restore all interpretive content as it existed on May 19, 2025 –even if the Order is only one of many factors that resulted in the revision or removal of a particular exhibit or other NPS interpretive material—will unquestionably impair NPS' ability to undertake its constant efforts to review and update interpretive materials. *Id.* ¶¶ 20-22. In addition, any additional removals or modifications of existing interpretive materials that NPS might wish to make in the future—even if for reasons unrelated to the Secretary's Order—could cause Plaintiffs to seek further relief if such materials addressed any of the issues that Plaintiffs have focused on in their filings.

For all these reasons, the Injunction Order irreparably harms the government.

13

**III.**    **Plaintiffs Fail to Demonstrate any Irreparable Harm.**

By contrast, Plaintiffs fail to demonstrate any compelling injury to their interests, much less irreparable harm. Initially, the Secretary's Order has been in effect since May 2025. And yet Plaintiffs delayed by ten months the filing of their motion for a stay or preliminary injunction. This extensive delay itself belies any claim of irreparable harm.

Further, Plaintiffs have failed to demonstrate that any of their members have any plans to visit any Park units at which any of the interpretive materials about which they complain have been altered. (*See* Doc. No. 31-1) at 11-12. And vague plans to someday visit other NPS sites "down the line," as proffered by one of Plaintiffs' members, is patently insufficient to establish actual or imminent injury. *See id.* at 12 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992)).

Plaintiffs' allegations of associational harm based on such things as mission frustration, abstract objections to the management of national parks, impairment of associational reputation, or monetary losses are either not judicially cognizable or are self-inflicted based on Plaintiffs' advocacy efforts and other choices. (*See* Doc. No. 31-1) at 26-28. The allegations fall well short of establishing irreparable harm.

Finally, it is specious to say that the immediate reinstallation of prior interpretive materials is necessary to prevent irreparable harm. Should Plaintiffs prevail at the conclusion of this lawsuit and obtain a judgment requiring the restoration of any removed or modified interpretive materials, that can be accomplished at that time. But there can be no credible assertion of irreparable harm under these circumstances, including in light of Plaintiffs' delay in bringing suit and seeking preliminary injunctive relief.

Plaintiffs demonstrate no cognizable harm, much less irreparable harm, from staying the Injunction Order.

## IV.    **The Public Interest Would be Well-Served by a Stay.**

The public interest and equities also weigh in favor of staying the Injunction Order. At a practical level, as discussed above, denying a stay could result in the disruption of NPS services, programming, and safety information during the time in which NPS interpretive materials and information are not available due to the infeasibility of obtaining suitable replacement materials during the 21-day timeframe for compliance imposed by the order. The public has an obvious interest in seeing that there is no such disruption. At a broader programmatic level, the public has an interest in the proper functioning of government and maintenance of interbranch comity in which the courts do not improperly police the government's right to convey its preferred speech and the associated implementation of changing government policies from one administration to the next. The Injunction Order runs contrary to these compelling public interests.

## CONCLUSION

For all these reasons, Defendants respectfully requests that the Court stay the Injunction Order pending appeal.

Dated:  June 15, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

*/s/ Romney Philpott*
Romney Philpott
Senior Trial Attorney
Environment and Natural Resources Division
United States Department of Justice

15

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was served upon Plaintiffs' counsel by the Electronic Case Filing system on June 15, 2026.

*/s/ Romney Philpott*
Romney Philpott
