# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

NATIONAL PARKS CONSERVATION )
ASSOCIATION, *et al.,* )
  )
    Plaintiffs, )
  )     **Case No. 26-cv-10877**
       v. )
  )
UNITED STATES DEPARTMENT OF )
THE INTERIOR, *et al.*, )
  )
    Defendants. )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' EXPEDITED MOTION FOR STAY PENDING APPEAL

A stay pending appeal would allow Defendants to continue their unlawful censorship campaign over the National Park System's busiest season, needlessly delay relief, and exacerbate the irreparable harm to both Plaintiffs and the public. Plaintiffs therefore oppose Defendants' motion. As the Court already determined, the Secretary's Order likely violates the Administrative Procedure Act (APA) by preventing the national parks from serving for the "benefit and inspiration of all of the people of the United States" and by stripping the public of access to "the highest quality science and information" and "highest quality interpretation and education."

Defendants do little more than rehash arguments that this Court already rightly rejected. Rather than demonstrating that Defendants are entitled to a stay, the relevant factors all weigh in Plaintiffs' favor. Defendants have not identified any errors in the Court's analysis or case law that suggests the Court's order was wrongly decided. Instead, Defendants raise now, for the first time, new arguments about purported harm to Defendants that have been waived or forfeited and are not persuasive anyway. The balance of the equities and public interest also strongly favor

1

maintaining the Court's § 705 stay and injunction. Plaintiffs respectfully request that the Court deny Defendants' motion (Doc No. 44).

## ARGUMENT

A stay pending appeal "is an intrusion into the ordinary processes of administration and judicial review, so this extraordinary relief is never granted as a matter of right." *R.I. State Council of Churches v. Rollins*, 158 F.4th 304, 311 (1st Cir. 2025) (internal quotation marks and citation omitted). Defendants "bear[] the burden of justifying the extraordinary relief [they] request[]." *Id.* To do so, they must make "(1) a strong showing that [they] [are] likely to succeed on the merits; (2) a showing that [they] will be irreparably injured absent a stay; (3) a showing that the issuance of the stay will [not] substantially injure the other parties interested in the proceeding; and (4) a showing that the public interest lies with [them], not the plaintiffs." *Id.* (fourth alteration in original) (citation omitted).

Defendants satisfy none of these factors. The Court thoroughly and persuasively explained that Defendants' jurisdictional arguments are meritless and that Plaintiffs are likely to show the Secretary's Order violates the APA several times over. *See generally Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior* (*NPCA I*), No. 26-cv-10877, 2026 WL 1601790 (D. Mass. June 4, 2026); *Nat'l Parks Conservation Ass'n v. U.S. Dep't of Interior* (*NPCA II*), No. 26-cv-10877, 2026 WL 1706963 (D. Mass. June 12, 2026). Defendants face no irreparable harm from an injunction that ends an unlawful practice and restores the status quo that was in place before the Order abruptly departed from the Park Service's longstanding approach to interpretation. By contrast, Plaintiffs would be irreparably harmed by a stay because, as this Court recognized, the Order "strips [park] sites of the context that gives them meaning" and "degrades the public's trust in the government." *NPCA II*, 2026 WL 1706963, at \*26. And the

2

balance of equities and public interest weigh decidedly against a stay where Defendants'
censorship of disfavored interpretive materials "diminishes the public's collective ability to
engage critically and thoughtfully with these topics." *Id.* at *27.

## I.    Defendants are not likely to succeed on the merits.

Defendants come nowhere near the necessary "strong showing" that they are likely to
succeed on the merits. *R.I. State Council*, 158 F.4th at 311 (citation omitted). Instead, they
largely rehash arguments that this Court rejected in its comprehensive orders denying
Defendants' motion to dismiss and granting Plaintiffs' motion for a preliminary injunction and §
705 stay. Defendants fail to show any error in the Court's analysis, and that alone warrants denial
of their stay motion. *See, e.g.*, *id.* at 312 ("If the government fails to make a strong showing that
it is likely to succeed on the merits, 'the remaining elements are of little consequence.'" (citation
omitted)).[1]

### A.    This Court correctly concluded that the Secretary's Order is a final agency action.

The Secretary's Order is "a final agency action." *NPCA I*, 2026 WL 1601790, at *9. As
this Court explained, "the Order is the consummation of a decision-making process, not
interlocutory or tentative." *Id.* The Order "issues binding . . . directives to the Land Management
Bureaus," "leaves little ambiguity over the type of interpretive materials to remove," and "sets
near-term deadlines on a two-phase schedule for completion"—all indicating that the Order "is
not a preliminary step far upstream of any consequences." *Id.* The Order also "imposes legal

---

[1] Defendants briefly suggest that they need only raise "serious and difficult questions of law." (Doc No.
44-1 at 3, 4 (quoting *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass. 1998))). That is
directly at odds with the First Circuit's repeated admonition that a strong showing of success on the merits is
required. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 66 (1st Cir. 2025). And the argument fails in any event, as
Defendants' stay motion does not raise "serious and difficult questions of law in an area where the law is somewhat
unclear." *Canterbury Liquors*, 999 F. Supp. at 150.

obligations on Land Management Bureau personnel, who must review interpretive materials at park sites, post QR codes, and remove purportedly violative materials." *Id.*

Defendants continue to insist—against all the evidence—that the Order does not have legal consequences. (Doc No. 44-1 at 5). They ignore that the Order imposes immediate legal obligations on agency personnel and alters the operative legal regime. *NPCA I*, 2026 WL 1601790, at *9; *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997) (final agency action would "alter the legal regime to which the action agency is subject"); *Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *9 (D.D.C. Mar. 30, 2021) (final agency action where directive "created legal consequences and obligations for park superintendents"). And Defendants' contention that the Order simply establishes a review process is untethered from the text of the Order itself and the way it has been implemented in practice. (*See* Doc No. 44-1 at 5). The Order decisively and finally announces a new policy under which certain historical and scientific information is no longer shared in America's largest classroom. *See NPCA II*, 2026 WL 1706963, at *15 ("Under the Order, the [Park Service] must review and reverse the installation of interpretive materials that the agency previously deemed relevant, accurate, useful, and informative, marking a shift from the [Park Service's] prior approach of retaining and incorporating such content.").

Moreover, while Defendants insist that the Order does not have legal consequences for any third party (Doc No. 44-1 at 6), the test is simply whether the result of the agency's decisionmaking process "directly affect[s] the parties," *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (citation omitted). The Order plainly does. For example, Plaintiffs and their members can no longer enjoy—as they did before the Order—interpretive materials that "reflect different cultural backgrounds, ages, education, gender, abilities, ethnicity, and needs" or

"reflect current scientific and academic research." 54 U.S.C. § 100803(2), (4). And the parks are no longer "enhanced by the availability and use of a broad program of the highest quality interpretation and education." *Id.* § 100802. As a result of the Order, Plaintiffs have lost the benefits they previously enjoyed from Defendants' complying with these statutory requirements. (*See generally* Doc Nos. 29-6 to 29-13); *see also, e.g.*, *City of Philadelphia v. Burgum*, 820 F. Supp. 3d 313, 332 (E.D. Pa. 2026) (final agency action where removal of displays undermined plaintiff's "statutory and long-running interests"); *Pub. Emps.*, 2021 WL 1198047, at *9 (directive created legal consequences for park patrons).

Defendants try to distract from the Secretary's Order at issue here by theorizing that if the Secretary himself removed signs from a park, that would not constitute final agency action. (Doc No. 44-1 at 5). That hypothetical is entirely inapposite. Plaintiffs do not challenge an individual sign removal; they challenge a sweeping order that dictates censorship of history and science in the national parks and "exclud[es] the experiences of communities whose contributions, struggles, and achievements form an important part of our Nation's story." *NPCA II*, 2026 WL 1706963, at *28.[2]

Finally, Defendants maintain that the Order is not the consummation of the agency's decisionmaking process. (Doc No. 44-1 at 6–7). The Court already dispensed with this argument, explaining that "[a]ctions that bind and direct subordinate agency personnel are final, even if what they authorize is an ongoing process." *NPCA I*, 2026 WL 1601790, at *9. The Order announced a new, final policy of removing certain historical and scientific information from the parks. It thus makes no difference that Defendants claim there is an "on-going agency review."

---

[2] Defendants also attempt to analogize the Order—which "seek[s] to rewrite the Nation's history with a white-out pen," *NPCA II*, 2026 WL 1706963, at *28—to the Secretary "order[ing] an assistant to use a certain type of paper in a printer." (Doc No. 44-1 at 6). As the Court explained in rejecting a similar argument in the first instance, "this hypothetical is a red herring"; a printer paper order almost certainly would "not constitute an 'agency action' within the meaning of the APA, making finality an irrelevant inquiry." *NPCA I*, 2026 WL 1601790, at *9 n.1.

(Doc No. 44-1 at 6); *see also, e.g.*, *Pub. Emps.*, 2021 WL 1198047, at *8 (directive was final even though park superintendents retained ability to impose limits or conditions because "they were still required to first impose the overarching [Park Service] policy").

### B. This Court correctly concluded that the Secretary's Order exceeds statutory authority and is contrary to law.

On the merits, the Secretary's Order exceeds statutory authority and is contrary to several laws governing the Park Service, including the Organic Act of 1916, the National Park Service Centennial Act, and the National Parks Omnibus Management Act. As the Court concluded, the Order "directly conflicts" with the Organic Act's conservation mandate because it directs the removal of climate-related interpretive materials "without identifying any conservation-related justification." *NPCA II*, 2026 WL 1706963, at *21. In doing so, the Order "ignores and defies the [Park Service's] core duty to protect and conserve the Nation's natural resources." *Id.*

The Secretary's Order likewise violates the Centennial Act because its "erasure of the struggles, lives, and stories of various marginalized communities directly denies the importance of the Centennial Act's mandate that park sites reflect the voices of all Americans." *Id.* at *23. With "the stroke of a pen," the Order "fosters alienation and disengagement by removing a source of potential connection that diverse communities could form with park resources," in violation of the Centennial Act's command that the Park Service "encourage visitors of all backgrounds to 'gain awareness, appreciation, and understanding' with park resources." *Id.* For "substantially similar reasons," the Order violates the Omnibus Management Act by "mandating the removal" of topics such as climate change and environmental degradation. *Id.* at *24.

Defendants make little effort to grapple with the Court's comprehensive analysis on these statutory violations. Instead, they argue for the first time that Plaintiffs must satisfy the ultra vires standard to challenge the Secretary's Order. (Doc No. 44-1 at 7). But the ultra vires standard has

no relevance to Plaintiffs' APA challenge, which—as this Court recognized—is premised on final agency action. (*Contra id.* at 7–8).

Defendants also recycle their argument that Plaintiffs must show the Order "is contrary to law in all its applications." (*Id.* at 8 (internal quotation marks and citation omitted)). This Court already soundly rejected that argument, which derives from *United States v. Salerno*, 481 U.S. 739 (1987), noting that "courts have not extended the case beyond its narrow factual context, where the plaintiffs brought a constitutional challenge to a federal statute that had yet to be implemented at all." *NPCA II*, 2026 WL 1706963, at \*19. Defendants insist that Plaintiffs "do not challenge any specific removal and instead challenge the Order itself in all applications." (Doc No. 44-1 at 8). But that mischaracterizes Plaintiffs' assertions and misunderstands the Court's conclusion. The point is that "Plaintiffs' claims do not involve speculative hypothetical applications; instead, Plaintiffs allege dozens of existing removals pursuant to the Secretary's Order." *NPCA II*, 2026 WL 1706963, at \*19. There is no basis to apply *Salerno* or its progeny in this straightforward APA challenge. *See, e.g.*, *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 904 (S.D. Ohio 2016); *see also NPCA II*, 2026 WL 1706963, at \*19 (collecting cases).

Defendants also assert that the Court's decision "is grounded in subjective disagreement, not clear statutory violations" (Doc No. 44-1 at 9), but they provide no analysis at all to support this baseless claim. In fact, the Court's decision was closely tethered to the specific statutory provisions at issue here. *See NPCA II*, 2026 WL 1706963, at \*20–24. And as the Court summed up, "the Government's actions do exactly what they profess to counteract, dismantling objective historic truths and permanently damaging public memory." *Id.* at \*24. Defendants offer no basis to revisit that conclusion.[3]

---

[3] Defendants argue in passing that the statutes in question "give the agency substantial discretion and lack the specific commands that Plaintiffs purportedly seek to enforce." (Doc No. 44-1 at 9). To the extent Defendants are attempting to renew their argument that the Order is committed to agency discretion by law, that argument already

### C. This Court correctly concluded that the Secretary's Order is arbitrary and capricious.

In addition to violating at least three different statutes, the Secretary's Order is arbitrary and capricious. This Court found that Plaintiffs are likely to show the Order lacked any reasoned explanation, disregarded substantial reliance interests, and failed to consider important aspects of the problem. *Id.* at *12–18.

Defendants do not engage at all with the Court's extensive analysis and conclusions on the arbitrary and capricious claim. Instead, they simply offer a recycled list of arguments from their previous briefing. (Doc No. 44-1 at 9–10). The Court already addressed these arguments in detail, explaining, for example, that "[a] unilateral, unreasoned, and lawless Executive Order of a President cannot be the sole justification for an agency's actions, lest the country be prepared to entrust its future to the whims of a single individual." *NPCA II*, 2026 WL 1706963, at *14; *see also, e.g.*, *New York v. Trump*, 811 F. Supp. 3d 215, 237–38 (D. Mass. 2025). The Court also highlighted the substantial reliance interests trampled by the Order, including those of "historians who chose to partner with the [Park Service]; . . . students and young adults who rely on park sites; . . . professional designers and specialists; . . . and millions of parents, educators, park visitors, and community groups who rely on the parks as a critical resource to learn and teach the most complete and accurate history and science possible." *NPCA II*, 2026 WL 1706963, at *15. And the Court recognized that the Order "failed to consider the interests of the public before ordering the removals." *Id.* at *18. Defendants offer no answer to any of these well-reasoned conclusions and therefore have not shown any likelihood of success—let alone a strong one—on the merits. *See, e.g.*, *Afr. Cmtys. Together v. Noem*, No. 25-cv-13939, 2026 WL 961900, at *1 (D.

---

failed. The Court rightly held that "[t]he concepts of public education, environmental conservation, intellectual discourse, scientific rigor, and diversity are not foreign to courts and provide an intelligible guidepost for review." *NPCA I*, 2026 WL 1601790, at *11.

Mass. Apr. 9, 2026) (denying motion for stay pending appeal where defendants largely "repeat[ed] the arguments they already raised in opposing Plaintiffs' motion").

## II.    Defendants suffer no harm at all, while Plaintiffs and the public will be irreparably injured by a stay.

A gulf exists between the harm that Defendants claim they will suffer if the Court's order remains in place and the irreparable harm that the Court has already recognized that Plaintiffs are suffering. A stay pending appeal would give Defendants license to expedite their censorship campaign; ignore the mandates of national parks statutes, policies, and purposes; and deny Plaintiffs, their members, and the public the opportunity to fully enjoy and benefit from the "essential democracy" of the national parks. Theodore Roosevelt, *Remarks at the Laying of the Cornerstone of the Gateway to Yellowstone National Park in Gardiner, Montana* (Apr. 24, 1903), https://perma.cc/CAE5-QGLH. By contrast, denying a stay will simply require Defendants to cease censoring history and science in the parks and to reinstall interpretive materials that were unlawfully removed. The disparity between relative harms alone is reason to deny a stay. *Cf. NetChoice, LLC v. Fitch*, 145 S. Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in denial of application to vacate stay).

Any minimal burden Defendants face from the Court's order, if it even exists, is a problem of their own creation, stemming from the decision to ignore congressional mandates related to national parks and violate the process and procedures that agencies must follow for final agency action. To start, Defendants argue, for the first time, that the Court's order impedes government speech. As an initial matter, Defendants waived that argument by declining to make it in prior briefing—even though they were on notice that Plaintiffs sought reinstatement of interpretive materials—and raising it for the first time here. *See, e.g., Burke v. Walsh*, No. 23-cv-11798, 2024 WL 3548759, at *6 (D. Mass. June 5, 2024) ("Arguments 'adverted to in a

cursory fashion, unaccompanied by developed' explanation are deemed waived." (quoting *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175–76 (1st Cir. 2011))). Regardless, Defendants' argument fails on the merits because the government speech doctrine is inapplicable here. The doctrine concerns whether the First Amendment applies to particular private expression or if the expression instead constitutes government speech outside the First Amendment's reach. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (describing the government speech doctrine by noting that if the government petitioners "were engaging in their own expressive conduct, then the Free Speech Clause has no application"). But there is no First Amendment challenge in this case (Doc No. 28 ¶¶ 131–209), and Plaintiffs have not alleged that their right to free speech has been violated. Instead, Plaintiffs assert that the government failed to comply with its obligations under the APA, and that failure caused irreparable harm. Nothing in *Summum* or any other case prevents courts from ordering the government to cease unlawful conduct and remedy harms. Indeed, while "[t]he government is free to say what it wants," it "must abide by the bounds of authority and the procedures that Congress has prescribed, through the APA and otherwise." *Drs. for Am. v. OPM*, 793 F. Supp. 3d 112, 150 (D.D.C. 2025) (vacating agency directive, issued pursuant to Executive Order, to remove content "promoting 'gender ideology'" and requiring agency to restore censored information). By ordering Defendants to undo their unlawful action, the Court aims a return to the "last uncontested status quo between the parties." *NPCA II*, 2026 WL 1706963, at *28. The Court's order thus is simply not the type that implicates government speech. And "while the government-speech doctrine is important—indeed essential—it is a doctrine that is susceptible to dangerous misuse," *Matal v. Tam*, 582 U.S. 218, 235 (2017), just as Defendants attempt here.

10

Next, Defendants claim that remedying their own unlawful actions would be "a herculean and unmanageable task." (Doc No. 44-1 at 10). In support of this assertion, Defendants describe a prolonged process they allegedly undertook to conduct "individualized" assessments of signs. That is beside the point. Defendants concede that those individualized assessments stem from the Secretary's Order, but do not explain their relevance here, where to comply with this Court's order, they need only reverse the actions that resulted from those assessments and need not conduct new assessments. (*See id.* at 12 (alleging that there are "practical difficulties" with implementing the Court's order and then describing the two phases of the implementation and noting that one "was not completed even" within the timeframe contemplated); *see also* Doc No. 44-2 ¶ 6).

Further, in opposing Plaintiffs' motion for preliminary injunction or stay, Defendants objected only to proposed relief that would have required them "to restore and preserve all [Park Service] properties that have been modified since May 2025, whether or not they were modified under the [Secretary's Order]." (Doc No. 31-1 at 29). The Court obviated that concern by limiting its order to materials altered, removed, or damaged "pursuant to the Secretary's Order." *NPCA II*, 2026 WL 1706963, at *29. Defendants should not be permitted to shift course now to avoid complying with this more tailored relief. *Cf. AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-00400, 2025 WL 625755, at *2 (D.D.C. Feb. 26, 2025) (denying stay pending appeal where government raised compliance concerns for first time in stay motion).

Defendants claim that "some decisions to remove materials may have been ultimately [due to] other factors in addition to the guidance from the Order." (Doc No. 44-1 at 12). But neither their briefing, the Second Bowron Declaration, nor any other citation provide a single example of a decision to remove material based on "a confluence of other factors." (*See*

11

*generally, e.g.*, Doc No. 44-2 ¶ 6). And Defendants do not explain how they balanced these factors or how—if at all—records underlying those decisions are maintained. Instead, their argument amounts to little more than "trust us." Defendants' speculation about what "may" have led to removals does not warrant a stay. *See, e.g.*, *New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025) ("Because the Defendants bear the burden of demonstrating that they 'will be irreparably injured absent a stay,' we cannot see how their speculative and conclusory statement suffices." (cleaned up)); *Pub. Serv. Co. v. W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987) ("Speculative injury does not constitute a showing of irreparable harm.").

Defendants also suggest there is "a conflict" between this Court's order and a stay pending appeal issued by the Third Circuit. *See* Order, *City of Philadelphia v. Sec'y U.S. Dep't of Interior*, No. 26-1348 (3d Cir. April 9, 2026), Doc. No. 39. No such conflict exists. The Third Circuit's order concerns only whether the defendants are required to comply with the district court's order in that case pending appellate proceedings. It has not opined, in general, on the lawfulness of the Park Service's removals or the legality of requiring the Park Service to reinstall unlawfully removed materials. Instead, the Third Circuit merely stayed a portion of the district court's order at issue there that instructed the defendants to reinstall previously removed materials. *See, e.g.*, *id.* at 1–2. The Third Circuit did not, nor could it, pass judgment on whether this Court's reinstallation order is justified. *Id.* Nor did the Third Circuit require Defendants to do, or not do, anything contrary to this Court's order.

Moreover, the Third Circuit did not stay the portion of the district court's order that enjoined Defendants "from taking any action to damage any exhibits, panels, artwork, or other items from the President's House site" and from "making any and all further changes to the President's House site, including the installation of replacement materials, without mutual

agreement of the City of Philadelphia during the pendency of this litigation or until further Order of the Court." *Id.* at 2. That is a far cry from Defendants' claim that the Third Circuit "has allowed NPS to display only the materials that it wants at the President's House." (Doc No. 44-1 at 13). Instead, the Third Circuit's order allows Defendants to restore removed materials so long as the City of Philadelphia agrees. In the unlikely event the City of Philadelphia disagrees with Defendants' effort to coordinate, Defendants can seek relief here.

Defendants next argue that because the park system is large and there are many different types of interpretive materials, it will take well more than the allotted time to resume prior distribution channels or reinstall removed exhibits. (*See, e.g.*, Doc No. 44-1 at 12). In support, Defendants suggest that "some of the removed materials . . . may have been disposed of." (*Id.*). That, too, amounts to little more than bald speculation insufficient to warrant a stay. *See New York*, 133 F.4th at 72. Defendant Bowron's declaration provides no help. She merely states that some of the materials "have likely been destroyed" and that "around 14 prior exhibits were destroyed" without identifying those materials. (Doc No. 44-2 ¶ 8; *see also* Doc No. 47 (requiring Defendants to provide an inventory of materials by June 17, 2026, at noon)). Instead, Defendant Bowron lists four examples of sites where waysides were removed and provides "estimate[s]" of the cost and time to replace materials. (Doc No. 44-2 ¶ 10). But Defendant Bowron does not claim those materials were destroyed or are otherwise unavailable, or in any way justify the estimates she provides. Instead, it is yet another example of Defendants simply asking the Court to "trust us."[4]

---

[4] Defendants also complain that the process will be "expensive." (Doc No. 44-1 at 13). The four examples of exhibit replacements in the Second Bowron Declaration (Doc No. 44-2 ¶ 10) total $11,300—roughly 0.0003% of the Park Service's $3.267 billion discretionary appropriation for fiscal year 2026. *See* Laura B. Comay, Cong. Rsch. Serv., IF13116, *National Park Service: FY2026 Appropriations* 1 (Feb. 27, 2026). And Defendants' complaints of staffing and funding issues ring especially hollow given the Park Service cuts this administration has imposed. *See, e.g.*, Eileen Sullivan, *Trump Shrank Staffing of National Parks. See How Many Are Struggling*, N.Y. Times (Sep. 1, 2025), https://www.nytimes.com/2025/08/27/us/politics/trump-cuts-national-parks.html.

Even assuming Defendants are correct that 14 exhibits were destroyed, that represents only a fraction of the "revision projects" Defendants concede have been completed. (*See id.* ¶ 8 ("[O]f approximately 100 completed revision projects reported under SO 3431, around 14 prior exhibits were destroyed as part of their removal.")). Defendants concede some removed exhibits "are likely still stored at or near the park." (*Id.*). For those, Defendants seem to suggest that reinstallation "would require the diversion of NPS staff resources" that would "likely cause impacts to visitors." (*See id.* ¶ 12). But once again, mere speculation does not demonstrate irreparable harm.

Further, Defendants concede that "[m]any" printed materials are generated by the park or a local vendor, which will "generally be easier" to replace, including, apparently, unigrid brochures. (*Id.* ¶¶ 15–16). While Defendants claim it "often takes several months to develop a new version of a park's unigrid brochure" (*id.* ¶ 16), and "take[s] months" to "develop" junior ranger booklets (*id.* ¶ 18), that is beside the point. No one is asking Defendants to "develop a new version," merely to revert to an old version. *NPCA II*, 2026 WL 1706963, at *29 (requiring Defendants to "list all interpretive materials that have been restored to their prior state as of May 19, 2025"). Defendants' claim that "[i]t would likely take several weeks" to "finalize an order and for the Government Printing Office to print and deliver" new copies of previous versions of unigrid brochures" (Doc No. 44-2 ¶ 16), and that the process would be similar for junior ranger booklets (*id.* ¶ 18), is unpersuasive. The Court provided Defendants three weeks to replace removed materials. *NPCA II*, 2026 WL 1706963, at *29. If Defendants move promptly to remedy their unlawful conduct, they can comply with the Court's order or seek limited extensions, even based on their wholly speculative timeline.[5] Finally, Defendants' stated concern

---

[5] To the extent the Court is persuaded by Defendants' claims that restoring the improperly removed materials within the ordered timeframe is not feasible, Defendants can seek necessary extensions justified by specific, and relevant, facts. (*Cf.* Doc No. 44-2 ¶ 6 (explaining that reviews were individualized to park sites); *id.*

14

about "impacts on visitors" rings hollow where Plaintiffs, representing literally millions of visitors, and thousands of others, have explained the detrimental impact of the removals. (*See, e.g.*, Doc No. 29-5 ¶ 43 (describing the harms to NPCA members' "informational, recreational, scientific, and educational interests"); Doc No. 29-8 ¶ 34 (NPCA member Jennifer Goepfert describing how "'America's largest classroom' has essentially shut its doors" to her family); Doc No. 29-7 ¶ 5 (AASLH member Donna Graves describing how "because of the Secretary's Order, [she] was forced into early retirement"); Doc No. 29-9 ¶ 25 (describing how "AASLH has also had to devote significant resources to mitigating the harms that have affected [their] members"); Doc No. 29-12 ¶ 19 (UCS describing how "[a]s long as the Secretary's Order censors relevant climate science, among other relevant knowledge, our national parks remain under threat and destruction"); Doc No. 29-6 ¶ 28 (SEGD describing how "[b]ecause of the Order, the Park Service is censoring the very type of interpretive design—that is, design that is inclusive and accessible—that [SEGD's] mission demands"); Doc No. 29-11 ¶ 18 (the Coalition describing how "[t]he censorship of history and science that is occurring in parks across the country threatens to undermine the integrity and credibility of the National Park Service"); Doc No. 29-10 ¶ 20) (ANPR describing how the Secretary's Order is a "derogation of the values for which the Park Service was established"); *cf. Analysis: Reporting signs that "disparage" American History*, Ctr. for W. Priorities (June 3, 2026), https://perma.cc/9JZG-FD84 ("An analysis of 35,700 submitted comments" through the QR codes posted at national parks revealed that "opposition to the sign removal order [was] near-unanimous, at 99.9 percent")).

Defendants' claimed harm is essentially that it would be time consuming and require effort to rectify the damage they caused, and that Plaintiffs, their members, and the public—those

---

¶¶ 8–13, 15–18 (explaining the varied circumstances in different parks regarding compliance with the Court's order)). In the meantime, there is no basis for an across-the-board stay relieving Defendants of their obligation to reinstate materials that they do not even claim present feasibility questions.

who the government is supposed to serve—should bear the brunt of rectifying the government's imposed damage. This complete disregard for the extensive irreparable harms that Plaintiffs and their members already face and will further contend with exemplifies Defendants' approach to implementing the Secretary's Order writ large. Defendants do nothing to counter the Court's detailed findings and explanation of the irreparable harms facing Plaintiffs and their members. Instead, they return to arguments this Court has already rejected, and conflate standing and irreparable harm. (*See generally* Doc No. 44-1 at 14–15; *NPCA II*, 2026 WL 1706963, at *26–27). The Court's earlier conclusions were thorough, well-reasoned, supported by extensive evidence, and correct.

The harms that Plaintiffs and their members are experiencing are severe, expansive, and irreparable, and those harms will be further exacerbated by any stay of the Court's order. The "touchstone of irreparable harm is that the injury is 'not easily measured or fully compensable in damages.'" *NPCA II*, 2026 WL 1706963, at *26 (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18–19 (1st Cir. 1996)). Those are precisely the types of harms that the Court recognized are at issue here. *Id.* at *25–26. Plaintiffs and their members have suffered aesthetic, recreational, and informational injuries traceable to the Secretary's Order. (*See, e.g.*, Doc No. 29-9 ¶¶ 34, 36). Many of these "harms are nonquantifiable by nature" and therefore irreparable. *NPCA II*, 2026 WL 1706963, at *25; *see also, e.g.*, *Nat'l Tr. for Historic Pres. v. Nat'l Park Serv.*, No. 25-cv-4316, 2026 WL 877779, at *14 (D.D.C. Mar. 31, 2026) ("Aesthetic and environmental injuries are typically irreparable because they are seldom . . . adequately remedied by money damages and are often permanent or at least of long duration." (omission in original) (internal quotation marks and citation omitted)); *City of Philadelphia*, 820 F. Supp. 3d at 342 ("Each person who visits the President's House and does not learn of the realities of

founding-era slavery receives a false account of this country's history."). Defendants' actions have also harmed Plaintiffs' relationships and reputations (*see, e.g.*, Doc No. 29-12 ¶¶ 13, 18; Doc No. 29-7 ¶¶ 28, 30–35; Doc No. 29-11 ¶ 17; Doc No. 29-10 ¶¶ 23–24; Doc No. 29-9 ¶¶ 30–32), which are difficult to measure and ordinarily irreparable. *Cf. Ross-Simons*, 102 F.3d at 20. Plaintiffs have lost income (Doc No. 29-7 ¶ 33; Doc No. 29-9 ¶ 28; Doc No. 29-10 ¶¶ 16, 23), and been forced to redirect resources and forgo activities aimed at preserving the parks because of the Secretary's Order (Doc No. 29-5 ¶ 41; Doc No. 29-9 ¶¶ 25–26; Doc No. 29-12 ¶ 16; Doc No. 29-6 ¶ 30). And Defendants' actions create obstacles for each Plaintiff organization to accomplish its mission (Doc No. 29-5 ¶¶ 34–36, 41; Doc No. 29-9 ¶¶ 21–26; Doc No. 29-10 ¶¶ 19–20; Doc No. 29-11 ¶ 12; Doc No. 29-6 ¶¶ 24–32; Doc No. 29-12 ¶¶ 15–18), which alone "provide[s] injury for purposes of irreparable harm." *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (cleaned up). Because Plaintiffs cannot be made whole later in the litigation by "traditional legal remedies," these harms are by definition irreparable. *NPCA II*, 2026 WL 1706963 at *25; *see also, e.g.*, *California v. Kennedy*, 802 F. Supp. 3d 273, 283 (D. Mass. 2025).

Moreover, the unique circumstances of this case demonstrate the severity of the harm here. The Secretary's Order has resulted in the removal and planned removal of materials that "were the product of years of care, stewardship, community collaboration, and public engagement," and that commemorate, memorialize, and celebrate the country, its people, and the "contributions to the ideals of freedom, democracy, and equity." *NPCA II*, 2026 WL 1706963, at *26. This is particularly pertinent in the lead up to July 4, 2026, a date Defendants identified as relevant for implementation of the Secretary's Order. As the Court recognized, "[b]ecause Defendants deemed it important to strip the parks of these undeniable truths in anticipation of the 250th Anniversary of our great Nation, it is equally important that our shared history be honestly

17

told and fully restored by the 250th Anniversary to properly honor the remarkable achievements of the United States." *Id.* at *28.

The broader public would also be harmed by a stay pending appeal. This Court emphasized that "the public ultimately bears the brunt of Defendants' actions," as "[e]veryday park visitors . . . look to the National Park system to learn and enhance their understanding of history, science, and this Nation." *Id.* at *27. A stay would allow the Order's considerable public harms to continue despite this Court's conclusion that the Order is likely unlawful. Those harms are difficult to overstate: "the Order erases the history of countless people; alienates communities from public spaces; limits the availability of scientific information relevant to ensuring the long-term preservation of the parks themselves; and impairs the mission of the [Park Service] to preserve the parks 'for the enjoyment, education, and inspiration of this and future generations.'" *Id.* And a stay would relieve Defendants of their obligation to restore materials in time for "the 250th anniversary of our Nation's creation," which would further damage the public interest. *Id.*

Defendants say the public has an interest in avoiding "disruption" of park services during the period in which interpretive materials would supposedly be unavailable "due to the infeasibility of obtaining suitable replacement materials." (Doc No. 44-1 at 15). As discussed above, Defendants fail to substantiate this argument that compliance with the Court's order will affect park services. And Defendants themselves "disrupted" the public's interest in accessing accurate historical and scientific information in the parks by adopting and implementing the Secretary's Order. They can hardly complain now that undoing the effects of the Order is detrimental to the public interest.[6]

---

[6] Defendants also assert that the public has an interest in "the proper functioning of government and maintenance of interbranch comity." (Doc No. 44-1 at 15). But the Court's order poses no threat to that interest, and it is well settled that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *NPCA II*, 2026 WL 1706963, at *26 (alteration in original) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).

**CONCLUSION**

Because Defendants have not demonstrated that a stay is warranted or that the Court's existing order should be disturbed, the Court should deny Defendants' motion for a stay pending appeal.

Date: June 17, 2026

Respectfully submitted,

*/s/ Brooke Menschel*

Brooke Menschel* (NY Bar No. 5004692)
Michael J. Torcello* (DC Bar No. 90014480)
Pablo A. Moraga* (DC Bar No. 90037895)
Steven Y. Bressler* (DC Bar No. 482492)
Robin F. Thurston* (DC Bar No. 1531399)
Mark B. Samburg (Mass. BBO No. 680099)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
T: (202) 448-9090
F: (202) 796-4426

*Counsel for the Plaintiffs*
*Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Brooke Menschel

Brooke Menschel